1   PAMELA PHILLIPS (No. 87581)
    pphillips@howardrice.com
2   AMY L. BOMSE (No. 218669)
    abomse@howardrice.com
3   HOWARD RICE NEMEROVSKI CANADY
         FALK & RABKIN
4   A Professional Corporation
    Three Embarcadero Center, 7th Floor
5   San Francisco, California  94111-4024
    Telephone:   415/434-1600
6   Facsimile:   415/677-6262

7   Attorneys for Defendant NETGEAR, INC.
    (APPEARING SPECIALLY FOR MOTION
8   TO DISQUALIFY)

9

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                  SAN JOSE DIVISION

13

14   FUJITSU LIMITED,                    No. CV 10-03972 LHK (HRL)

15              Plaintiff,               Action Filed: September 3, 2010

16        v.                             DEFENDANT NETGEAR, INC.'S
                                         MOTION TO DISQUALIFY BAKER
17   BELKIN INTERNATIONAL, INC.,         BOTTS AND FOR STAY PENDING
     BELKIN, INC., D-LINK CORPORATION,   RESOLUTION OF THIS MOTION
18   D-LINK SYSTEMS, INC., NETGEAR,
     INC., ZYXEL COMMUNICATIONS         Date:      December 16, 2010
19   CORPORATION, and ZYXEL             Time:      1:30 p.m.
     COMMUNICATIONS, INC.,              Place:     Courtroom 4, 5th Floor
20                                      Judge:     Hon. Lucy H. Koh
                Defendants.
21                                      Trial Date:   None

22

23

24

25

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

MOTION TO DISQUALIFY                    CV10-03972 LHK (HRL)

# TABLE OF CONTENTS

|  |  |  |  | Page |
|---|---|---|---|---|
| INTRODUCTION |  |  |  | 1 |
| I. | FACTUAL BACKGROUND. |  |  | 1 |
|  | A. | The Ruckus Litigation. |  | 2 |
|  | B. | NETGEAR Retains Baker Botts For The Ruckus Reexamination. |  | 3 |
|  | C. | Baker Botts' Representation Of NETGEAR On Indemnification Matters. |  | 4 |
|  | D. | Baker Botts Seeks A Conflict Waiver From NETGEAR To Represent Fujitsu In Asserting Patent Infringement Claims Against NETGEAR. |  | 5 |
|  | E. | The Instant Litigation Against NETGEAR. |  | 9 |
|  | F. | Baker Botts' Efforts To Rewrite History. |  | 9 |
| ARGUMENT |  |  |  | 10 |
|  | A. | Baker Botts Is Automatically Disqualified Because It Violated Its Duty Of Loyalty By Assisting One Current Client, Fujitsu, In Asserting A Patent Infringement Claim Against Another Current Client, NETGEAR. |  | 10 |
|  | B. | The Baker Botts Attorneys Who Worked for NETGEAR Are Disqualified Because They Received Material Confidential Information. |  | 15 |
|  | C. | The Baker Botts Attorneys Who Worked for NETGEAR Are Disqualified Because There Is A Substantial Relationship Between This Lawsuit And Baker Botts' Prior Representations Of NETGEAR. |  | 17 |
|  | D. | The Entire Baker Botts Firm Must Be Disqualified From This Case. |  | 20 |
|  | E. | The Court Should Stay This Action Pending Resolution Of NETGEAR's Motion to Disqualify. |  | 21 |
| CONCLUSION |  |  |  | 22 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

5
*City & County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839
(2006) ............................................................................................................. 11

6
*CMAX, Inc., v. Hall*, 300 F.2d 265 (9th Cir. 1962) ........................................... 21

7
*Earl Scheib, Inc. v. Superior Court*, 253 Cal. App. 2d 703 (1967) .................. 16

8
*EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459 (Fed. Cir. 1984) ..................... 23

9
*Flatt v. Superior Court*, 9 Cal. 4th 275 (1994) ........................... 10, 11, 18, 20

10
*Genentech, Inc. v. Sanofi-Avenis Deutschland GMBH*, No. C 08-04909 SI,
2010 WL 1136478 (N.D. Cal. 2010) ........................................................... 10

11
*H.F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d 1445 (1991) .. 18

12
*Henriksen v. Great Am. Sav. & Loan*, 11 Cal. App. 4th 109 (1992) ................. 20

13
*Hulbert v. Cheeks*, No. 07 C 423, 2007 WL 2076031 (N.D. Ill. July 17, 2007) ... 23

14
*Image Technical Servs., Inc. v. Eastman Kodak Co.*, 820 F. Supp. 1212 (N.D.
Cal. 1993) ..................................................................................................... 14

15

16
*In re Jordan*, 12 Cal. 3d 575 (1974) ................................................................. 15

17
*Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698 (2003) ........... 17, 19, 20

18
*Landis v. N. Am. Co.*, 229 U.S. 248 (1936) ...................................................... 21

19
*Miller v. Metzinger*, 91 Cal. App. 3d 31 (1979) ............................................... 10

20
*People ex rel. Dept. of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th
1135 (1999) ................................................................................................... 20

21
*Quark, Inc. v. Power Up Software Corp.*, 812 F. Supp. 178 (D. Colo. 1992) ... 22

22
*River West, Inc. v. Nickel*, 188 Cal. App. 3d 1297 (1987) ............................... 18

23
*Styles v. Mombert*, 164 Cal. App. 4th 1163 (2009) .......................................... 16

24
*Truck Ins. Exch. v. Fireman's Fund Ins*. Co., 6 Cal. App. 4th 1050 (1992) ..... 11

25
*Unified Sewerage Agency v. Jelco, Inc.*, 646 F.2d 1339 (9th Cir. 1981) ...... 10, 11

26
*Yorn v. Superior Court*, 90 Cal. App. 3d 669 (1979) ....................................... 16

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

**Page(s)**

## Statutes

Bus. & Prof. Code §6068(e)(1) ......................................................... 15

Civ. Code
    §1638 ............................................................................................ 13
    §1641 ............................................................................................ 14

Civ. L. R. 11-4(a) ............................................................................... 10

Cal. R. Prof'l Cond.
    3-100, Discussion §1 ................................................................. 16
    3-310(A) ................................................................................ 13, 14
    3-310(C)(3) ............................................................................ 12, 13
    3-310(E) ..................................................................................... 16

## Other Authorities

*Webster's Third New International Dictionary* 1821 (3d ed. 2002) ....... 13

## INTRODUCTION

The facts behind the instant motion to disqualify Baker Botts illustrate why there are ethics laws to govern attorney conduct. Having agreed to represent NETGEAR in two separate matters and having spent several months communicating with NETGEAR about them, Baker Botts realized that its longstanding work for another client was about to ripen into a lucrative opportunity to file a lawsuit against NETGEAR for patent infringement. Baker Botts asked NETGEAR to waive this direct conflict, but when NETGEAR declined, the firm fired NETGEAR. Then, to add insult to injury, Bake Botts denied that it had ever represented NETGEAR.

