| | |
|---|---|
| 1 | PAMELA PHILLIPS (No. 87581) |
|   | pphillips@howardrice.com |
| 2 | AMY L. BOMSE (No. 218669) |
|   | abomse@howardrice.com |
| 3 | HOWARD RICE NEMEROVSKI CANADY |
|   |         FALK & RABKIN |
| 4 | A Professional Corporation |
|   | Three Embarcadero Center, 7th Floor |
| 5 | San Francisco, California 94111-4024 |
|   | Telephone:   415/434-1600 |
| 6 | Facsimile:   415/677-6262 |
| 7 | Attorneys for Defendant NETGEAR, INC. |
|   | (APPEARING SPECIALLY FOR MOTION |
| 8 | TO DISQUALIFY) |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FUJITSU LIMITED, | No. CV 10-03972 LHK (HRL) |
| Plaintiff, | Action Filed: September 3, 2010 |
| v. | DEFENDANT NETGEAR, INC.'S REPLY IN SUPPORT OF NETGEAR'S MOTION TO DISQUALIFY BAKER BOTTS AND FOR STAY PENDING RESOLUTION |
| BELKIN INTERNATIONAL, INC., BELKIN, INC., D-LINK CORPORATION, D-LINK SYSTEMS, INC., NETGEAR, INC., ZYXEL COMMUNICATIONS CORPORATION, and ZYXEL COMMUNICATIONS, INC., | |
|   | Date: December 16, 2010 |
|   | Time: 1:30 p.m. |
|   | Place: Courtroom 4, 5th Floor |
|   | Judge: Hon. Lucy H. Koh |
| Defendants. | |
|   | Trial Date: None |

REPLY ISO MOTION TO DISQUALIFY     CV10-03972 LHK (HRL)

**TABLE OF CONTENTS**

| | Page |
|---|---|
| INTRODUCTION | 1 |
| ARGUMENT | 3 |
|     A.  Baker Botts Admits That It Was Adverse To One Of Its Own Current Clients Without That Client's Consent. | 3 |
|     B.  Baker Botts Does Not Dispute That It Received Confidential Information About NETGEAR's Strategy For This Litigation And The Related Reexamination. | 9 |
|     C.  There Is A Substantial Relationship Between This Lawsuit and Baker Botts' Representations of NETGEAR. | 11 |
| CONCLUSION | 14 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

| | |
|---|---:|
| *Flatt v. Superior Court*, 9 Cal. 4th 275 (1994) | 7, 8 |
| *Fla. Ins. Guar. Ass'n. Inc. v. Carey Canada, Inc.*, 749 F. Supp. 255 (S.D. Fla. 1990) | 6 |
| *Forrest v. Baeza*, 58 Cal. App. 4th 65 (1997) | 8 |
| *Friskit, Inc. v. RealNetworks, Inc.*, No. C 03-05085 WWS, 2007 WL 1994204 (N.D. Cal. July 5, 2007) | 6, 7, 8 |
| *Global Van Lines, Inc. v. Superior Court*, 144 Cal. App. 3d 483 (1983) | 12 |
| *Gregori v. Bank of Am.*, 202 Cal. App. 3d 291 (1989) | 10 |
| *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal. App. 4th 698 (2003) | 12, 13 |
| *Morrison Knudsen Corp. v. Hancock*, 69 Cal. App. 4th 223 (1999) | 11 |
| *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal. 4th 1135 (1999) | 12 |
| *Sabrix, Inc. v. Carolina Cas. Ins. Co.*, No. CV-02-1470-HU, 2003 WL 23538035 (D. Or. July 23, 2003) | 4 |
| *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422 (1999) | 3. 4. 5, 6, 8 |
| *Truck Ins. Exch. v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050 (1992) | 3, 5 |

