UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| FUJITSU LIMITED, | ) | Case No.: 10-CV-03972-LHK |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER CONSTRUING DISPUTED CLAIM TERMS OF U.S. PATENT NO. |
| BELKIN INTERNATIONAL, INC.; BELKIN, INC.; D-LINK CORPORATION; D-LINK SYSTEMS, INC.; NETGEAR, INC.; ZYXEL COMMUNICATIONS CORPORATION; and ZYXEL COMMUNICATIONS, INC., | ) ) ) ) ) ) ) | RE. 36,769 |
| Defendants. | ) ) ) | |

Plaintiff Fujitsu, Ltd. ("Fujitsu") brings this action for patent infringement against Defendants Belkin International, Inc.; D-Link Corp.; D-Link Systems, Inc.; Netgear, Inc.; Zyxel Communications Corp.; and Zyxel Communications, Inc. (collectively "Defendants"). The parties now seek construction of two disputed terms in the claims of U.S. Patent No. Re. 36,769 ("the '769 Patent"). The Court held a Tutorial on October 6, 2011, and a *Markman* hearing on October 14, 2011. For the reasons discussed in Section III.B, *infra*, the parties filed supplemental briefing on October 21, 24, and 28, 2011. ECF Nos. 191, 195, 200. The Court has reviewed the claims, specifications, and other relevant evidence, and has considered the briefing and arguments of the parties. The Court now construes the terms at issue.

## I. BACKGROUND

### A. Prosecution History

The '769 Patent is a reissue of U.S. Patent No. 5,357,091 ("the '091 Patent"), which was filed on April 30, 1992, claiming priority over a Japanese application filed in April 1991. The '091

United States District Court
For the Northern District of California

Patent was issued on October 18, 1994. Two years later, on October 18, 1996, Fujitsu filed a reissue application, in which it canceled all independent claims of the '091 Patent, added 18 additional claims, and rewrote the dependent claims to depend on new independent claims 38 and 39. After considering more than thirty references during the reissue proceedings, the U.S. Patent and Trademark Office ("PTO") allowed the '769 Patent to issue on July 11, 2000.

The '769 Patent was reexamined in response to independent *ex parte* requests from Fujitsu in 2005 and Belkin in 2006 ("Belkin Reexam I"), which the PTO merged into a single reexamination proceeding involving review of more than 180 prior art references. The PTO issued a reexamination certificate on December 8, 2009, in which it canceled six claims and allowed 41 additional claims. Belkin filed a second request for *ex parte* reexamination on March 3, 2011 ("Belkin Reexam II"), which the PTO granted but on which no action has yet been taken.

### B.   Background and Description of the Invention

The invention at issue relates to a "card type input/output interface device" and to systems that use such a device to facilitate communication between an electronic device system and an external or peripheral device. At the time of Fujitsu's claimed invention, small scale portable electronics, such as laptop computers, featured connector ports mounted on the sidewall of the main body for connecting to external devices, such as printers and modems. These various connectors were of different dimensions and specifications and occupied valuable real estate on the sidewall of small scale portable electronics, imposing a significant constraint on the ability to downsize such electronic devices. *See* '769 Patent, col. 1:15-62.

The claimed invention sought to address this problem by creating a card-type device that serves as an interface between an electronic device (such as a laptop) and an external device (such as a printer), thereby reducing or eliminating the need for multiple externally mounted connector ports on the sidewalls of the electronic device's main body. *See id.* col. 1:54-62; col. 2:1-4; col. 7:15-24. At the time, card-type devices were commonly used for memory storage. Known as Integrated Circuit (IC) memory cards, these cards could be inserted into a slot in the main body of a portable electronic device and used as an external storage device. *See id.* col. 1:18-55. The '769 patent is the first disclosure of a card-type device that serves not as a memory storage device but

2

1    rather as an interface device capable of transferring data between an electronic device and an

2    external device.

3          As shown in Figure 1 of the '769 Patent, the claimed card type input/output interface device

4    consists of three main components: (1) a first connection part on one end ("first data interface

5    unit") for transferring data between a main body of an electronic device and the card type

6    input/output interface device; (2) a second connection part on the opposite end ("second data

7    interface unit") for transferring data between an external device and the card type input/output

8    interface device; and (3) a circuit connecting the first interface and second interface units ("data

9    transfer circuit").  *See* '769 Patent, col. 2:5-15.  An electronic device accommodating this card type

10   input/output interface unit may include a single slot formed in the main body rather than

11   incorporate multiple connector ports on its sidewalls, thereby facilitating downsizing of the

12   electronic device.  *See id.* col. 2:1-5.

13         The '769 patent describes three embodiments of the card type input/output interface device.

14   The first two embodiments disclose a wireless card interface device, while the third embodiment

15   discloses a wired connection.  In the first two embodiments, the card type input/output interface

16   device is configured to send and receive data at the second data interface wirelessly via a radio

17   transmitter/receiver unit and an antenna.  *See id.*, col. 3:18-col.5:41 (first embodiment); col. 5:42-

18   col. 6:29 (second embodiment).  In the third embodiment, the card type input/output interface

19   device is configured to send and receive data at the second data interface through a cable using

20   various types of standard connectors.  *See id.* col. 6:31-7:43.

21         The asserted claims of the '769 patent can be divided into three categories: (1) "device"

22   claims directed to the "card type input/output interface device" itself (*e.g.*, claims 2, 4-18, 38, 41-

23   43, 56-61, 63, 65-66, 72-76, 78, 80-82, 88-89, and 91-93); (2) "system" claims directed to a system

24   comprised of the card interface device and an "external device" to which it connects (*e.g.*, claims

25   46-49, 62, 67-69, 77, 83-85, 90, and 94-96); and (3) "electronic system" claims directed to an

26   electronic system comprised of the card interface device, an "electronic device," and an "external

27   device" (*e.g.*, claims 20, 22-37, 39, 52-54, 64, 70-71, 79, and 86-87).  *See* First Am. Compl.