It is understandable why Baker Botts wants to distance itself from its two prior representations of NETGEAR. First, when Baker Botts took NETGEAR on as a client, it had a duty to be candid about any conflicts between it and NETGEAR. It also had a duty not to engage in conduct adverse to NETGEAR. Baker Botts knows that it violated both of those duties and that the penalty for those violations is its automatic, mandatory disqualification from this case. Second, during its representations of NETGEAR, Baker Botts attorneys obtained confidential information that is material to this lawsuit. Third, the subject matter of Baker Botts' prior representations of NETGEAR is substantially related to the subject matter of this litigation. Because Baker Botts violated its duties of candor and loyalty to NETGEAR, and has put NETGEAR's confidential information at risk, the firm must be disqualified from representing Fujitsu in this patent suit.

## I. FACTUAL BACKGROUND.

In order to understand why Baker Botts must be disqualified from this lawsuit, the Court needs to understand the relationships between three separate matters. The first matter is this dispute between Fujitsu and NETGEAR, which arises out of Fujitsu's contention that NETGEAR infringes one of Fujitsu's patents. That dispute first arose back in 2002, detoured through a reexamination proceeding before the United States Patent & Trademark Office ("PTO"), and has now culminated in this patent infringement lawsuit. The second matter involves patent infringement disputes between Ruckus Wireless and NETGEAR.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    Those disputes are being litigated in two patent infringement suits pending in this court, and
2    in a related reexamination proceeding pending before the PTO.   In the third matter,
3    NETGEAR hired Baker Botts to handle certain indemnification claims NETGEAR might
4    have against third parties for liability NETGEAR incurs in certain patent infringement
5    matters.  These three separate sets of proceedings overlap in subject matter and time.

6        In the first set of proceedings, Baker Botts represents Fujitsu adverse to NETGEAR.
7    While representing Fujitsu in those proceedings, Baker Botts took NETGEAR on as a client
8    in the Ruckus reexamination proceeding and on the indemnification issues.   Baker Botts
9    represented NETGEAR for several months on those two matters before it fired NETGEAR
10   in an attempt to avoid the conflicts created by its adversity to NETGEAR that was about to
11   erupt in this lawsuit.

### A.    The Ruckus Litigation.

12
13       In May 2008, Ruckus Wireless ("Ruckus"), a developer of Wi-Fi technology, filed a
14   lawsuit against NETGEAR in the U.S. District Court for the Northern District of California.
15   Declaration Of Brian Busse In Support Of Defendant NETGEAR, Inc.'s Motion To
16   Disqualify Baker Botts ("Busse Decl." and "NETGEAR's Motion"), ¶3; Request For
17   Judicial Notice In Support Of NETGEAR's Motion ("RJN"), Ex. A.  Ruckus alleges that
18   NETGEAR infringes U.S. Patent Nos. 7,358,912 and 7,193,562 in the course of deploying
19   Wi-Fi antenna array technology in its WPN824 RangeMax Wireless Router ("WPN824"), a
20   high-speed wireless router that employs multiple antenna configurations to enable faster and
21   more stable connections.   Busse Decl. ¶7.   The Ruckus patents describe methods and
22   apparatuses of wirelessly transmitting signals through the deployment of an antenna array to
23   create particular radiation patterns.  *Id.*

24       Ruckus also sued Rayspan Corporation ("Rayspan") alleging similar claims of patent
25   infringement.  Busse Decl. ¶4.  Declaration Of Sandra Godsey In Support Of NETGEAR's
26   Motion ("Godsey Decl.") ¶2.  Shortly after the lawsuit was filed, NETGEAR and Rayspan
27   agreed to a formal common defense and joint defense arrangement.   As part of this
28   arrangement, NETGEAR and Rayspan agreed to share common counsel and defense costs.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    Busse Decl. ¶4.

2         NETGEAR and Rayspan hired counsel to represent them in their defense of Ruckus'

3    patent infringement claims and simultaneously to pursue a reexamination of the Ruckus

4    patents in the PTO.  Busse Decl. ¶5.  On November 28, 2008, a reexamination was ordered

5    with respect to certain claims of the '562 patent, and on December 2, 2008, reexamination

6    was granted with respect to the '912 patent.  *Id.*  The reexaminations and related appeals are

7    currently proceeding in the PTO.   The Court ordered a litigation stay while the

8    reexaminations proceed in the PTO, and the litigation stay remains in effect.  *Id.*

9         On November 4, 2009, Ruckus filed a new complaint in the Northern District of

10   California, alleging that NETGEAR and Rayspan infringe a patent that is related to the

11   patents previously asserted against them.  Busse Decl. ¶6.  RJN Ex. B.  As with the previous

12   Ruckus action, the WPN824 RangeMax wireless router is the allegedly infringing device.  In

13   March 25, 2010, the Court ordered a stay in the second lawsuit until the reexamination

14   proceeding for the '562 Patent in the first Ruckus lawsuit against NETGEAR and Rayspan is

15   completed.  *Id.*

16        Around the time that Ruckus filed the second lawsuit against NETGEAR and Rayspan,

17   both NETGEAR and Rayspan began contemplating changing counsel for both the

18   reexamination proceedings and litigation.  Busse Decl. ¶8; Godsey Decl. ¶3.  The parties

19   contacted Barton Showalter, a partner at Baker Botts, based on a recommendation

20   Ms. Godsey had received from other counsel.  Godsey Decl. ¶3.  NETGEAR had also

21   already been speaking to Baker Botts about possibly representing NETGEAR with respect to

22   indemnification matters.  Declaration Of Andrew Kim In Support Of NETGEAR's Motion

23   ("Kim Decl.") ¶4.

24        **B.    NETGEAR Retains Baker Botts For The Ruckus Reexamination.**

25        In mid-November, Brian Busse, Director of Intellectual Property at NETGEAR, and

26   Sandy Godsey, Chief IP Counsel for Rayspan, began talking to Mr. Showalter about

27   possibly stepping in to represent those two companies in the *Ruckus v. NETGEAR* litigation

28   and/or the reexamination proceedings at the PTO.  Busse Decl. ¶8; Godsey Decl. ¶4.  Baker

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    Botts was pitching to win both representations.  Busse Decl. ¶8; Godsey Decl. ¶6.

2         On December 10, 2009, NETGEAR and Rayspan confirmed to Mr. Showalter that they

3    wanted to retain Baker Botts to represent them in the '562 (Ruckus) reexamination

4    proceedings.   Busse Decl. ¶10.   On January 4, 2010, Mr. Showalter sent a formal

5    engagement letter, stating that Baker Botts was "pleased to have the opportunity to represent

6    both NETGEAR and Rayspan in the inter partes reexamination involving U.S. Patent No.

7    7,193,562."  Id.  The engagement letter also confirmed that Baker Botts had performed a

8    conflicts check and that it was free to undertake the Ruckus examination representation.  Id.

9    Mr. Busse and Ms. Godsey signed and returned the engagement agreements.  Id.; Godsey

10   Decl. ¶6.

11        Between November 2009 and February 2010, Mr. Busse and Ms. Godsey had

12   numerous substantive calls with Mr. Showalter and other partners at Baker Botts.  Busse

13   Decl. ¶¶8, 9, 10; Godsey Decl. ¶¶4, 5, 7, 8.  During these calls, NETGEAR and Rayspan in-

14   house counsel shared with Mr. Showalter and other Baker Botts attorneys confidential

15   information about strategy for the Ruckus reexamination and the Ruckus patent litigation,

16   the interpretation of the Ruckus patents and their claims, and the product (the WPN824) and

17   technology at issue in this lawsuit.  Busse Decl. ¶¶8-12; Godsey Decl. ¶¶4-8.  In fact, the

18   information that Rayspan and NETGEAR needed to disclose to Baker Botts was so sensitive

19   that Rayspan Chief Technical Officer, Maya Achour, insisted that Bart Showalter sign a

20   non-disclosure agreement, which he did.  Godsey Decl. ¶4.