**Statutes**

| | |
|---|---:|
| Bus. & Prof. Code §6068(e)(1) | 11 |
| Cal. Rule of Prof. Conduct | |
|     3-310(C) | 8 |
|     3-310(C)(3) | 8 |
|     3-310(E) | 12 |

| | |
|---|---|
| 1 | **INTRODUCTION** |

In its opposition to NETGEAR's motion to disqualify, Baker Botts makes a series of critical admissions. **First**, Baker Botts concedes that it was engaged as counsel to NETGEAR for several months and performed substantive work for NETGEAR on two patent law matters—a fact that it previously attempted to deny. **Second**, Baker Botts confirms that it was actively assisting another client, Fujitsu, to assert patent claims *against* NETGEAR during the entire period that Baker Botts was also *representing* NETGEAR on patent matters. **Third**, Baker Botts admits that it did not tell NETGEAR that it was helping Fujitsu on a matter directly adverse to NETGEAR when it agreed to represent NETGEAR in December 2009. **Fourth**, Baker Botts admits that it never obtained NETGEAR's consent to represent Fujitsu adverse to NETGEAR. **Fifth,** Baker Botts admits that because NETGEAR would not consent to having its own patent attorneys sue it for patent infringement, Baker Botts fired NETGEAR so that it could continue to represent Fujitsu on a multi-defendant patent infringement lawsuit against NETGEAR.

*Current client rule*. The first reason that Baker Botts must be disqualified is that it violated California's "current client" rule. Under California law, that rule prohibits a law firm from being adverse to a current client on any matter without the client's informed written consent. The penalty for violating that rule is *per se* automatic disqualification from the matter in which the law firm was adverse to that client. To avoid this well-established rule, Baker Botts proposes a brand new exception to the rule. The exception would *allow* law firms to be adverse to an existing client without that client's consent (contrary to California's "current client" rule), and it would *allow* the law firm to fire that client if it complains about the situation (contrary to California's "hot potato" rule), if the client was unlucky enough to have been the last one in the firm's door. That is not the law in California. Baker Botts failed to tell the Court about a case directly on point—with facts strikingly similar to this one—in which a later client disqualified a law firm from representing an earlier client.

*Disqualification based on confidential information.* The second reason that Baker Botts must be disqualified from this lawsuit is that it received confidential information from NETGEAR and Rayspan, while representing those two companies, that is material to this lawsuit. Baker Botts

1 argues that it did not receive such confidential information. But the declarations it submitted do not 2 even address the evidence Rayspan and NETGEAR submitted showing that they gave Baker Botts 3 confidential information about (1) NETGEAR's strategy for patent litigation, (2) NETGEAR's 4 ability to obtain indemnification from third parties for lawsuits such as this one, and (3) 5 NETGEAR's approach to settlement, including NETGEAR's settlement payments in previous 6 patent infringement lawsuits—all information that is material to this lawsuit. Instead of dealing with 7 that information, Baker Botts focuses on the fact that some technical information about 8 NETGEAR's WPN824 router is publicly available. But most companies publish information about 9 their products. The fact they do so does not mean that those companies do not have *other* 10 confidential information about those same products that they have revealed only to their attorneys in 11 confidence, as NETGEAR and Rayspan did here. Failing to rebut that it did not receive all of the 12 confidential information that NETGEAR and Rayspan identified in their declarations, Baker Botts 13 must be disqualified from this case.

14 ***Substantial relationship test.*** The third reason that Baker Botts must be disqualified is 15 because its representation of Fujitsu in this patent infringement case is substantially related to work 16 that Baker Botts did for NETGEAR and Rayspan in connection with the Ruckus patent 17 reexamination proceeding. Baker Botts tries to dispute that relationship with an argument that 18 misses the mark: it argues that NETGEAR's products were not directly at issue in the Ruckus 19 reexamination proceeding that it was handling for NETGEAR. But even if information about the 20 structure or function of NETGEAR's product, the router, was not going to be a part of its formal 21 submission to the PTO in the Ruckus patent reexamination proceeding, learning about that structure 22 and function certainly was a part of Baker Botts' representation of NETGEAR. That is, part of 23 Baker Botts' work was to understand the structure of NETGEAR's router in order to make sure that 24 positions it took in the PTO would not harm NETGEAR's interests in the related patent 25 infringement case Ruckus had filed against NETGEAR. Since the structure of NETGEAR's 26 accused products—including the very same router at issue in the Ruckus litigation—are at issue in 27 this case, the matters are substantially related.