28

3

United States District Court
For the Northern District of California

1  ("FAC") ¶ 17, ECF No. 102.  Fujitsu originally asserted 32 of the 86 claims in the '769 patent but

2  has since reduced the number of asserted claims to 21.[1]

### C.  Claim Terms at Issue

The parties originally sought construction of eight terms: (1) "card"/"card interface"; (2) "data interface unit"; (3) "data transfer circuit"; (4) "slot"; (5) "to be inserted into a slot provided in the electronic device"; (6) "wireless data transmitter/receiver"; (7) "edge portion"; and (8) "providing a peripheral function for the electronic device."[2]  However, since filing their original claim construction briefs, the parties have stipulated to construe the first six terms as follows:

(1)  "card" and "card interface" are to be given their ordinary and customary meaning;

(2)  "data interface unit" is to be construed as "a unit for buffering or receiving/transmitting data";

(3)  "data transfer circuit" is to be construed as "a circuit for transferring data";

(4)  "slot" is to be given its ordinary and customary meaning;

(5)  "to be inserted into a slot provided in the electronic device" is to be given its plain meaning; and

(6)  "wireless data transmitter/receiver" is to be construed as "electronics that can send and receive data wirelessly."[3]

---

[1] Specifically, Fujitsu is asserting independent claims 38, 41, 43, 45, 47, and 49, and dependent claims 2, 4, 8, 9, 10, 12, 13, 14, 15, 18, 20, 27, 32, 42, 48.

[2] In their Amended Joint Claim Construction and Prehearing Statement, filed August 19, 2011, the parties identify a ninth disputed term, "card type input/output interface device."  *See* ECF No. 164 at 3.  However, the Court need not address this term.  Neither party addressed this term in its briefs or in its argument at the *Markman* hearing.

[3] At the October 6, 2011 tutorial, the parties stipulated to the plain meaning of "to be inserted into a slot provided in the electronic device."  Tutorial Tr. at 6-7.  In a Joint Status Report Re: Claim Construction Meet-and-Confer, filed October 12, 2011, the parties further stipulated to a construction of "wireless data transmitter/receiver" and also agreed that the terms "card"/"card interface" and "slot" required no construction.  *See* ECF No. 188 at 1.  The parties stipulated to constructions of "data interface unit" and "data transfer circuit" during the claim construction hearing on October 14, 2011.  *See Markman* Hr'g Tr. at 86-87 ("data transfer circuit"), 102-03 ("data interface unit").

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS

United States District Court
For the Northern District of California

1   The parties having so stipulated, the Court hereby adopts these constructions for the first six terms.

2   Thus, the only remaining disputed terms requiring construction by the Court are (1) "edge portion,"

3   and (2) "providing a peripheral function for the electronic device."

4   **II.   LEGAL STANDARD**

5       Claim construction is a question of law to be determined by the Court.  *Markman v.*

6   *Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).

7   "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full

8   understanding of what the inventors actually invented and intended to envelop with the claim."

9   *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (internal citation omitted).

10  Accordingly, a claim should be construed in a manner that "stays true to the claim language and

11  most naturally aligns with the patent's description of the invention."  *Id.* (internal citation omitted).

12      In construing disputed terms, the Court looks first to the claims themselves, read in context,

13  for "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

14  which the patentee is entitled the right to exclude.'"  *Id.* at 1312 (quoting *Innova/Pure Water, Inc.*

15  *v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Generally, the words

16  of a claim should be given their "ordinary and customary meaning," which is "the meaning that the

17  term would have to a person of ordinary skill in the art in question at the time of the invention, i.e.,

18  as of the effective filing date of the patent application."  *Id.* at 1312-13 (internal quotation marks

19  and citations omitted); *accord Chamberlain Group, Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed.

20  Cir. 2008).  In some instances, the ordinary meaning to a person of skill in the art is clear, and

21  claim construction may involve "little more than the application of the widely accepted meaning of

22  commonly understood words."  *Phillips*, 415 F.3d at 1314.

23      In many cases, however, the meaning of a term to a person skilled in the art will not be

24  readily apparent, and the court must ascertain the term's meaning by looking to other sources, such

25  as "'the words of the claims themselves, the remainder of the specification, the prosecution history,

26  and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms,

27  and the state of the art.'"  *Id.* (quoting *Innova*, 381 F.3d at 1116).  Under these circumstances,

28  courts generally begin by examining intrinsic evidence (including the claims, the specification,

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS

and, if in evidence, the prosecution history) before turning to extrinsic evidence (*e.g.*, expert testimony, dictionaries, and treatises). *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *see also Phillips*, 415 F.3d at 1324 ("[T]here is no magic formula or catechism for conducting claim construction[, n]or is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.").

First, the court should consider the context in which the term is used in an asserted claim or in related claims, bearing in mind that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Claim differentiation is a valuable claim construction tool, in that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (citation omitted).