21        **C.    Baker Botts' Representation Of NETGEAR On Indemnification Matters.**

22        Around the same time period, NETGEAR also retained Baker Botts for a second

23   matter: to serve as NETGEAR's outside counsel in pursuing patent infringement

24   indemnification claims against NETGEAR's various chipset suppliers and original design

25   manufacturers.  Busse Decl. ¶13.  NETGEAR contacted Baker Botts for representation on

26   indemnification matters based on a recommendation that NETGEAR's General Counsel,

27   Andrew Kim, had received in April, 2009 from an attorney at Cisco Systems.  Kim Decl. ¶4.

28   On January 11, NETGEAR signed a separate engagement agreement, this one signed by

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    Kurt Pankratz and Brian Busse.  Busse Decl. ¶13.

2         To enable Baker Botts to pursue NETGEAR's suppliers, Mr. Busse provided Baker

3    Botts with confidential information including indemnification agreements, his thoughts on

4    the strength of NETGEAR's indemnification rights, information about settlement

5    agreements from other patent litigation and communications that NETGEAR has had with

6    its major suppliers over indemnification rights.  Busse Decl. ¶13.

7         **D.    Baker Botts Seeks A Conflict Waiver From NETGEAR To Represent
         Fujitsu In Asserting Patent Infringement Claims Against NETGEAR.**
8

9         When NETGEAR retained Baker Botts, it agreed to waive two conflicts.  First, when

10   NETGEAR contacted Kurt Pankratz about the possibility of representing NETGEAR with

11   respect to its indemnification agreements, Mr. Pankratz informed NETGEAR that Baker

12   Botts had a conflict with another client, MOSAID.  Busse Decl. ¶¶14-15.  Brian Busse

13   discussed the conflict with Mr. Pankratz at some length, and ultimately decided that

14   NETGEAR would agree to waive the conflict.  *Id.* ¶15.  This waiver is set forth in detail in

15   the January 11, 2010 engagement agreement under the heading "Existing Adverse Matter

16   Conflict Waiver."  *Id.*  In that letter, Baker Botts identified the fact that it had a potential

17   conflict with MOSAID, and warned NETGEAR of the adverse consequences of giving the

18   waiver.  *Id.*

19        Second, at Baker Botts' request, NETGEAR granted a limited advance waiver of

20   certain prospective conflicts.  Busse Decl. ¶16.  Specifically, Baker Botts asked NETGEAR

21   to agree that Baker Botts "may represent a party with interests directly adverse to yours, so

22   long as the adverse representation is *not substantially related* to the matters we have been

23   engaged to handle on your behalf"  *Id.*  NETGEAR agreed to grant the prospective waiver

24   based on Baker Botts' express representation that the waiver applied only to unrelated

25   matters.  *Id.*  To induce NETGEAR to agree to the waiver, Baker Botts assured NETGEAR

26   that it would "give careful consideration to the needs of both clients before undertaking any

27   such [adverse] representation."  *Id.*  Baker Botts did not keep that promise.

28        On February 1, 2010, NETGEAR received a demand letter from Fujitsu, asserting that

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

NETGEAR infringed one of Fujitsu's patents. Busse Decl. ¶17. Mr. Showalter was copied on this letter. *Id*. Not realizing that there was a connection between the Fujitsu demand letter and the work that Baker Botts was undertaking for NETGEAR, Mr. Busse continued to prepare for a meeting with Bart Showalter and Rayspan that had been set to take place on February 11. Busse Decl. ¶18. On February 5, Mr. Busse sent Mr. Showalter confidential information related to the WPN824. On February 8, Mr. Busse sent Mr. Pankratz (who was handling the indemnification matters) Mr. Busse's own confidential analyses of indemnity claims and historical indemnity settlements and terms with its third party vendors. *Id*.

On February 8, after receiving this confidential information, Kurt Pankratz called Mr. Busse to request an additional conflict waiver. Busse Decl. ¶18. Mr. Pankratz told Mr. Busse that a conflict had just come to the attention of Baker Botts involving its existing client, Fujitsu. *Id*. Mr. Pankratz explained that Baker Botts (and Bart Showalter, in particular) had earlier represented Fujitsu in negotiations between Fujitsu and NETGEAR over a possible license of U.S. Patent Re 36,769 (the '769 Patent) patents. *Id*. In 2005, Fujitsu had put the patent into reexamination, and the PTO had recently confirmed the validity of the patent. *Id*. Thus, Mr. Pankratz explained, it was possible that Fujitsu would attempt to assert the patent against NETGEAR in the future in light of the reconfirmation of Fujitsu's patent. Mr. Pankratz explained that Baker Botts wanted NETGEAR to agree that Baker Botts could represent Fujitsu in a patent lawsuit against NETGEAR if such litigation occurred. Mr. Busse did not consent to the waiver during that call, but he did agree to look into the nature of the Fujitsu patent dispute and the facts that Mr. Pankratz had disclosed. *Id*.

After the call, Mr. Busse researched NETGEAR's prior negotiations with Fujitsu over the '769 patent. Busse Decl. ¶19. He learned that there had been two meetings in 2003 and early 2004, but that the negotiations had broken off without resolution in mid-2004. *Id*. ¶¶20-21. On NETGEAR's side, its negotiations with Fujitsu had been handled by NETGEAR's outside counsel. *Id*. ¶20 In fact, the entire negotiation ended before NETGEAR had hired any internal counsel, which is why neither Mr. Busse nor NETGEAR's General Counsel, Andrew Kim, knew anything about the negotiations over the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

'769 patent or about Baker Botts' representation of Fujitsu in this matter. *Id.* ¶21; Kim Decl. ¶2. Baker Botts and Mr. Showalter should have been aware of that representation, of course, but had not disclosed it to NETGEAR back in November 2009, when Baker Botts pitched to represent NETGEAR.[1]

After the call with Mr. Pankratz, Mr. Busse also studied the demand letter NETGEAR had received from Fujitsu. Busse Decl. ¶20. Fujitsu's letter demanded that NETGEAR obtain a license to use the technology covered by the '769 patent. *Id.* In this letter, Fujitsu also asserted infringement by NETGEAR's WPN824, the very product at issue in the Ruckus matter. As a result of his research, Mr. Busse concluded that NETGEAR could not grant Baker Botts the conflict waiver it requested, because Fujitsu's potential infringement claim against NETGEAR—the subject of which is now this lawsuit—was too closely related to the work that Baker Botts was already doing for NETGEAR. *Id.* ¶20.