28

# ARGUMENT

### A. Baker Botts Admits That It Was Adverse To One Of Its Own Current Clients Without That Client's Consent.

Under California law, an attorney who represents one current client adverse to another current client violates his duty of loyalty and is automatically disqualified from that representation. A corollary to the current client conflict rule is the "hot potato" rule, which holds that an attorney cannot turn a current client into a former client by firing that client after a disqualifying conflict arises. *Truck Ins. Exch. v. Fireman's Fund Ins. Co*., 6 Cal. App. 4th 1050, 1057 (1992). The oft-repeated rationale for the hot potato rule is that it prevents a lawyer from firing the disfavored, generally less lucrative, client in an effort to cure the conflict. *Id.*

In its opposition, Baker Botts admits that California law prohibits an attorney from being adverse to a current client without the client's consent. Plaintiff Fujitsu's Opposition to Defendant Netgear's Motion to Disqualify Baker Botts and For Stay Pending Resolution ("Opp.") at 14. Baker Botts also admits that it represented Fujitsu adverse to NETGEAR while it was actively representing NETGEAR on two matters, and that it did not have NETGEAR's consent to waive the conflict. *Id.* at 7-8. Baker Botts further admits that dropping one of those clients to cure the conflict is generally impermissible. *Id.* at 14. However, Baker Botts claims that its conduct falls under an exception to the hot potato rule. According to Baker Botts, this exception permits an attorney to drop a client in favor of another client if the client the attorney wants to drop happens to have hired the attorney later in time than the client that the attorney wishes to continue to represent. *Id.*[1]

In making this argument, Baker Botts ignores *State Farm Mut. Auto. Ins. Co. v. Fed. Ins. Co.*, 72 Cal. App. 4th 1422 (1999), although it is directly on point and refutes Baker Botts' first client/second client theory  In *State Farm*, State Farm retained McCormick to defend its insured. *Id.* at 1426. McCormick concluded that another insurer, Federal, owed coverage and asked Federal to contribute to the defense of that case. Federal refused. *Id.* There were no further communications

---

[1] Fujitsu spends a great deal of time discussing the fact that NETGEAR granted conflict waivers to Baker Botts on other matters, such as for the MOSAID matter. Those facts are irrelevant to this motion, because a waiver of one specific conflict does not waive an entirely different conflict.

1  between McCormick, the law firm, and Federal. *Id*. A year later, Federal hired McCormick to
2  represent one of its insureds in a separate lawsuit. *Id*. While representing Federal's insured in that
3  matter, McCormick filed a lawsuit against Federal on behalf of State Farm, seeking contribution for
4  damages in the first lawsuit. Federal—the second client in the door—sought to disqualify
5  McCormick from representing its pre-existing client, State Farm. *Id.* at 1427. The Court of Appeal
6  held that "mandatory disqualification" was required, because the McCormick firm had sued a
7  current client, which is impermissible in California. *Id*. at 1432-33.

8  Baker Botts initially points the Court to an unpublished Oregon District Court opinion, *Sabrix,*
9  *Inc. v. Carolina Cas. Ins. Co.*, No. CV-02-1470-HU, 2003 WL 23538035 (D. Or. July 23, 2003).
10 Why this Court should apply an Oregon decision is unclear, but even if it did, *Sabrix* does not create
11 an exotic new exception to the hot potato rule that always permits a law firm to drop a second client
12 when a conflict arises. Rather, in *Sabrix*, the Oregon court simply applied an exception to the hot
13 potato rule that some courts have recognized. That exception is sometimes referred to as the "thrust
14 upon" exception. The thrust upon exception to the hot potato rule allows a law firm to cure a
15 conflict by dropping one of two clients when it unexpectedly finds itself in a conflict situation that it
16 did nothing to create. Courts who have applied the exception have uniformly been insistent that a
17 law firm cannot qualify for this exception unless (a) the conflict at issue was created by events
18 outside the control of the lawyer and (b) once the conflict occurs, the attorney immediately withdrew
19 from one of the two representations.[2]

20 No California court has actually applied the thrust upon exception to the hot potato rule,
21 although a few California courts have acknowledged, in *dictum*, that it might be appropriate to do so