Furthermore, the claims must be read "in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979; *accord Phillips*, 415 F.3d at 1315. Because the specification must contain a description of the invention sufficiently clear "to teach and enable those of skill in the art to make and use the invention," *Phillips*, 415 F.3d at 1323, the specification is "'always highly relevant'" and "'[u]sually [] dispositive; it is the single best guide to the meaning of a disputed term,'" *id.* at 1315 (quoting *Vitronics*, 90 F.3d at 1582); *accord Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1320 (Fed. Cir. 2011). Where the specification reveals that the patentee has given a special definition to a claim term that differs from the meaning it would ordinarily possess, the inventor's lexicography governs. *Phillips*, 415 F.3d at 1316. Likewise, where the specification reveals an intentional disclaimer or disavowal of claim scope by the inventor, the inventor's intention as revealed through the specification is dispositive. *Id.*

The court should also consider, if it is in evidence, the patent's prosecution history, which consists of the complete record of proceedings before the PTO and includes the prior art references cited during the examination. *Id.* at 1317. Although it is generally less useful than the specification for claim construction purposes, the prosecution history nevertheless "can often

6

United States District Court
For the Northern District of California

inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be." *Id.* (internal citations omitted).  For example, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

Finally, the court is also authorized to consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980 (internal citations omitted).  Expert testimony may be particularly useful in "[providing] background on the technology at issue, [explaining] how an invention works, [ensuring] that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or [establishing] that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318.  Technical dictionaries are likewise helpful in educating the court on how one of ordinary skill in the art might use the claim terms.  *Id.* Although the court may consider evidence extrinsic to the patent and prosecution history, such evidence is considered "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1317-18 (internal quotation marks and citation omitted).  Thus, while extrinsic evidence may be useful in claim construction, ultimately "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.  Any expert testimony "'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history'" will be significantly discounted.  *Id.* at 1318 (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS

United States District Court
For the Northern District of California

III. DISCUSSION

A. "edge portion"

| Fujitsu's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning | "a sidewall of the card" |

The term "edge portion" does not appear in the specification but appears in dependent claims 8 and 26, which recite a card interface device "wherein said antenna is an edge portion of said card." '769 Patent, claims 8, 26. Defendants propose construing "edge portion" as "the sidewall of the card" so as to avoid jury confusion with the terms "end" or "end portion," which appear elsewhere in the claims. Resp. at 15; *see, e.g.*, '769 Patent, claim 51 (describing "a card, provided with a first end portion and a second end portion opposite to the first end portion, the first end portion inserted into the slot of the electronic device"). Defendants assert that their construction is supported by Figures 4A through 4D, which are diagrams showing "an antenna used in disclosed embodiments of the present invention." '769 Patent, col. 2:54-55. These embodiments illustrate the antenna (12-1) at the sidewall of the card. Defendants also argue that their construction is supported by the text of the specification, which describes the antenna in Figure 4A as being "fastened to the sidewall of the card." *Id.*, col. 4:60-62. Fujitsu counters that nothing in the claim language or specification supports narrowly construing the term to mean "the sidewall" and that the term "edge" is commonly understood to mean "the line where an object or area begins or ends." Br. at 17 (citing Garten Decl. Ex. 11 at FUJ0020922, Ex. 12 at FUJ0020932).

The Court agrees with Fujitsu that "the ordinary meaning" of this claim term "may be readily apparent even to lay judges," and therefore claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. Furthermore, Defendants' proposed narrowing construction is not supported by evidence, intrinsic or otherwise. Indeed, Defendants' proposed construction is inconsistent with the plain language of the specification. Defendants would have the Court construe claims 8 and 26 as reciting a card interface device "wherein said antenna is the sidewall of the card." The preferred

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

embodiment, however, describes an antenna that is "rotatably supported by a screw member 12k," which in turn is "fastened *to* the sidewall of the card 4 so that the rod antenna 12-1 rotates around the screw member 12k." '769 Patent, col. 4:59-62 (emphasis added). The proposed embodiment specifically and expressly discloses an antenna attached by a screw *to* the sidewall of the card; therefore, the antenna cannot *be* the sidewall of the card, as Defendants propose. Defendants' proposed construction of "edge portion" as "a sidewall of the card" reads out the preferred embodiment. A proposed construction that excludes a preferred embodiment "is rarely, if ever, correct." *Vitronics Corp.*, 90 F.3d at 1582; *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007).

The Court finds nothing in the evidence that justifies displacing the plain and ordinary meaning of a non-technical term with unsupported limitations and therefore agrees with Fujitsu. The plain and ordinary meaning of the term "edge portion" is sufficiently clear, and therefore no construction is required.

**B. "providing a peripheral function for the electronic device"**

| Fujitsu's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning | "performing a function instructed by the electronic device" |
| | **Defendants' Alternative Proposed Construction[4]** |
| | "peripheral devices such as modems, printers or disk drives, that are connected to a computer and are controlled by its microprocessor, and human input/output devices, such as keyboards, monitors and mice" |

At the heart of the dispute over the construction of this term is whether an external device "providing a peripheral function for the electronic device" includes routers and access points such as Defendants' accused devices. Fujitsu's proposed "plain meaning" construction would

---

[4] Defendants did not propose this alternative construction until the *Markman* hearing. *See Markman* Hr'g. Tr. 20:17-23, 30:25-31:8; *see also* Defendants' *Markman* Hearing Exhibits Slide at 10_003.

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS

**United States District Court**
For the Northern District of California

1   presumably be broad enough to encompass such devices, whereas Defendants' narrower proposed

2   constructions may not.