Before Mr. Busse could communicate his decision to Baker Botts, he was surprised to receive a proposed waiver from Mr. Pankratz which misleadingly purported to "confirm formally [Mr. Busse's] oral consent to our representation of Fujitsu in connection with [its assertion of patent '769]." Busse Decl. ¶24. Mr. Busse had never agreed to waive the Fujitsu conflict. *Id.*

When NETGEAR subsequently told Mr. Showalter that it would not waive the



HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

---

[1]Given Mr. Showalter's extensive involvement in the negotiations adverse to NETGEAR, it is astonishing that he did not disclose this conflict to NETGEAR in November 2009. As a result of Mr. Busse's investigation in February 2010 he learned the following details about Mr. Showalter's involvement. On March 19, 2002, an executive of Fujitsu wrote to NETGEAR offering to license the '769 patent. Busse Decl. ¶19. NETGEAR retained Jamie DiBoise and other lawyers at Wilson, Sonsini, Goodrich & Rosati in connection with Fujitsu's asserted patent rights. *Id.* After NETGEAR's counsel responded to Fujitsu that a license was not needed and that a number of the '769 Patent claims appeared invalid over the prior art, Mr. Busse learned (in February 2010) that Mr. Showalter had taken over communications on behalf of Fujitsu. *Id.*

The parties met face-to-face in California twice, first on June 18, 200 and again on July 26, 2004. Busse Decl. ¶20 Showalter attended the both meeting for Fujitsu. Mr. Showalter and Mr. DiBoise also exchanged numerous letters, which presented detailed facts and arguments concerning the validity of the '769 Patent and Fujitsu's assertion that NETGEAR needed to license the patent. *Id.* Discussions between NETGEAR and Fujistu broke down after the July 2004 meeting.

conflict, Mr. Showalter intimated that he would withdraw from representing NETGEAR unless it agreed to the waiver. Busse Decl. ¶26. Mr. Busse was shocked that Mr. Showalter would threaten to withdraw, especially when NETGEAR had a rebuttal brief due in the Ruckus reexam within a few weeks. *Id.* Mr. Showalter knew that NETGEAR and Rayspan were under a tight deadline in the PTO. Two months earlier, on November 25, 2009, he had urged Mr. Busse to act quickly in retaining Baker Botts. "If you want Baker Botts to take over the reexamination, we need to move quickly to transfer responsibility." *Id.*

Having found himself with a thorny conflict between two current clients who were adverse on a substantially related matter, Mr. Showalter also began to try to "fix" his problem by suggesting that he had not yet "taken on" the representation of NETGEAR.

> Hey Brian, it's Bart. Yeah, I talked to our general counsel and sort of walked them through the basic facts without disclosing the underlying details, but the basic facts and he agrees with me, it's an ethical issue—not just business relationship—it's an ethical issue that there is an outstanding, ongoing, adverse matter and *I cannot take on a representation of Netgear without a waiver* when there is an ongoing adverse matter. That's kind of his, sort of, policy and I sort of walked through some options with him and he basically said no, I think you're going to get yourself into an ethical quagmire because you've got an ongoing adverse representation which I didn't think was very ongoing until you told me about this recent letter so why don't you give me a call and maybe we can talk through it. But, I don't see how I can move forward without a waiver and it sounds like you don't feel comfortable and I completely understand on the waiver side to the extent it's going to spill over into some litigation strategy or potentially even litigation representation. (*Id.* ¶40 & Ex. 10)

In fact, at the time of this voicemail, Mr. Showalter had been advising NETGEAR and Rayspan for three months and had personally signed an engagement agreement with NETGEAR on January 4. Busse Decl. ¶¶8-12; Godsey Decl. ¶¶4-9.

On February 28, 2010, Mr. Busse wrote a detailed letter to Baker Botts explaining why Baker Botts' representation of Fujitsu adverse to NETGEAR was related to the work that Baker Botts was doing for NETGEAR. Busse Decl. ¶27. Mr. Busse confirmed that NETGEAR wanted Baker Botts to continue the work that it had begun for NETGEAR, including moving forward with the indemnification claims and representing NETGEAR in the PTO proceeding, rather than representing Fujitsu in a patent infringement suit against NETGEAR.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    In early March 2010, Baker Botts made one last pitch to NETGEAR for a waiver, this

2    time offering to erect an ethical wall between the attorneys handling the NETGEAR and

3    Fujitsu representations.  Busse Decl. ¶28.  When NETGEAR declined once again to waive

4    the conflict, Messrs. Pankratz and Showalter informed Mr. Busse that Baker Botts was firing

5    NETGEAR as a client in both matters, the Ruckus reexamination and the indemnification

6    matters.  NETGEAR and Rayspan were forced to retain other counsel to replace Baker

7    Botts.  *Id.*; Godsey Decl. ¶10.

8    ### E.    The Instant Litigation Against NETGEAR.

9    On September 3, 2010, Fujitsu filed the instant lawsuit against NETGEAR, represented

10   by Baker Botts.  In this lawsuit, Fujitsu alleges that NETGEAR infringes the '769 patent by

11   selling wireless interface cards and routers, including but not limited to the NETGEAR

12   RangeMax NEXT series of wireless interfaces, which series includes the WPN824, the

13   accused product in the Ruckus litigation.  Busse Decl. ¶29, *Fujitsu Ltd. v. Belkin Int'l, Inc.*,

14   *et al.*  ¶17 [Docket No. 1] ("Fujitsu Complaint").

15   ### F.    Baker Botts' Efforts To Rewrite History.

16   After receiving Fujitsu's complaint, Mr. Busse received a letter from George Lamb, the

17   Deputy General Counsel for Baker Botts, purporting to respond—seven months later—to the

18   concerns that Mr. Busse had raised in his February 28, 2010 letter.  In Baker Botts' letter, its

19   counsel, Mr. Lamb, sought to rewrite history, continuing with the pretense that Baker Botts

20   had actually *declined* the representation of NETGEAR.

> Our tender of the February 15, 2010 [waiver] letter at the outset of the *proposed* Netgear engagements was to eliminate the possibility of just the sort of conflict concerns you have raised.  Netgear certainly had the right to refuse to agree to the letter, but ***Baker Botts also had the right to refuse the proposed Netgear engagements—which we did***.  Although we do not believe our representation of Netgear would have presented any conflicts of interest, it was clear to us that you felt differently.  Not wishing ***to begin a relationship*** with Netgear by having an argument over conflicts, and also not wishing to imperil our long attorney-client relationship with Fujitsu in connection with the Ozawa Patent infringement claim, ***Baker Botts was forced to decline both Netgear engagements***.  Baker Botts never appeared as counsel for Netgear in the Ruckus Patent reexamination proceeding, and we have never sent Netgear a bill for legal services in connection with any matter.  (Busse Decl. ¶30 & Ex. 2) (emphasis added).

28   In fact, Baker Botts' representation of NETGEAR had been ongoing since November 2009,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   and two formal engagement letters between Baker Botts and NETGEAR had been signed in

2   early January 2010.  Baker Botts did not decline to represent NETGEAR, it fired its existing

3   client in a futile attempt to cure its conflict.  Busse Decl. ¶31; Godsey Decl. ¶10.[2]

4                                              **ARGUMENT**

5          Under the local rules of this Court, every attorney practicing in the Northern District of

6   California must comply with the rules of professional conduct for California.  Civ. L.R. 11-

7   4(a).  Accordingly, federal courts in California apply California law regarding motions to

8   disqualify counsel.  *Genentech, Inc. v. Sanofi-Avenis Deutschland GMBH*, No. C 08-04909

9   SI, 2010 WL 1136478, at *4 (N.D. Cal. Mar. 20, 2010).

10   **A.   Baker Botts Is Automatically Disqualified Because It Violated Its Duty Of Loyalty By Assisting One Current Client, Fujitsu, In Asserting A Patent Infringement Claim Against Another Current Client, NETGEAR.**

11

12          California law prohibits an attorney from representing a client and at the same time

13   being adverse to that client on any matter without the client's informed written consent.