---

23 [2]The facts of *Sabrix* present a classic example of a conflict that was "thrust upon" a law firm
24 due to circumstances beyond its control. In *Sabrix*, a law firm represented Sabrix adverse to Carolina Casualty. At the same time, the firm was representing another client, SeniorNet, in an unrelated litigation. Midway through that second lawsuit, SeniorNet submitted a claim to its insurer,
25 which happened to be Carolina Casualty. After Carolina Casualty objected to the firm's representation of Sabrix, the firm withdrew as counsel in the SeniorNet case, but remained in the
26 first case. Carolina Casualty then sought to disqualify the firm from representing Sabrix adverse to Carolina Casualty in that lawsuit. Relying on Oregon law, the court held that the thrust upon
27 exception to the hot potato rule permitted the firm to continue representing Sabrix, because it timely withdrew from the other representation.
28

in certain situations. But whether California law recognizes the thrust upon exception is not relevant here, because Baker Botts clearly cannot fit its conduct within the narrow confines of the exception. The thrust upon exception applies only if the attorney played no role in creating the conflict. The conflict truly must be thrust upon the attorney by some circumstances outside of its control. *State Farm*, 72 Cal. App. 4th at, 1432 ("[I]t is critical that the attorney not have played any role in creating the conflict of interest."). Baker Botts clearly played a role in creating the conflict of interest present here: it voluntarily accepted NETGEAR as a client when it knew or should have known that it was representing Fujitsu adverse to NETGEAR (in violation of the current client rule). *Truck Ins.,* 6 Cal. App. 4th at 1059 (law firm that accepted representation of one client knowing that it was representing another adverse to that client: "By such action, [the law firm] must be viewed as having created the conflict.").

Baker Botts offers some excuses for violating the current client rule, but they do not fit the requirements of the thrust upon exception to the hot potato rule. Mr. Pankratz claims that he "did not appreciate" the adversity between Fujitsu and NETGEAR when he took NETGEAR on as a client in the indemnity matters, because he was not involved in the work that Baker Botts was doing for Fujitsu adverse to NETGEAR. Opp. at 9. So his excuse is simply ignorance. Mr. Showalter's excuse is that he forgot about Fujitsu's adversity to NETGEAR when he agreed to represent NETGEAR. *Id.* at 10. Mr. Showalter does not explain why his memory was not refreshed when he received the PTO's decision on the Ozawa patent in April of 2009 or when the PTO actually issued the reexamination certificate on December 8, 2009.[3]

These excuses amount to nothing more than a failure to spot a conflict. The thrust upon exception to the hot potato rule does not protect lawyers from their own failure to spot a conflict. Law firms have an obligation to conduct conflict checks before taking on a new matter. Large law

---

[3] Mr. Showalter and Baker Botts were the prosecuting attorneys for the Ozawa patent, and thus would have received notice from the PTO that the reexamination certificate for the Ozawa patent was going to be issued prior to NETGEAR's retention of Baker Botts as counsel. Defendant Netgear's Motion To Disqualify Baker Botts And For Stay Pending Resolution ("Motion") at 6-8. In April 2009, the PTO sent Mr. Showalter a notice that it intended to issue the reexamination certificate for the Ozawa patent. Declaration of Brian Busse In Support of Motion ("Busse Decl.") Ex. 9.

firms, in particular, routinely face the problem of "failed memory" or "ignorance" problems like those described above. To avoid those problems, large firms like Baker Botts have sophisticated, computerized conflicts systems into which they enter the names of their clients and any adverse parties. They also require their lawyers to run conflict checks when taking on new clients. Surely Baker Botts has such a conflicts database and follows that normal practice. Thus, when NETGEAR approached Baker Botts about possible representation in late 2009, Baker Botts' conflicts database should have reflected that Baker Botts was currently representing Fujitsu adverse to NETGEAR. Had Baker Botts appropriately tracked its open matters, a simple conflict check would have avoided the problem that occurred here: within a few minutes after either Mr. Showalter or Mr. Pankratz entered NETGEAR's name into the firm's conflicts database as a prospective client, the system would have spotted that the firm was already adverse to NETGEAR on the still-open Fujitsu Ozawa matter. Neither of Baker Botts' declarations say a word about Baker Botts' conflict checking process in this matter, much less explain how the system failed.