3          Prior to the *Markman* hearing, the parties stipulated to adding two prior art references, U.S.

4   Patent No. 4,972,457 ("O'Sullivan") and the Arlan 400 Brochure ("Arlan"), to the *Markman*

5   hearing record.  ECF No. 187, Exs. C & F.[5]  During the *Markman* hearing, Defendants introduced

6   new arguments based on these two references.[6]  Defendants represented that they discovered these

7   new arguments between the time Fujitsu filed its reply and the *Markman* hearing.  *Markman* Hr'g

8   Tr. 84:25-85:11.  At the *Markman* hearing, Defendants also proposed a new alternative claim

9   construction in response to the Court's questions at the Tutorial.  *Id.* at 31:14-24.  Defendants

10  provided their alternative claim construction to Fujitsu the day before the *Markman* hearing.  *Id.* at

11  20:17-23.  The parties discussed Arlan in their original claim construction briefing.  Neither party's

12  original claim construction briefing discussed O'Sullivan.

13         Ordinarily, the Court would find that any arguments not made in the claim construction

14  briefing have been waived and may not be raised for the first time at the *Markman* hearing.

15  However, in this instance, the parties have narrowed their claim construction disputes from a

16  possible total of ten terms down to two terms, and the parties have represented that a ruling as to

17  whether this term covers routers and access points is necessary for settlement.  Defendants' sales of

18  routers and access points essentially constitute the potential damages in this case.  Moreover, if this

19  case does not settle, the Court finds that ignoring Defendants' new argument would "frustrate the

20  Court's ability to satisfy its independent duty to properly instruct the jury."  *Capital Mach. Co.,*

21  *Inc. v. Miller Veneers, Inc.*, No. 1:09-cv-00702, 2011 WL 4102583, at *2 n.3 (S.D. Ind. Sept. 14,

22  2011).  Accordingly, the Court will consider the additional briefing and materials attached thereto

23  in construing this term.  Ultimately, however, the Court finds that Defendants' new arguments lack

24  merit.

25

26

27  _____
    [5] Defendants contend that the Arlan reference itself was not in evidence until the parties stipulated
    to add additional evidence into the record just prior to the hearing.  Bovich Decl. ¶ 8.
28  [6] Fujitsu did not object to Defendants' new arguments until after Defendants completed their
    presentation regarding these two references.  *See Markman* Hr'g Tr. 67:13-14, 18-19.

United States District Court

For the Northern District of California

Fujitsu argues that a person of ordinary skill in the art reading the claims and specification at the time of the invention would understand external devices "providing a peripheral function" to include modems, printers, and other "well-known accessory devices." Br. at 7; Reply at 1.

Defendants proffer two proposed constructions. In the first round of briefing, Defendants argued that the claimed "external device providing a peripheral function for the electronic device" is essentially a "peripheral device." Resp. at 16, 20 & n.12. As such, Defendants contended that the claimed "external device" must: (1) be "under the control of" the electronic device, *id.* at 16; (2) "execut[e] . . . instructions on the data" received from the electronic device, *id.* at 18; and (3) "perform[] a function on the data and transform[] it," *id.* Defendants urged the Court to construe "providing a peripheral function for the electronic device" to mean "performing a function instructed by the electronic device."

At the *Markman* hearing, Defendants proposed the following alternative construction for "external device providing a peripheral function for the electronic device": "a peripheral device such as a modem, printer, or disk drive, that is connected to a computer and is controlled by its microprocessor, and a human input/output device, such as a keyboard, monitor or mouse."[7] Thus, Defendants changed the term to be construed from (1) "providing a peripheral function for the electronic device" to (2) "external device providing a peripheral function for the electronic device."

The Court rejects Defendants' proposed constructions and finds that a plain and ordinary meaning construction is most appropriate for this term.

### 1.   Claim Language and Specification

The disputed term is used throughout the asserted two device "system" claims. '769 Patent, claims 45, 47, 48, and 49. For example, independent claim 45 recites "an external device providing a peripheral function for the electronic device." '769 Patent, col.12:47-48. Fujitsu and Defendants agree that the term "providing a peripheral function" necessarily modifies the term "external device." *See* Resp. at 16; Reply at 1. While the Court likewise agrees that "providing a

---

[7] The Court modifies Defendants' alternative proposed construction, which was proposed in the plural, to match the claimed "electronic device," which is singular.

peripheral function" refers to a specific kind of external device, to construe the precise scope of the disputed limitation, the Court must read the claim language in light of the specification.

The specification does not use the term "peripheral function," but does use the terms "external device" and "peripheral device" when referring to devices that communicate with the "electronic device" through the card interface. *Id.* at col. 1:11-14, 56-59; col. 3:40-47. In describing the field of the invention, the specification states, "[t]he present invention generally relates to a card type input/output interface device, which couples a main body of an electronic device system and an external or *peripheral device* with each other." *Id.* at col.1:11-14 (emphasis added). The specification identifies modems and printers as examples of the claimed "external device providing a peripheral function for the electronic device." '769 Patent, claims 45, 47, 48, and 49; *see, e.g.*, *id.* at col. 1:22-24; col. 3:65-67; col. 6:14.

*Defendants' First Proposed Construction.* Defendants argued that the specification supported their first proposed construction because one of ordinary skill in the art would understand that "'an external device performing a peripheral function for the electronic device' is the same thing as a 'peripheral device.'" Resp. at 16. Defendants supported this argument with the fact that modems and printers, the only examples in the specification of external devices "providing a peripheral function for the electronic device," are peripheral devices. According to Defendants, a peripheral device is well understood by those of ordinary skill in the art to mean "a device that acts under the control of another device." *Id.* (citing Brody Rep. ¶ 97).