14   *Flatt v. Superior Court*, 9 Cal. 4th 275, 284 (1994).  The prohibition applies even where the

15   matters on which the attorney represents the two clients have nothing in common.  *Id.*

16   ("Even though the simultaneous representations may have *nothing* in common and there is

17   *no* risk that confidences to which counsel is a party in the one case have any relation to the

18   other matter, disqualification may nevertheless be *required*.")  The interest at stake in such a

19   conflict is the attorney's duty of loyalty (as opposed to the duty of confidentiality).  *Unified*

20   *Sewerage Agency v. Jelco, Inc.*, 646 F.2d 1339, 1345 (9th Cir. 1981).

21          The reason for the rule is evident, even (or perhaps especially) to the nonattorney.

22          A client who learns that his lawyer is also representing a litigation adversary,

23          even with respect to a matter *wholly unrelated* to the one for which counsel was
           retained, cannot long be expected to sustain the level of confidence and trust that

24          [2]Mr. Lamb goes on to assert that "Baker Botts never appeared as counsel for Netgear in

25   the Ruckus Patent reexamination, and we have never sent Netgear a bill for legal services in
     connection with any matter."  Neither point helps erase the fact that Baker Botts  represented

26   NETGEAR.  With respect to the first point, the reason that Baker Botts never appeared in
     the reexamination is that the firm fired NETGEAR weeks before it was supposed to make its

27   first appearance and file a rebuttal brief.  Busse Decl. ¶¶25, 29.  With respect to the second
     point, the fact that an attorney did not charge a fee for his services does not prove that there

28   was no attorney-client relationship.  *Miller v. Metzinger*, 91 Cal. App. 3d 31, 39 (1979).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

is one of the foundations of the professional relationship.  (*Flatt*, 9 Cal. 4th at 285)

Because the conflict is considered to be so grave, the rule for disqualification of an attorney who acts adversely to one of his current clients without its consent is more stringent than the rule used when an attorney wants to be adverse to a *former* client.  When an attorney acts adversely to a current client without its consent, disqualification is *per se* and automatic.  *Flatt*, 9 Cal. 4th at 284; *City & County of San Francisco v. Cobra Solutions, Inc.*, 38 Cal. 4th 839, 846-47 (2006).

Furthermore, an attorney cannot cure his conflict and avoid disqualification by dropping the less favored client once a conflict arises.  *Truck Ins. Exch. v. Fireman's Fund Ins*. Co., 6 Cal. App. 4th 1050, 1057 (1992).  "If this were not the case, the challenged attorney could always convert a present client into a 'former client' by choosing when to cease to represent the disfavored client.  *Id.* (quoting *Jelco* at 1345 n.4); *see also Flatt*, 9 Cal. 4th at 288 ("So inviolate is the duty of loyalty to an existing client that not even by withdrawing from the relationship can the attorney evade it").

Here, according to Baker Botts' own deputy general counsel, Baker Botts took on NETGEAR as a client while, at the very same time, it was actively assisting Fujitsu in asserting claims *against* NETGEAR.   Busse Decl. ¶27 & Ex. 2 ("Baker Botts has represented Fujitsu—against Netgear on the ['769] Patent—for more than seven years . . . *When the ['769] Patent came out of reexamination in* **December 2009***, Fujitsu,* <u>*with the*</u> <u>*counsel of Baker Botts, continued to assert its infringement claim against Netgear*</u>").  In that same month, when NETGEAR confirmed it wanted Baker Botts to represent it, Baker Botts failed to disclose to NETGEAR that it had an ongoing relationship with Fujitsu that was adverse to NETGEAR.  Busse Decl. ¶21.  Instead, Baker Botts accepted the representation and allowed NETGEAR to reveal confidential information about its products and its litigation strategy while Mr. Showalter, or one of his colleagues, was, according to its own in-house counsel's admission, assisting Fujitsu to "assert its infringement claim against NETGEAR."   Then, after Fujitsu sent its demand letter, Baker Botts tried to convince

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   NETGEAR to waive the conflict, which it disingenuously described as a "potential conflict."

2   When NETGEAR refused, Baker Botts abandoned NETGEAR without regard to the

3   prejudice its actions would cause.  This conduct is the very essence of disloyalty, and Baker

4   Botts must be disqualified.[3]

5      Baker Botts also violated Rule 3-310(C)(3) of the California Rules of Professional

6   Conduct when it took NETGEAR on as a client (a) without disclosing that Baker Botts was

7   already adverse to NETGEAR on the Fujitsu matter and (b) without obtaining NETGEAR's

8   written consent.  Under Rule 3-310(C)(3), if an attorney is representing a client on a matter

9   ("Matter #1) and, at the same time, wants to accept as a client in a new matter (Matter #2)

10   someone who has an interest in Matter #1 that is adverse to the interests of the client the

11   attorney is already representing in Matter #1, then the attorney must obtain both clients'

12   consent – that of the attorney's existing client in Matter #1 and that of the new client who the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

[3]The reexamination file for the '769 Patent confirms Mr. Lamb's admission that Baker Botts's representation of Fujitsu continued throughout the entire reexamination process and even after Baker Botts accepted NETGEAR as a client.  On May 18, 2005, Fujitsu – represented by Showalter – filed a request for ex parte reexamination of the '769 Patent with the PTO.  Busse Decl. ¶33 In this request, Showalter wrote:

> [S]ince the issuance of the '679 [sic] Patent, various third parties (the "Third Parties") have identified various references that were not cited during the examination of the application that underlies the '679 Patent.  The Third Parties have asserted a belief that the references raise a substantial new question of patentability.  Fujitsu Limited files this Request to resolve any substantial new question of patentability with respect to the references identified herein.  *Id.*

The references identified in the request include all of the references that NETGEAR cited to Baker Botts during the 2002 through 2004 licensing discussions, which NETGEAR asserted invalidated the '769 Patent.  Busse Decl. Ex. 4 at 20.

Baker Botts followed up with additional filings in the PTO on behalf of Fujitsu as the reexamination proceeded.  On December 28, 2007, Baker Botts filed a Response to Office Action on behalf of Fujitsu, arguing, among other things, that Arlan and IEEE VMEbus references did not invalidate many of the pending claims.  Busse Decl. ¶¶36-37.  On January 14, 2008, Baker Botts filed a Response to Office Action in which  it argued, among other things, that Arlan and IEEE VMEbus did not invalidate many of the pending claims.  *Id.* ¶38.  Baker Botts added new claims to the patent, designed, at least in part, to overcome the rejections based on one of such NETGEAR references.  *Id.* ¶36.  Thus, like many patent owners, Fujitsu used the reexamination procedure as a means to test the strength of prior art that it knew would be asserted against it by parties it later intended to sue – in this case, NETGEAR.  As part of Mr. Busse's investigation described above, he learned that, in April 2009, the PTO sent Baker Botts a "Notice of Intent to Issue Ex Parte Reexamination Certificate" with regard to the '769 Patent.  *Id.* ¶39.

attorney will represent in Matter #2.  Rule 3-310(C)(3) applied here.