Baker Botts cannot shift the burden of checking for conflicts to the client by arguing (as it seems to do by implication) that NETGEAR should have been aware of Baker Botts' representation of Fujitsu and that, by hiring Baker Botts, NETGEAR impliedly consented to the adverse representation. That very argument was made and rejected in *State Farm*. "[I]t is the attorney who is charged with the responsibility of performing conflict checking upon accepting a new client. The new client is under no such obligation." 72 Cal. App. 4th at 1435.[4]

In addition to citing the unpublished Oregon case, Baker Botts relies heavily on a two-page unpublished decision from the Northern District of California, *Friskit, Inc. v. RealNetworks, Inc.*, No. C 03-05085 WWS, 2007 WL 1994204 (N.D. Cal. July 5, 2007). In *Friskit*, a law firm had been representing Friskit in litigation against RealNetworks in federal court for two years. At that point, for reasons that are not explained, the CEO of RealNetworks retained the same firm to represent him

---

[4] Baker Botts also failed to immediately withdraw from a concurrent representation once the conflict arose in December 2009. *Fla. Ins. Guar. Ass'n Inc. v. Carey Canada, Inc.*, 749 F. Supp. 255, 261 (S.D. Fla. 1990) (thrust upon exception did not apply because the law firm failed to withdraw immediately).

1  personally on unrelated matters. Shortly thereafter, the CEO moved to disqualify the law firm from
2  the lawsuit. The court denied the motion on the grounds that the duty of loyalty an attorney owes to
3  an existing client is not subordinated to any duty owed to a later client. This earlier client-later
4  client hierarchy appears to be derived from a California Supreme Court decision, *Flatt v. Superior*
5  *Court*, 9 Cal. 4th 275 (1994) (*Friskit*, 2007 WL 1994204, at *2). But *Flatt* had nothing to do with
6  disqualification. *Flatt* involved whether someone a law firm had turned away—in other words, a
7  *non*-client—could sue the law firm that turned him away for malpractice because it had failed to
8  warn him about the statute of limitations on his potential claim when it turned him away.

9      The facts of *Flatt* themselves were somewhat unusual. In that case, Gail Flatt, a lawyer, met
10  with a prospective client for approximately one hour, discussing the possibility of representing that
11  client in a claim against another lawyer. After the consultation was over, Ms. Flatt ran a conflict
12  check and found that her firm was actually representing the law firm the prospective client wanted to
13  sue. Within a week, Ms. Flatt told the client that she could not represent him due to a conflict.
14  When she did so, she did not give the prospective client any advice about the statute of limitations
15  on his claim. After the prospective client let the statute of limitations run on his claim against the
16  lawyer, he sued Ms. Flatt for having failed to advise him about the statute of limitations. The
17  Supreme Court held that under the unusual circumstances present in the *Flatt* case, Ms. Flatt did *not*
18  have a duty to advise that particular prospective client about the statute of limitations because to do
19  so would have been disloyal to another one of her firm's existing clients. 9 Cal. 4th at 290. In short,
20  the court held that the duty of loyalty to an *existing* client trumped any duty that the lawyer might
21  owe to a mere *prospective* client. But *Flatt* did not in any way suggest a hierarchy of loyalty
22  between two *existing* clients, which is the situation Baker Botts faced once it took NETGEAR on as
23  a client.

24      In fact, to the contrary, the Supreme Court took pains to limit its ruling to the facts before it—
25  an hour-long preliminary consultation with a prospective client followed by the attorney
26  immediately notifying the prospective client that a conflict *precluded* representation. The court even
27  stated that, under other circumstances, for example, a greater lapse of time or expenditure of
28  resources, "an attorney's mere withdrawal from the second representation may not be sufficient to

1  resolve all ethical responsibilities." *Flatt*, 9 Cal. 4th at 290, n.6. In the 20 years since *Flatt* was
2  decided, no California court has ever extended the "no duty" rule in the manner that Baker Botts
3  proposes to do. Given the actual facts in *Flatt* and the Supreme Court's careful limitation of its
4  holding, the validity of *Friskit* under California law is questionable.

5  Baker Botts relies on one other case, *Forrest v. Baeza*, 58 Cal. App. 4th 65 (1997), as
6  authority for the proposition that a law firm may withdraw from one client and continue representing
7  another. It is true that there are some cases where that is permitted, but the circumstances in *Forrest*
8  are completely different from this case. In *Forrest*, a lawyer represented a corporation and two of its
9  directors jointly in a shareholder derivative suit. A third party moved to disqualify the firm from
10 jointly representing the company and the directors. Due to the unusual nature of a shareholder
11 derivative lawsuit, the court held it would be improper for a lawyer representing the directors
12 accused of violating their duties to the corporation to also represent the corporation. In that type of
13 case, courts will allow a lawyer who normally represents the corporation to withdraw from
14 representing the corporation and, instead, to limit his or her representation to just the directors
15 accused of misconduct. There was no allegation in *Forrest* that the attorney had violated the duty of
16 loyalty to its client, as Baker Botts did. *Id.* at 80 ("this is not a case where an attorney unilaterally
17 (or otherwise) decides to drop one client in preference for a more favored one"). Given these unique
18 circumstances, the court held that the attorney could continue to represent the directors because that
19 would eliminate the conflict, and there was no risk to the corporation's confidential information. *Id.*
20 at 82.