The Court disagrees that the specification supports Defendants' first proposed construction. That the specification uses the terms "external *or* peripheral device," *see, e.g.*, '769 Patent col. 1:11-14 (emphasis added), indicates that "external device" is not interchangeable with "peripheral device," as Defendants suggest. The plain meaning of the word "or" in this context suggests the possibility of a device that is an "external device providing a peripheral function to the electronic device," but that is not a "peripheral device." Moreover, that the specification in several places refers to "an external device" alone without referring to a "peripheral device" provides further support that "external device providing a peripheral function" and "peripheral device" are not necessarily coextensive.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Defendants also argue that one of ordinary skill in the art would understand "peripheral

2    function" to mean "the execution of instructions on data."  Resp. at 18.  This interpretation is not

3    supported by the specification.  The specification does not refer to "instructions" sent from the

4    "electronic device" to the "external device" to perform or execute a "function," as Defendants' first

5    proposed construction would require.  The only reference in the specification to any "instruction"

6    concerns an internal instruction—that is, within the electronic device—sent from the processor to

7    the card interface device "to transfer data." *Id.* at col. 5:6-11; 6:16; *see also* Williams Rep. ¶ 59;

8    Brody Dep. 67:7-8; 68:9-10.  For example, the specification states that in one embodiment, "[t]he

9    processor in the main body **20** or the like specifies the external device **30** and *generates an*

10   *instruction* to transfer data." '769 Patent, col. 6:16.  As Defendants' expert admits, Defendants'

11   first proposed construction does not rely on the "narrow use" of the word "instruction" from the

12   specification.  *See* Brody Dep. 68:3-8.  Thus, Defendants' first proposed construction, which

13   requires the external device to perform a function "*instructed* by the electronic device," finds no

14   support in the specification (emphasis added).

15   Moreover, to the extent Defendants argue that the "instructed by" limitation comes not from

16   the specification, but rather from a skilled artisan's understanding that a peripheral device is

17   "controlled by" the electronic device, Brody Dep. 66:14-16; 67:22-68:1, this limitation is

18   undermined by Defendants' second proposed construction.  Defendants argued in the first round of

19   briefing that the "external device providing a peripheral function for the electronic device" was a

20   "peripheral device."  As discussed below, Defendants' second proposed construction identifies

21   mice as an example of a peripheral device.  However, Defendants admitted at the Tutorial that mice

22   are not "controlled by" or "instructed by" the electronic device.  *See* Tutorial Tr. 102:12-21.  Thus,

23   the "instructed by" limitation is unsupported by the specification and inconsistent with Defendants'

24   own alternative proposed construction.

25   Nor does the specification language suggest that the external device must "perform[] a

26   function" on data sent from the electronic device, as Defendants argue would be understood by a

27   person of ordinary skill in the art.  Defendants state that a "true peripheral device such as a printer .

28   . . *transforms* the data (i.e., by performing functions such as printing the data)."  Resp. at 17 (citing

13

United States District Court
For the Northern District of California

1    Brody Rep. ¶¶ 100-03) (emphasis in original).  Defendants also state that a skilled artisan would

2    understand that "a peripheral device does not merely transfer data and pass it along to another

3    location, but instead performs a function on the data and transforms it."  Resp. at 18.

4          The specification does not support Defendants' first proposed construction in this regard.

5    There is no mention in the specification of the external device transforming data.  To the extent

6    Defendants rely on the disclosed embodiments -- a modem and a printer -- for the requirement that

7    an external device "providing a peripheral function for the electronic device" transforms data

8    received from the electronic device, Defendants are improperly seeking to import the limitations of

9    the disclosed embodiments into the claim terms.  *See Phillips*, 425 F.3d at 1323.  Accordingly, the

10   Court finds that the specification does not support Defendants' first proposed construction.

11         *Defendants' Alternative Proposed Construction*.  Defendants' new proposed construction --

12   "a peripheral device such as a modem, printer, or disk drive, that is connected to a computer and is

13   controlled by its microprocessor, and a human input/output device, such as a keyboard, monitor, or

14   mouse" -- is a more explicit attempt to import the limitations of the disclosed embodiments into the

15   claim terms by directly importing the examples of printers and modems, while imposing other

16   limitations such as human input/output devices, that do not appear in the specification at all.

17   Moreover, Defendants do not explain why the electronic device to which the external device

18   connects ought to be limited to a computer when the specification does not suggest such a

19   limitation.  Accordingly, the Court finds that the specification does not support Defendants'

20   alternative proposed construction.

21         Thus, the specification supports neither of Defendants' proposed constructions for this

22   term.

23                    **2.  Prosecution History**

24         The parties' original briefs cite little evidence from the prosecution history in support of

25   their proposed constructions.  As discussed above, the Court granted leave to file supplemental

26   briefing to address Defendants' new arguments based on the Arlan and O'Sullivan references.

27   Neither of Defendants' proposed constructions is supported by the prosecution history arguments

28   made in the two sets of briefs.

14

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS

**United States District Court**
For the Northern District of California

1    In the first round of briefing, Fujitsu argued that evidence from the reexamination history

2    undermines Defendants' position that peripheral devices do not include routers and access points.

3    Br. at 9-10.  According to Fujitsu, "Belkin cited prior art that used access points or routers in an

4    effort to invalidate the claims during reexamination, but now seeks a narrowing construction to

5    avoid infringement by those same devices."  Reply at 3.  Fujitsu notes that during reexamination

6    Belkin argued that the Arlan reference disclosed a wireless card that is "used to connect . . . a

7    personal computer [] to an external or peripheral device, such as a network server."  Br. at 10

8    (citing Request for Reexamination, Garten Decl. Ex. 7 at 35).  Thus, on reexamination Belkin

9    appeared to take a broader view of an "external device providing a peripheral function" than it does

10   here.