- While Baker Botts was representing Fujitsu adverse to NETGEAR in Matter #1, the firm accepted NETGEAR as a client in two separate matters—in Matter #2 (Ruckus reexamination proceeding) and in Matter #3 (NETGEAR indemnification issues).

- Obviously, NETGEAR's interests in Matter #1 is adverse to Fujitsu.

- Hence, under Rule 3-310(C)(3), Baker Botts needed to obtain not just Fujitsu's informed written consent to take NETGEAR on as a client, but it also needed to obtain NETGEAR's informed written consent to be adverse to it now that NETGEAR was going to be a client.  Mr. Showalter concedes exactly this point in the voicemail that he left for NETGEAR's in-house counsel on February 22, 2010, when he stated, "I talked to our general counsel . . . and he agrees with me, it's an ethical issue."  Busse Decl. ¶22 Ex. 2.

Under Rule 3-310(C)(3), for NETGEAR's consent to have been "informed," Baker Botts was required to provide NETGEAR with a written disclosure stating the facts and circumstances that would be relevant to NETGEAR's decision whether to grant the consent. "Disclosure" means "informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client." Rule 3-310(A).

Baker Botts may attempt to argue that NETGEAR gave its "informed consent" when NETGEAR agreed, in its engagement letters, that the firm could be adverse to NETGEAR on future unrelated matters.  (Interestingly, these are the same engagement letters that Baker Botts now apparently disavows.)  But the "prospective waiver" clause in the Baker Botts-NETGEAR engagement does not apply for two reasons.  First, as a matter of contract interpretation, the clear and explicit language of the engagement agreement—and the prospective waiver section therein—shows that the waiver applies only to future, as-yet-unmaterialized conflicts.  Civ. Code §1638 ("The language of a contract is to govern its interpretation if the language is clear and explicit").  The term "prospective waiver" unambiguously refers only to a waiver applying to future conflicts.  *Webster's Third New International Dictionary* 1821 (3d ed. 2002) ("prospective:  concerned with or related to *the future*").  The conditional and forward-looking language Baker Botts used to describe the waiver it sought confirms this interpretation.  For example, the section begins with this

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

explanation: "the nature of our practice is such that occasionally the Firm *may* concurrently represent a second client that is adverse to another client . . ."  In addition, it would be absurd to suppose that the parties meant for the prospective waiver to include any existing conflicts that Baker Botts already had when it took NETGEAR on as a client, because Baker Botts expressly stated—in the same agreement—that there were no such conflicts.  Busse Decl. ¶15.[4]  Civ. Code §1641 ("The whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, *each clause helping to interpret the other*") (emphasis added).  Baker Botts evidently knows how to properly disclose an existing conflict, because it did exactly that in one of its two engagement agreements with NETGEAR.  *Id.*  Perhaps the most persuasive evidence that the advance waiver does not apply to the Fujitsu conflict is Baker Botts' own conduct.  In February 2010, when the attorneys supposedly first identified the Fujitsu conflict, they asked NETGEAR to sign a new conflict waiver.  Busse Decl. ¶18.  There would have been no reason to do so if they believed that NETGEAR had already waived the conflict.

Second, as applied to the Fujitsu conflict, the waiver is unenforceable under California ethics law.  Under California law, to obtain a valid conflict waiver, the attorney must first disclose to the client "the relevant circumstances and the actual and reasonably foreseeable adverse consequences to the client or former client."  Rule 3-310(A).  Clearly, Baker Botts did not disclose the "relevant circumstances" — i.e., the fact that Fujitsu had concluded its reexamination of the '769 Patent and intended to assert that patent against NETGEAR, even in litigation if necessary.  When an attorney is asking a client to consent to an *actual* conflict such as this, "[t]he details are essential to informed consent so that the client can weigh and measures the nature of the contrary interests and give informed consent based upon knowledge of material facts."  *Image Technical Servs., Inc. v. Eastman Kodak Co.*, 820 F.

---

[4]The prospective waiver section of the letters is entitled "*Other* Conflicts *and Prospective* Waiver."  The phrase "*other* conflicts" distinguishes the potential conflicts described in this later section from any actual "conflicts" described in the section called "Conflicts."  *Id.* ¶15.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Supp. 1212, 1217 (N.D. Cal. 1993).

In *Eastman Kodak*, a law firm sought a waiver from its current client, Kodak, to be adverse to it in an antitrust case.  The firm told Kodak that it intended to file a brief contrary to Kodak's interest in the United States Supreme Court.  Kodak agreed.  When the case was remanded and Kodak's own law firm appeared in the district court adverse to Kodak, Kodak moved to disqualify the firm.  The court granted the motion, because although the firm had obtained a waiver allowing it to file an appellate brief, it had not obtained a waiver to appear adverse to its current client in a courtroom.  The court held that the firm had not obtained Kodak's informed consent because the firm had not fully disclosed the details of its proposed adverse representation or the consequences of that representation to Kodak.

Here, Baker Botts failed to disclose any information about its existing representation of Fujitsu adverse to NETGEAR when it agreed to represent NETGEAR.  In fact, Baker Botts expressly stated in its two agreements that, other than the MOSAID conflict, the firm had no existing conflicts.  Busse Decl. ¶15.  If Baker Botts wanted NETGEAR to consent to Baker Botts' adverse representation of Fujitsu, it was required to specifically identify the client (Fujitsu), the nature of the client's claims against NETGEAR and the actual and reasonably foreseeable consequences to NETGEAR of being represented by a law firm that was contemporaneously suing it on a related patent matter.  That was the information NETGEAR needed in order to "weigh and measure the nature of the contrary interests."  Having failed to do any of this, Baker Botts cannot get a backdoor consent to an existing conflict through a general, advance conflict waiver.

**B.  The Baker Botts Attorneys Who Worked for NETGEAR Are Disqualified Because They Received Material Confidential Information.**

There is a second reason why Baker Botts is disqualified from representing Fujitsu in this lawsuit:  in the course of representing NETGEAR, its attorneys obtained confidential information that is material to this lawsuit.  An attorney has a duty to preserve the confidentiality of client information.  *In re Jordan*, 12 Cal. 3d 575 (1974); *see also* Bus. & Prof. Code §6068(e)(1) (attorney must 'maintain inviolate the confidence, and at every peril

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

to himself or herself to preserve the secrets, of his or her client"). The attorney's obligation to protect client information is necessary for the attorney-client relationship to function.

> Preserving the confidentiality of client information contributes to the trust that is the hallmark of the client-lawyer relationship. The client is thereby encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matter. The lawyer needs this information to represent the client effectively . . . (Cal. R. Prof'l Conduct, Rule 3-100, Discussion §1)

The attorney's fiduciary duty to protect his client's confidential information continues to operate in full force even after an attorney-client relationship ends. *Styles v. Mombert*, 164 Cal. App. 4th 1163, 1167 (2009). To ensure that a client's information is protected, the law forbids an attorney from being adverse to a current or former client if the attorney possesses confidential information from the former client that is material to the matter against the former client, unless the former client consents in writing. Rule 3-310(E). An attorney is not allowed to accept a representation if it would put his former client's confidential information at risk of disclosure. *Yorn v. Superior Court*, 90 Cal. App. 3d 669, 675 (1979) (the rule "is designed not only to prevent dishonest conduct but to avoid placing the honest practitioner 'in a position where he may be required to choose between conflicting duties, or . . . attempt to reconcile conflicting interests'") (citing *Earl Scheib, Inc. v. Superior Court*, 253 Cal. App. 2d 703, 706 (1967)).