21 Ironically, there is a California Rule of Professional Conduct that directly addresses the first
22 client/second client situation present here, which NETGEAR addressed in its opening brief. Baker
23 Botts chose to ignore that rule in its opposition. Rule 3-310(C)(3) of the California Rules of
24 Professional Conduct requires an attorney to seek the informed written consent of both an existing
25 client (here Fujitsu) and a new client (which, in December 2009, NETGEAR was) under the very
26 circumstances present here. Violation of Rule 3-310(C) is a separate grounds for granting
27 NETGEAR's motion to disqualify Baker Botts. *See State Farm*, 72 Cal. App. 4th at 1428.

28

REPLY ISO MOTION TO DISQUALIFY         CV10-03972 LHK (HRL)

-8-

### B. Baker Botts Does Not Dispute That It Received Confidential Information About NETGEAR's Strategy For This Litigation And The Related Reexamination.

In its opening brief, NETGEAR showed that Baker Botts must also be disqualified because it received confidential information from NETGEAR that would be material to Fujitsu in prosecuting its claims against NETGEAR. This occurred when Baker Botts was pitching to represent the companies in the Ruckus patent litigation. Busse Decl. ¶9; Declaration of Sandra Godsey In Support of Motion ("Godsey Decl.") ¶¶5-6. After NETGEAR and Rayspan hired other counsel for the Ruckus patent infringement suit, Baker Botts attorneys continued to be involved in strategy discussions involving not just the reexamination of the Ruckus patent but also the related patent litigation with both in-house counsel at NETGEAR and Rayspan and outside patent litigation counsel. *Id.* ¶8. As a result of these discussions, Baker Botts learned how NETGEAR approaches patent litigation, how aggressive to be in litigation and its approach to settlement, all of which is helpful to Fujitsu in this litigation.

Baker Botts's response to this evidence is silence. Baker Botts does not deny that it received confidential information from NETGEAR about NETGEAR's and Rayspan's strategy for the reexamination and *the patent infringement suit* nor does Baker Botts deny that it received information about NETGEAR's views on how aggressive to be in patent litigation. Baker Botts does not even bother to deny that this type of information would be highly pertinent to a plaintiff suing NETGEAR for patent infringement, nor could Baker Botts credibly do so.

Baker Botts admits that it received certain information about NETGEAR's router, (Opp. at 10; Declaration of Barton E. Showalter In Support of Opposition ¶15 ("Showalter Decl.")), but tries to avoid the consequences of this admission by asserting that this information is not material, arguing that the structure of the router is not at issue in this case: "the only claimed feature of the [router] is that it provides a peripheral function." Opp. at 17. While that *may* be Fujitsu's current infringement theory in this case, that theory could evolve. What is clear, however, is that Baker Botts is simply wrong when it asserts that the only features Fujitsu claims its patent covers for the "external devices"—such as the router—are that they provide a "peripheral function." For example, Claim 37 recites an "external device" comprising a "third data interface unit, coupled to a second radio

1 transmitter/receiver means, for coupling said external device to another external device and
2 transferring data there between." Presumably, Fujitsu will attempt to read this claim element on
3 NETGEAR's routers, including its WPN824 router. To do so, Fujitsu may take discovery into the
4 specific structure and operation of the routers—discovery which may implicate the confidential
5 information disclosed to Baker Botts.[5]

6 Baker Botts also claims that the documents that NETGEAR gave to Baker Botts containing
7 information about NETGEAR's WPN824 router are not confidential because NETGEAR has
8 published information about how the router works. Opp. at 16-17. But this argument misses the
9 mark—publishing technical information about a consumer product does not invariably mean that a
10 company has nothing confidential to divulge to its lawyers about the product when that product is
11 the subject of a patent lawsuit.