11   Defendants cite *Seachange Int'l Inc. v. C-Cor Inc.,* 413 F.3d 1361, 1374 (Fed. Cir. 2005),

12   and counter that the alleged infringer's statements during reexamination do not impact the scope of

13   the term.  It is true that statements made by the *patentee* that distinguish prior art may lead to a

14   disavowal of claim scope.  However, this does not mean that an *accused infringers'* statements

15   during reexamination are wholly irrelevant to construing the claim terms.  Moreover, Defendants

16   have not cited any cases that stand for such a proposition.  Indeed, the Federal Circuit's case law

17   appears to allow for the consideration of any statements made during the prosecution history.  *See*

18   *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374 (Fed. Cir. 2008) ("Statements

19   made during prosecution may also affect the scope of the claims." (citing *Rexnord Corp. v. Laitram*

20   *Corp.*, 274 F.3d 1336, 1343 (Fed. Cir. 2001))).  Nevertheless, the statement Fujitsu cites here, that

21   Defendants understood a "peripheral device" to include "network servers," merely suggests that

22   Defendants may have understood "providing a peripheral function for the electronic device" to be a

23   broader concept than they advocate here.  This does not, however, answer the parties' central

24   question of whether the claimed "external device providing a peripheral function for the electronic

25   device" includes routers and access points.  Accordingly, the Court looks to Fujitsu's statements

26   during the reexamination history to see if there was a clear disavowal of claim scope.

27   In their supplemental briefing, Defendants argue that Fujitsu disavowed routers and access

28   points during the reexamination history when distinguishing O'Sullivan and Arlan.  Suppl. Resp. at

1.  As stated above, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g*, 334 F.3d at 1324.  For the prosecution disclaimer doctrine to apply, the disavowal must be "clear and unmistakable," *id.* at 1326, and must be the only "reasonable interpretation" of the patentee's statements, *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1287 (Fed. Cir. 2005) ("There is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed term.").

*Fujitsu's Distinguishing of Claims Containing "Peripheral Function" Generally.*  During reexamination proceedings, in Fujitsu's Response and Amendments to the Office Action mailed on September 29, 2007, and the Decision Granting One Month Petition for Extension of Time mailed on November 29, 2007, Fujitsu sought to overcome the rejection of original Claims 2, 4-18, 20 and 22-55, and additional Claims 56-109.  Fowler Decl. Ex. 3 at 37.[8]  Claims 2, 4-6, 18, 20, 22-24, 36, 38-43, 45-49, and 51-54 were rejected under 35 U.S.C. § 102(a) as being anticipated by O'Sullivan, and Claims 7-9, 12-17, 25-27, 30-35, 44, 50, and 55 were "rejected under 35 U.S.C. § 103(a) as being unpatentable over O'Sullivan in view of Inoue (Gordon, May, or Mizutani)."  *Id.* at 59.  Fujitsu asserted several grounds for traversing these rejections.  *Id.*  For example, Claim 45 recites "an external device providing a peripheral function for the electronic device."  *Id.* at 16.  Fujitsu argued that Claim 45 was not anticipated by O'Sullivan because O'Sullivan failed to "disclose, teach, or suggest, 'a card, electrically connected to the external device to be inserted into a slot provided in the electronic device.'"  *Id.* at 61-62.  On the other hand, Fujitsu never argued that Claim 45 was not anticipated by O'Sullivan because O'Sullivan failed to disclose "an external device providing a peripheral function for the electronic device."  Thus, Fujitsu distinguished O'Sullivan on several grounds unrelated to whether O'Sullivan disclosed, taught, or suggested "an external device providing a peripheral function for the electronic device."

---

[8] The page number refers to the page numbering in the original document, not the page numbering on the ECF stamp.

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS

United States District Court
For the Northern District of California

1    Likewise, Claims 2, 4-5, 18, 20, 22-23, 36-43, 45-49, and 51-54 were rejected under 35

2    U.S.C. § 102(b) as being anticipated by Arlan, and Claims 6-9, 12-13, 24-27, 30-31, 44, 50, and 55

3    were "rejected under 35 U.S.C. § 103(a) as being unpatentable over Arlan in view of Inoue

4    (O'Sullivan, Gordon, May or Mizutani)."  *Id.* at 67.  Fujitsu asserted several grounds for traversing

5    these rejections as well.  *Id.*  For example, Fujitsu argued Claim 45 was not anticipated by Arlan

6    because Arlan failed to "disclose, teach, or suggest 'a second data interface unit for transmitting the

7    output information to the external device and for receiving the input information from the external

8    device.'"  *Id.* at 67.  On the other hand, Fujitsu never argued that Claim 45 was not anticipated by

9    Arlan because Arlan failed to disclose "an external device providing a peripheral function for the

10   electronic device."  Furthermore, Fujitsu asserted that the "new claims [we]re also allowable

11   because they recite further patentable distinctions over the references."  *Id.* at 79.  Thus, Fujitsu

12   listed several grounds for distinguishing all of the cited prior art references, none of which included

13   failure to disclose "an external device providing a peripheral function for the electronic device."

14   *Id.*

15   *Fujitsu's Distinguishing of New Claim 62.*  However, specific to new Claim 62, which is

16   not asserted here, Fujitsu argued: "New Claim 62, for example, is not anticipated by the references

17   also at least because the references fail to disclose, teach, or suggest 'an external device providing a

18   peripheral function for the electronic device, wherein the external device comprises an antenna and

19   a wireless transmitter/receiver.'  For example, O'Sullivan does not teach or suggest such an

20   external device.  The other references are similarly deficient.  Favorable action is requested."  *Id.* at

21   81-82.  Claim 62 recites, in part, a system comprising "an external device providing a peripheral

22   function for the electronic device, *wherein the external device comprises an antenna and a wireless*

23   *transmitter/receiver.*"  '769 Patent, claim 62 (emphasis added).  Defendants contend that "Fujitsu

24   disavowed O'Sullivan and Arlan on the basis they did not contain an 'external device performing

25   [sic] a peripheral function,' and not on the basis they lacked an 'antenna and a wireless

26   transmitted/receiver.'"  Suppl. Resp. at 1 (emphasis omitted).  Defendants argue that Fujitsu's

27   statement therefore amounts to a clear disavowal of routers and access points because routers

28   comprise an antenna and a wireless transmitter/receiver.