For nearly three months, Bart Showalter and other attorneys at Baker Botts had substantive discussions about the Ruckus reexamination and related Ruckus patent litigation with in-house attorneys at NETGEAR and Rayspan who were charged with handling both proceedings. Busse Decl. ¶¶9, 12, 18; Godsey Decl. ¶¶4-9. Both of those proceedings involve the very same NETGEAR product that is at issue in this litigation. Busse Decl. ¶¶3, 29. During these conversations with Baker Botts, NETGEAR's in-house counsel discussed strategy for the reexamination process and the patent infringement suit, NETGEAR's views on how aggressive to be in patent litigation and how NETGEAR approaches settlement discussions. *Id.* ¶11. This is information that NETGEAR's litigation adversary, Fujitsu, would certainly value.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    In addition, NETGEAR also disclosed confidential technical information to Baker

2    Botts about the design of the accused product, the RangeMax WPN824, including

3    confidential information relating to the antenna structure and radiation patterns of the

4    WPN824.  Busse Decl. ¶¶9, 12, 18; Godsey Decl. ¶¶4, 5.  Information about NETGEAR's

5    antenna structure is material to this lawsuit because several claims asserted in the Fujitsu

6    patent concern the use of a particular antenna structure.  *See e.g.* RJN Ex. C (Fujitsu Re

7    36,769) at claim 4 ("A card type input/output interface device as claimed in claim 2, wherein

8    said second data interface unit comprises an **antenna** coupled to said radio

9    transmitter/receiver mean") and claim 8 ("A card type input/output device . . . wherein said

10   **antenna** is an edge portion of said card").  Fujitsu would obtain a substantial advantage in

11   shaping its claim construction arguments in this litigation if it had access to confidential

12   information regarding NETGEAR's product that Baker Botts obtained in its representation

13   of NETGEAR.

14   Baker Botts attorneys also received material confidential information as a result of the

15   their representation of NETGEAR in pursuing its indemnification rights.  NETGEAR

16   provided Baker Botts with confidential information about which of its suppliers had agreed

17   to indemnify NETGEAR and the strength of NETGEAR's indemnification rights.  Busse

18   Decl. ¶13.  In this case, Fujitsu would find highly valuable information about who is

19   ultimately responsible for indemnifying NETGEAR, NETGEAR's views on the strength and

20   magnitude of its indemnification claims, and NETGEAR's confidential settlement terms

21   with other patent plaintiffs.  Courts recognize that receipt of this type of information justifies

22   disqualification because it is exactly this type of information that parties use to shape their

23   litigation strategy, including settlement strategy.  As such, it would be highly valuable

24   information to the party's litigation adversary.  *See Jessen v. Hartford Cas. Ins. Co.*, 111

25   Cal. App. 4th 698, 712-13 (2003).  ("We consider the "subject" of a representation as

26   including information material to the evaluation, prosecution, *settlement* or accomplishment

27   of the litigation . . .") (emphasis added).

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**C.    The Baker Botts Attorneys Who Worked for NETGEAR Are Disqualified Because There Is A Substantial Relationship Between This Lawsuit And Baker Botts' Prior Representations Of NETGEAR.**

To avoid having to resolve disputes over whether a law firm received confidential material information, courts can choose to use an alternative test known as the "substantial relationship test" to determine whether disqualification is required.  Under this test, a law firm is disqualified from being adverse to a former client on a matter if the matter is substantially related, legally or factually, to any matter the firm previously handled for that client.  If the matters are substantially related, then the court *presumes* that the law firm obtained confidential information that is material and the law firm is disqualified.  *Flatt v. Superior Court*, 9 Cal. 4th 275, 283 (1994).  ("Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated," the court *presumes* that the attorney had access to confidential information in the course of the first representation and "disqualification of the attorney's representation of the second client is mandatory"); *see also River West, Inc. v. Nickel*, 188 Cal. App. 3d 1297, 1304 (1987) ("[I]n the usual case when the substantial relationship is established, *the inquiry ends and the disqualification should be ordered*") (emphasis added).

This standard, with its conclusive presumption of knowledge of confidential information, is "justified as a rule of necessity" because:

> [I]t is not within the power of the former client to prove what is in the mind of the attorney.  Nor should the attorney have to engage in a subtle evaluation of the extent to which he acquired relevant information in the first representation and of the actual use of that knowledge and information in the subsequent representation.  The conclusive presumption also avoids the ironic result of disclosing the former client's confidences and secrets through an inquiry into the actual state of the lawyer's knowledge and it makes clear the legal profession's intent to preserve the public's trust over its own self-interest. (*H.F. Ahmanson & Co. v. Salomon Bros., Inc.*, 229 Cal. App. 3d at 1445, 1453 (1991) (citations and internal quotation marks omitted)

Here, Baker Botts must be disqualified because its representation of NETGEAR in the Ruckus reexamination proceeding is substantially related to this case.   A substantial relationship exists whenever the "subjects" of the two representations are linked in some rational manner.  *Flatt*, 9 Cal. 4th at 283.  In applying the substantial relationship test, courts

consider similarities between the two factual situations and the legal questions posed.  The court does not limit its inquiry to looking at the precise legal and factual issues involved in both matters, because "limiting the comparison of the two representations to their precise legal and factual issues might operate unrealistically to the detriment of the first client."  As a result, courts apply "a broader definition than [just looking at] the discrete legal and factual issues involved in the compared representations."  *Jessen*, 111 Cal. App. 4th at 712-13.

> We consider the 'subject' of a representation as including information material to the evaluation, prosecution, settlement or accomplishment of the litigation . . . Thus, successive representations will be "substantially related" when the evidence before the trial court supports a rational conclusion that [a] information material to the evaluation, prosecution, settlement or accomplishment of the former representation given its factual and legal issues is [b] also material to the evaluation, prosecution, settlement or accomplishment of the current representation given its factual and legal issues.  (*Id.*)

It is readily apparent that there is a substantial relationship between this lawsuit and the Ruckus patent reexamination proceeding in which Baker Botts previously represented NETGEAR.  Both this case and the Ruckus litigation involve claims of patent infringement over wireless technologies.  Both cases also generally involve wireless routers as accused products.  Busse Decl. ¶¶3, 29.  Moreover, the specific product at issue in the Ruckus litigation – the WPN824 RangeMax Wireless Router – has now been accused of infringement in this case.  The patents in both the Ruckus litigation and this lawsuit also both assert claims relating to antenna structures.  *See* RJN Ex. B at claim 1 & Ex. C at claim 4.  Both the Ruckus '562 Patent and Fujitsu's '769 Patent contain claims related to the *location* of the antenna on the device in question.  **Compare** RJN Ex. B (claim 1) (a first antenna element **located near a first periphery** of the circuit board) **with** RJN Ex. C (claim 8) ("A card type input/output device . . . wherein said antenna is an **edge portion** of said card").  Thus, the structure of the antenna of the WPN824 router is a material issue in both cases, and whether that structure is infringing will be a common issue of fact and law in both cases.