12 In sum, contrary to Baker Botts' arguments, the information it obtained regarding the
13 WPN824 is both confidential and material to this action. Moreover, given the stage of this
14 litigation, it is simply too early to know the full scope of technical issues and information that will
15 be relevant to discovery to be done, infringement theories and/or claim construction positions.
16 Because of the risk that such confidential information will be misused, Baker Botts should be
17 disqualified. *Gregori v. Bank of Am.*, 207 Cal. App. 3d 291, 308 (1989) ("disqualification is proper
18 where, as a result of a prior representation . . . there is a reasonable probability counsel has obtained
19 information the court believes would likely be used advantageously against an adverse party during
20 the course of the litigation.")

---

[5]Baker Botts' position that the information is not material is also undermined by Baker Botts' own arguments during the reexamination of the Ozawa Patent. Those arguments show that Fujitsu believed that features of the "external devices" were important beyond merely performing a "peripheral function." Specifically, Fujitsu, through Baker Botts, described the structure of the claimed "external device" in detail in order to obtain patentability. For example, Baker Botts stated:

> Support for Claim 62 may be found in . . . Figures 2B and 3B and at Column 3, line 53 – column 4, line 8 and Column 4 lines 35-45. In particular, that portion of the disclosure describes . . . an example external device 30, which provides support for an external device, a card, a first data interface unit, a second data interface unit, a data transfer circuit, and "*wherein the external device comprises an antenna and a wireless transmitter/receiver.*" (Busse Decl. Ex. 6) (emphasis added)

As such, the reexamination record also shows that details as to the specific structure and operation of the routers are, in fact, material to this case.

1  NETGEAR also provided confidential information about its indemnification rights to Baker
2  Botts. Baker Botts takes the position that such information is not material to its claim for
3  infringement. Opp. at 17. But material information is not limited to just that specific information
4  that pertains to a particular element in the adversary's claim. Being privy to confidential
5  information about a litigation adversary's financial resources can frequently provide a substantial
6  strategic advantage, requiring the firm's disqualification. *See Morrison Knudsen Corp. v. Hancock*,
7  69 Cal. App. 4th 223 (1999) (law firm's knowledge of client's financial wherewithal gleaned from
8  representing client's insurer constituted material confidential information requiring the firm's
9  disqualification). Here, simply knowing which of NETGEAR's suppliers entered into written
10 indemnification agreements with NETGEAR, and which of NETGEAR's suppliers were *not*
11 contractually obligated to provide NETGEAR with indemnification, would provide Fujitsu with a
12 significant strategic advantage. This is information that NETGEAR gave to Baker Botts. Busse
13 Decl. ¶13.

14  **C. There Is A Substantial Relationship Between This Lawsuit and Baker Botts' Representations of NETGEAR.**
15

16  NETGEAR showed in its opening brief that there is a substantial relationship between this
17 lawsuit and the Ruckus reexamination, which Baker Botts handled for NETGEAR before it fired
18 NETGEAR. Given that showing, this Court must presume that Baker Botts received confidential
19 information from NETGEAR that is material to its representation of Fujitsu. Motion at 17.
20  Baker Botts's first response to this argument is stunning: It argues that, under California law,
21 a "second client" who gave her lawyer confidential material information has no power to prevent her
22 lawyer from putting her confidential information at risk by representing another client adverse to
23 her. Opp. at 18. This argument is so contrary to well-established California law that it borders on
24 sanctionable conduct even to make the argument. Case after case recognizes an attorney's duty to
25 preserve a client's confidential information. *See* Bus. & Prof. Code §6068(e)(1) (attorney must
26 'maintain inviolate the confidence, and at every peril to himself or herself to preserve the secrets, of
27 his or her client"); *see also* Motion at 15-16 (citing authorities). Case after case recognizes that a
28 lawyer is disqualified from being adverse to a current or former client whenever matters are

REPLY ISO MOTION TO DISQUALIFY               CV10-03972 LHK (HRL)
-11-

1  substantially related. *Global Van Lines, Inc. v. Superior Court*, 144 Cal. App. 3d 483, 489-90
2  (1983) (attorney disqualified because substantial relationship between representations gave rise to
3  presumption that attorney received confidential information); *see also* Motion at 18 (citing
4  authorities.)