**United States District Court**
For the Northern District of California

1    The Court disagrees.  The specific statement here is unclear as to whether it is

2   distinguishing the O'Sullivan and Arlan references on the ground that the external device in those

3   references did not "provide a peripheral function for the electronic device" or on the ground that

4   the external device in those references did not comprise "an antenna and a wireless

5   transmitter/receiver."  The statement therefore does not amount to a "clear and unmistakable"

6   disavowal of routers and access points.  *Omega Eng'g*, 334 F.3d at 1324.  Furthermore, "[e]ven if

7   an isolated statement appears to disclaim subject matter, the prosecution history as a whole may

8   demonstrate that the patentee committed no clear and unmistakable disclaimer."  *Ecolab, Inc. v.*

9   *FMC Corp.*, 569 F.3d 1335, 1342 (Fed. Cir. 2009) (citing *Elbex Video, Ltd. v. Sensormatic Elecs.*

10   *Corp.*, 508 F.3d 1366, 1372-73 (Fed. Cir. 2007)).

11    The prosecution history as a whole further buttresses Fujitsu's construction.  Fujitsu's

12   patent application included numerous claims that included the limitation "providing a peripheral

13   function for the electronic device."  Fujitsu never cited to this limitation to distinguish these claims

14   from any of the cited prior art references.  For Claim 62, however, Fujitsu cited to the following

15   limitation as a basis to distinguish the invention from all cited prior art references, including

16   O'Sullivan and Arlan: "an external device providing a peripheral function for the electronic device,

17   wherein the external device comprises an antenna and a wireless transmitter/receiver."  This

18   prosecution history as a whole supports Fujitsu's argument that the limitation, "wherein the

19   external device comprises an antenna and a wireless transmitter/receiver," was the basis upon

20   which Claim 62 was not anticipated by the cited prior art references.

21    At the very least, the specific ground upon which Fujitsu distinguished O'Sullivan and

22   Arlan is ambiguous, and thus falls short of the "clear and unmistakable" disclaimer standard.  *See*

23   *SanDisk*, 415 F.3d at 1287.  Moreover, even if there was a disclaimer as to Claim 62, it would not

24   extend to the other claims lacking the "wherein" clause.  *See Golight, Inc. v. Wal-Mart Stores, Inc.*,

25   355 F.3d 1327, 1333 (Fed. Cir. 2004) (disclaimer relating to art that did not teach 360-degree

26   rotation did not apply to claims lacking such a claim element).

27    Defendants argue that O'Sullivan and Arlan teach external devices "comprising an antenna

28   and a wireless transmitter/receiver," and therefore the only ground on which Fujitsu distinguished

18

1    these devices is that they did not "provide a peripheral function for the electronic device." The

2    Court is not persuaded.

3         The Court has reviewed O'Sullivan's specification and the reexamination history of the

4    patent at issue.  O'Sullivan's specification does in fact state: "the transceiver unit **4** communicates

5    with the cellular telephone network **12** using radio waves, these waves being transmitted and

6    received using antennas **10** and **32**." *Id.* at col. 5:18-20.  However, O'Sullivan's specification at

7    best is ambiguous as to whether O'Sullivan teaches: (1) an *external device*, and (2) an external

8    device comprising an antenna *and* a wireless transmitter/receiver.  Moreover, Defendants rely

9    heavily on Figure 1, but the Court finds that Figure 1 does not clearly teach an external *device*, nor

10   does it clearly teach an external device comprising both an antenna *and* a wireless

11   transmitter/receiver.  Furthermore, the reexamination history of the patent at issue is ambiguous as

12   to whether the Examiner understood that O'Sullivan taught an external device comprising an

13   antenna and a wireless transmitter/receiver.  In light of these ambiguities, the Court cannot find a

14   prosecution history disclaimer.

15        The Arlan reference is similarly unavailing to Defendants.  The Arlan brochure describes

16   cards for providing wireless LAN access to computers.  Add'l Evid., Ex. F at 1-2.  The first page of

17   the brochure depicts three computers; a "LAN file server"; and the Arlan card, which appears to

18   contain an antenna and is inserted into the LAN file server.  *Id.* at 1.  The second page of the

19   brochure depicts the Arlan card with an antenna.  *Id.* at 2.  Belkin appeared to contend in its

20   reexamination request, and the Examiner agreed, that the LAN file server is the "external device."

21   *See* Fowler Decl. Ex. 4 at 35 and Ex. 6 at 76.  However, the LAN file server does not appear to

22   comprise an antenna.  Rather, the Arlan card appears to comprise the antenna.  Thus, it is a

23   reasonable interpretation that Fujitsu was distinguishing the Arlan reference on the ground that the

24   external device, the LAN file server, did not comprise an antenna.  The mere fact that Fujitsu

25   admitted that "Arlan disclosed a transceiver," Fowler Ex. 3 at 68, does not mean that Fujitsu

26   admitted that the *external device* in Arlan comprised a transceiver.  Indeed, Fujitsu states that Arlan

27   did not specify "where the transceiver is located." *Id.*  Again, in light of these ambiguities, the

28   Court cannot find a prosecution disclaimer.

19

United States District Court
For the Northern District of California

Defendants' reliance on *Andersen Corp. v. Fiber Composites, LLC,* 474 F.3d 1361 (Fed. Cir. 2007) is misplaced.  Defendants cite *Andersen* for the proposition that disavowal on a particular ground may exist even if the applicant distinguishes the reference on other grounds as well.  Suppl. Resp. at 1.  In *Andersen*, however, the basis for the disclaimer was clear and unambiguous.  Here, by contrast, the statement Defendants allege is a disclaimer is ambiguous.