There is another area in which Baker Botts' prior representation of NETGEAR is substantially related to this lawsuit:  both involve issues about whether third party vendors

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

have any obligations to indemnify NETGEAR for any liability NETGEAR incurs.  Busse Decl. ¶37.  Indeed, with respect to the Ruckus reexamination, Baker Botts represented both NETGEAR and one of its third party suppliers, Rayspan.  The indemnification representation involved issues related to the value of NETGEAR's indemnification rights, its historical settlements with third party vendors, and settlement terms.  *Id*.  This litigation, too, includes infringement claims against products supplied to NETGEAR by third party vendors.  As recognized in the *Jessen* case quoted above, information relevant to NETGEAR's settlement position and resources for settlement is material to its litigation adversary, Fujitsu: any experienced trial lawyer would recognize the value of knowing an opponent's relationships with potential indemnitors and the terms upon which the opponent might obtain financial support in settling the litigation.  *Jessen*, 111 Cal. App. 4th at 712-13.

In sum, there is a substantial relationship between Baker Botts' representation of NETGEAR in the reexamination and indemnification matters, and Baker Botts' representation of Fujitsu here.  Accordingly, Baker Botts is legally *presumed* to have obtained confidential information material to this lawsuit and must be disqualified.

### D.   The Entire Baker Botts Firm Must Be Disqualified From This Case.

Mr. Showalter and every other attorney at Baker Botts who worked on the NETGEAR matters are disqualified from representing Fujitsu in this case.  Their conflicts are imputed to their entire firm, mandating that Baker Botts itself be disqualified from representing Fujitsu in this case.  *Flatt*, 9 Cal. 4th at 283; *Henriksen v. Great Am. Sav. & Loan*, 11 Cal. App. 4th 109, 117 (1992) ("W]here an attorney is disqualified because he formerly represented and therefore possesses confidential information regarding the adverse party in the current litigation, *vicarious disqualification of the entire firm is compelled as a matter of law*") (emphasis added).  "The vicarious disqualification rule recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information."  *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc*., 20 Cal. 4th 1135, 1153-54 (1999).  Accordingly, Baker Botts must be disqualified from this case due to its breach of its duty of confidentiality as well as

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    its breach of its duty of loyalty to NETGEAR.

2    **E.    The Court Should Stay This Action Pending Resolution Of NETGEAR's**
3    **Motion to Disqualify.**

4        The "power to stay proceedings is incidental to the power inherent in every court to

5    control disposition of the causes on its docket with economy of time and effort for itself, for

6    counsel, and for litigants." *Landis v. N. Am. Co.,* 299 U.S. 248, 254 (1936).  The exertion of

7    this power is with the sound discretion of the district court.  *CMAX, Inc. v. Hall*, 300 F.2d

8    265, 268 (9th Cir. 1962).   The competing interests that a district court must weigh in

9    deciding whether to grant a stay include: (1) "possible damage which may result from the

10   granting of a stay, (2) the hardship or inequity which a party may suffer in being required to

11   go forward, and (3) the orderly course of justice measured in terms of the simplifying or

12   complicating of issues, proof, and questions of law which could be expected to result from a

13   stay." *Id.*, *citing Landis,* 299 U.S. at 254-55.  Here, each of these interests weighs heavily in

14   favor of a stay.

15       First, there would be no prejudice to Fujitsu if this case is stayed pending resolution of

16   the motion to disqualify.  The case is in its early stages, with the initial Case Management

17   Conference not scheduled until January 2011, there are no pending discovery requests, and

18   no impending deadlines under the Patent Local Rules.  Furthermore, Fujitsu has been on

19   notice of this conflict since at least February 2010.

20       Second, NETGEAR would suffer severe and irreparable harm if the case were allowed

21   to proceed before deciding the disqualification motion.  As discussed earlier, Baker has

22   improperly gained knowledge of NETGEAR's strategies regarding re-examination,

23   indemnity and other defense issues, as well as knowledge about NETGEAR's accused

24   products in the case.  If allowed to proceed, Baker may use that knowledge, even

25   inadvertently, in the case.

26       Third, the orderly course of justice demands that this case be stayed pending a ruling

27   on the disqualification motion.  Fujitsu should not be allowed to proceed to develop its

28   infringement and invalidity positions in this case, while its counsel is in possession of

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   information gained from Fujitsu's adversary.  Allowing the case to proceed will multiply and

2   complicate issues the Court will need to address if it disqualifies Baker Botts.

3                                   **CONCLUSION**

4        When NETGEAR sought representation by Baker Botts in late 2009, Baker Botts had a

5   choice: Baker Botts could have declined to represent NETGEAR because of its continuing

6   representation of Fujitsu adverse to NETGEAR, *or* Baker Botts could have asked

7   NETGEAR to waive the conflict after giving NETGEAR full disclosure of the relevant facts

8   and the possible adverse consequences NETGEAR could suffer from the waiver.  As the

9   record demonstrates, NETGEAR would ***not*** have waived this conflict, would ***not*** have

10  provided confidential information to Baker Botts and would ***not*** have retained that firm.

11  Instead of following the appropriate ethical course, Baker Botts accepted and commenced

12  representation of NETGEAR while keeping its ongoing, adverse representation of Fujitsu a

13  secret.  Instead of following the appropriate ethical course, Baker Botts did not disclose the

14  conflict until *after* it had received confidential information from NETGEAR and Rayspan

15  and *after* it had signed a non-disclosure agreement.

16        Accordingly, NETGEAR asks the Court to disqualify Baker Botts from any

17  participation, direct or indirect, in this case and from representing Fujitsu, or from assisting

18  Fujitsu, directly or indirectly, in asserting patent infringement claims which are based upon

19  the '769 patent or which involve antenna technology.  NETGEAR also seeks an order

20  (a) requiring Baker Botts to return all confidential information it obtained from NETGEAR

21  and Rayspan, (b) requiring Baker Botts to destroy any work product it created relating to

22  said information, and (c) precluding Baker Botts from providing its successor counsel in this

23  matter (or in any related matter) with any work product that Baker Botts has developed

24  about this lawsuit since November 2009, which is when Baker Botts began confidential

25  discussions with NETGEAR.  The transfer of such information to successor counsel is

26  prohibited because such work product was prepared during a period when Baker Botts knew,

27  or should have known, that it was adverse to NETGEAR on the Fujitsu matter.  *See Quark,*

28  *Inc. v. Power Up Software Corp.*, 812 F. Supp. 178, 180 (D. Colo. 1992) (ordering that no

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

member of a disqualified firm may work on litigation "behind the scenes" and that no work-product may be turned over to successor counsel); *EZ Paintr Corp. v. Padco, Inc.*, 746 F.2d 1459, 1463 (Fed. Cir. 1984) (prohibiting a disqualified firm from turning over any work product that was prepared after conflicted attorneys joined the disqualified firm); *Hulbert v. Cheeks*, No. 07 C 423, 2007 WL2076031, at *1 (N.D. Ill. July 17, 2007) (where attorney obtained material confidential information, disqualification "require[d] a total dissociation from the matter on the part of [the firm]," and the firm was also barred from "consultation and advice . . . as well as formal representation).

DATED: October 14, 2010.

Respectfully,

PAMELA PHILLIPS
AMY L. BOMSE
HOWARD RICE NEMEROVSKI CANADY
    FALK & RABKIN
A Professional Corporation


By: _____/s/ Amy L. Bomse_____
                         AMY L. BOMSE

Attorneys for Defendant NETGEAR, INC.

W03 101410-181400001/U10/1627726/F