5  To support its argument, Baker Botts has woven together a few snippets from various
6  California cases. But what Baker Botts does not explain is that the language it quotes is pulled from
7  discussions of conflicts between former and current clients where it is a *former* client whose
8  information is at risk. The language in *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys.,
9  Inc*., 20 Cal. 4th 1135 (1999) about the "first client's confidential information" and in *Flatt* about the
10 "disqualification from representation of the second client" are byproducts of the factual situations
11 being described, not a part of the rule. None of the cases Baker Botts cites hold that a lawyer does
12 not owe a duty of confidentiality to an existing client simply because another client "got there first."
13 Moreover, the ethics rule that protects a client's confidential information expressly applies to former
14 *and* current clients: Cal. Rule of Prof. Conduct 3-310(E) (A member shall not, without the informed
15 written consent of the *client* or former client, accept employment adverse to the *client* or former
16 client where, by reason of the representation of the *client* or former client, the member has obtained
17 confidential material information.").

18 Next, Baker Botts claims that there is no substantial relationship between this case and Baker
19 Botts' representation of NETGEAR in the reexamination for two reasons. First, Baker Botts asserts
20 that the Ozawa Patent is directed to card type input/output devices, whereas the Ruckus Patent is
21 directed to circuit boards with antennas. Opp. at 19. This alleged difference in the patents,
22 however, cannot hide the fact that both Ruckus and Fujitsu claim the *same NETGEAR product*
23 infringes both patents and the same structure of this NETGEAR product is at issue in both cases.
24 Second, Baker Botts argues that there is no substantial relationship between the two representations
25 because NETGEAR's products are at issue in the Fujitsu case but not in the Ruckus reexamination
26 proceeding. *Id.* ("NETGEAR products are entirely irrelevant in the Ruckus reexamination
27 proceeding.") Courts have long recognized that attorneys often need to learn more from their clients
28 than what is "directly related to the transaction or lawsuit at hand." *Jessen v. Hartford Cas. Ins. Co.*,

1    111 Cal. App. 4th 698, 712-13 (2003).  That is true here.  Even if NETGEAR's products were not a
2    part of its formal submission to the PTO in the reexamination proceeding, Baker Botts needed to
3    understand NETGEAR's non-infringement defenses in the Ruckus litigation, which implicate the
4    structure of NETGEAR's router that is accused of infringing both Ruckus's and Fujitsu's patents, in
5    order to effectively represent NETGEAR's interests at the PTO.  Busse Decl. ¶11.  In short, the
6    work Baker Botts' has done (a) for NETGEAR in the Ruckus reexamination proceeding and (b)
7    against NETGEAR in the Fujitsu patent infringement suit both concern the structure and function of
8    the same NETGEAR products.  This constitutes a substantial relationship.

9        Baker Botts also claims there is no substantial relationship between Baker Botts'
10   representation of NETGEAR with respect to its indemnification rights against third party suppliers
11   because NETGEAR's indemnification rights are not the "subject matter" of this lawsuit.  Baker
12   Botts's approach is far more narrow than the law requires.  For purposes of determining whether
13   there is a substantial relationship between two representations, courts consider whether, given the
14   nature of representation A, the lawyer would likely have obtained information that would be
15   material not just to the merits of B's case, but to "the evaluation, prosecution, settlement or
16   accomplishment of the litigation . . ."  *Jessen*, 111 Cal. App. 4th at 713.  In representing NETGEAR
17   with respect to its indemnification rights, Baker Botts by definition would have acquired
18   confidential information about those rights.  Would such information be material to Fujitsu's
19   accomplishment of its goals in this case, including, potentially, settlement?  The answer is yes.

REPLY ISO MOTION TO DISQUALIFY      CV10-03972 LHK (HRL)

-13-

**CONCLUSION**

For the reasons set forth in NETGEAR's opening brief and this reply, the Court should disqualify Baker Botts from any participation, direct or indirect, in this case and from representing or assisting Fujitsu, directly or indirectly, in asserting patent infringement claims against NETGEAR.

DATED: December 2, 2010.

Respectfully,

PAMELA PHILIPS
AMY L. BOMSE
HOWARD RICE NEMEROVSKI CANADY FALK &
    RABKIN
A Professional Corporation

By: _____/s/ Amy L. Bomse_____
            AMY L. BOMSE

Attorneys for Defendant NETGEAR, INC.