The Court finds that the reexamination history does not support Defendants' position that Fujitsu disclaimed routers and access points.  Moreover, Defendants have not stated how the reexamination history supports either of their proposed constructions for this term.  Accordingly, the Court finds that the reexamination history does not support Defendants' proposed constructions.

### 3.   Extrinsic Evidence

Turning finally to extrinsic evidence, Defendants rely primarily on the 1991 *Microsoft Press Computer Dictionary* ("*Microsoft Dictionary*") and the testimony of both Fujitsu's expert and Defendants' expert, to support their proposed constructions, which they contend exclude routers and access points.  The Court discusses these sources in turn.

#### a.   *Microsoft Dictionary*

Defendants argue that because *Microsoft Dictionary*'s definition identifies "disk drives, printers, modems and joy sticks," but not routers and access points, as peripheral devices, this supports their narrow interpretation of the disputed term.  Resp. at 17.  The Court is not persuaded.

The *Microsoft Dictionary* defines peripheral as "a term used for devices, such as disk drives, printers, modems, and joysticks, that are connected to a computer and are controlled by its microprocessor. . . .  Keyboards, monitors, and mice are also strictly considered peripheral devices, but because they represent primary sources of input and output in most computer systems, they can be considered more as extensions of the system unit than as peripherals." *Microsoft Computer Dictionary* (1991), at 298.

*Defendants' First Proposed Construction.*  The Court does not find that a single dictionary definition of "peripheral" supports Defendants' proposed construction of "providing a peripheral function for the electronic device."  As discussed above, the Court found that the disputed term is

20

United States District Court
For the Northern District of California

not limited to a "peripheral device" and applies more broadly to any external device that "provid[es] a peripheral function for the electronic device." Furthermore, the *Microsoft Dictionary* definition is silent as to whether a peripheral device necessarily receives instructions from the electronic device, as Fujitsu's first proposed construction would require. Thus, the *Microsoft Dictionary* does not support Defendants' first proposed construction.

   *Defendants' Alternative Proposed Construction.* Defendants' alternative proposed construction is a clear attempt to mirror the *Microsoft Dictionary* definition. However, Defendants have not pointed to intrinsic evidence to support importing the specific limitations identified in this dictionary definition. Although the Court may consider evidence extrinsic to the patent and prosecution history, such evidence is considered "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1317-18 (internal quotation marks and citation omitted). Moreover, the Court is not inclined to limit "an external device providing a peripheral function for the electronic device" only to those devices identified in the *Microsoft Dictionary* given that Defendants themselves identified examples of external devices providing a peripheral function not identified in the *Microsoft Dictionary*, such as network servers. *See* Garten Decl. Ex. 7 at 35. Thus, while the *Microsoft Dictionary* supports Defendants' alternative proposed construction, the Court declines to adopt it in light of the intrinsic evidence.

### b. Expert Testimony

   Defendants rely on expert testimony in support of only their first proposed construction, not their alternative construction. Defendants quote Fujitsu's expert, Dr. Williams, as admitting that an external device "providing a peripheral function for the electronic device" "needs to know what to do with the data, how to organize that data and *what functions to provide* to the electronic device as a result of receiving that data." Resp. at 18 (citing Williams Dep. 191:2-9, 192:24-193:6) (emphasis added by Defendants). This quote does not support Defendants' conclusion that a peripheral device must perform functions *on the data*. This quote merely states that the external device must receive data that tells the external device what peripheral function to provide to the electronic device as a result of receiving that data. Similarly, that Fujitsu's expert stated, in

21

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS

response to a hypothetical, that "instructions are *often* provided as part of the data stream that is provided to the external device," Williams Rep. ¶ 61 (emphasis added by the Court), does not support Defendants' position that the electronic device must *always* send the external device an instruction to perform a function on and transform the data.

Defendants' own expert's testimony does not support Defendants' first proposed construction either. Defendants cite the testimony of their expert, Dr. Brody, in support of their proposed construction of "providing a peripheral function." Resp. at 18. Defendants suggest that "performing a peripheral function" requires "perform[ing] a function on the data and transform[ing] it." *Id.* Even if "performing a peripheral function" required "transforming data," Defendants' first proposed construction does not mention "transforming" or any of its variants. As such, Dr. Brody's testimony does not support Defendants' proposed construction.

Given that the intrinsic and extrinsic evidence does not support either of Defendants' proposed constructions, the Court adopts a plain and ordinary meaning construction of the term "providing a peripheral function for the electronic device." Fujitsu is therefore free to argue that a person of ordinary skill in the art would understand this term to include routers and access points.

## IV. CONCLUSION

In summary, and for the reasons stated herein, the Court construes the disputed claim terms of the '769 Patent as follows:

"edge portion" is to be given its plain and ordinary meaning; and

"providing a peripheral function for the electronic device" is to be given its plain and ordinary meaning.

**IT IS SO ORDERED.**


Dated: February 3, 2012

*Lucy H. Koh*
LUCY H. KOH
United States District Judge

Case No.: 10-CV-03972-LHK
ORDER CONSTRUING DISPUTED CLAIM TERMS