UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FUJITSU LIMITED,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>BELKIN INTERNATIONAL, INC.; BELKIN, INC.; D-LINK CORPORATION; D-LINK SYSTEMS, INC.; NETGEAR, INC.; ZYXEL COMMUNICATIONS CORPORATION; and ZYXEL COMMUNICATIONS, INC.,<br><br>　　　　Defendants. | Case No.: 10-CV-03972-LHK<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT |

Plaintiff Fujitsu, Ltd. ("Fujitsu") brings this action for patent infringement against Defendants Belkin International, Inc. ("Belkin"); D-Link Corp. and D-Link Systems, Inc. ("D-Link"); and Netgear, Inc. ("Netgear") (collectively, "Defendants").[1] Before the Court are three fully-briefed motions: (1) Fujitsu's Motion for Summary Judgment and Summary Adjudication of Infringement of U.S. Patent No. Re. 36,769 ("the '769 Patent"), ECF No. 255 ("Infringement Mot."); (2) Defendants' Motion for Summary Judgment of Invalidity, ECF No. 259 ("Invalidity Mot."); and (3) Defendants' Motion for Summary Adjudication of No Willful Infringement and No

---

[1] This action was originally also brought against Defendants Zyxel Communications Corp. and Zyxel Communications, Inc. ("Zyxel"). On September 10, 2012, Fujitsu and Zyxel filed a stipulation of dismissal with prejudice. ECF No. 293.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Active Inducement, ECF No. 261 ("Willfulness Mot."). The Court held a hearing on all three motions on September 20, 2012. Having considered the parties' submissions and argument and the relevant law, and for the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Fujitsu's Motion for Summary Judgment and Summary Adjudication of Infringement; DENIES Defendants' Motion for Summary Judgment of Invalidity; DENIES Defendants' Motion for Summary Adjudication of No Willfulness; and DENIES Defendants' Motion for Summary Adjudication of No Active Inducement.

## I.  BACKGROUND

### A.  The '769 Patent

The invention of the '769 Patent relates to a "card type input/output interface device" and to systems that use such a device to facilitate communication between an electronic device system and an external or peripheral device. At the time of Fujitsu's claimed invention, small scale portable electronics, such as laptop computers, featured connector ports mounted on the sidewall of the main body for connecting to external devices, such as printers and modems. These various connectors were of different dimensions and specifications and occupied valuable real estate on the sidewall of small scale portable electronics, imposing a significant constraint on the ability to downsize such electronic devices. *See* '769 Patent, col.1:15-62. The claimed invention sought to address this problem by creating a card-type device that serves as an interface between an electronic device (such as a laptop) and an external device (such as a printer), thereby reducing or eliminating the need for multiple externally mounted connector ports on the sidewalls of the electronic device's main body. *See id.* col.1:54-62; col.2:1-4; col.7:15-24. At the time, card-type devices were commonly used for memory storage. Known as Integrated Circuit ("IC") memory cards, these cards could be inserted into a slot in the main body of a portable electronic device and used as an external storage device. *See id.* col.1:18-55. The '769 patent is the first disclosure of a card-type device that serves not as a memory storage device but rather as an interface device capable of transferring data between an electronic device and an external device.

As shown in Figure 1 of the '769 Patent, the claimed card type input/output interface device consists of three main components: (1) a first connection part on one end ("first data interface

United States District Court
For the Northern District of California

unit") for transferring data between a main body of an electronic device and the card type input/out interface device; (2) a second connection part on the opposite end ("second data interface unit") for transferring data between an external device and the card type input/output interface device; and (3) a circuit connecting the first interface and second interface units ("data transfer circuit"). *See* '769 Patent, col.2:5-15.  An electronic device accommodating this card type input/output interface unit may include a single slot formed in the main body rather than incorporate multiple connector ports on its sidewalls, thereby facilitating downsizing of the electronic device. *See id.* col.2:1-5.

The '769 patent discloses three embodiments of the card type input/output interface device. The first two embodiments disclose a wireless card interface device, while the third embodiment discloses a wired connection.  In the first two embodiments, the card type input/output interface device is configured to send and receive data at the second data interface wirelessly via a radio transmitter/receiver unit and an antenna. *See id.*, col.3:18-col.5:41 (first embodiment); col.5:42-col.6:29 (second embodiment).  In the third embodiment, the card type input/output interface device is configured to send and receive data at the second data interface through a cable using various types of standard connectors. *See id.* col.6:31-7:43.

The claims of the '769 patent can be divided into three categories: (1) "device" claims directed to the "card type input/output interface device" itself (*e.g.*, asserted claims 2, 4, 8, 9, 14, 41); (2) "system" claims directed to a system comprised of the card interface device and an "external device" to which the card interface device connects (*e.g.*, asserted claims 47 and 48); and (3) "electronic system" claims directed to an electronic system comprised of the card interface device, an "electronic device," and an "external device" (*e.g.*, asserted claims 20 and 27).  *See* First Am. Compl. ("FAC") ¶ 17, ECF No. 102.  Fujitsu originally asserted 32 of the 86 claims in the '769 patent, but then subsequently reduced the number of asserted claims to 21, and now asserts only 10.

### B.  Prosecution History

The '769 Patent is a reissue of U.S. Patent No. 5,357,091 ("the '091 Patent"), which was filed on April 30, 1992, claiming priority over a Japanese application filed in April 1991.  The '091 Patent was issued on October 18, 1994.  Two years later, on October 18, 1996, Fujitsu filed a

**United States District Court**
For the Northern District of California

1    reissue application, in which it canceled all independent claims of the '091 Patent, added 18

2    additional claims, and rewrote the dependent claims to depend on new independent claims 38 and

3    39.  After considering more than thirty references during the reissue proceedings, the U.S. Patent

4    and Trademark Office ("PTO") allowed the '769 Patent to issue on July 11, 2000.  *See* FAC Ex. A.

5         The '769 Patent was reexamined in response to independent *ex parte* requests from Fujitsu

6    in 2005 and Belkin in 2006 ("Belkin Reexam I"), which the PTO consolidated into a single

7    reexamination proceeding involving review of more than 180 prior art references.  On September

8    29, 2007, the PTO initially rejected all claims of the '769 Patent.  Decl. of Seth B. Herring in Supp.

9    of Defs.' Mot. for Summ. Adjudication of No Willfulness and No Active Inducement ("Herring

10   Decl.") ¶ 23 & Ex. V at FUJ0002983.  One year later, on September 26, 2008, the PTO issued a

11   final rejection of similar claims.  *Id.* Ex. V at *3425.  Finally, the PTO issued a reexamination

12   certificate on December 8, 2009, in which it canceled six claims and allowed 41 additional claims.

13        On March 3, 2011, Belkin filed a second request for *ex parte* reexamination on March 3,

14   2011 ("Belkin Reexam II"), which the PTO granted on May 25, 2011.  On March 14, 2012, the

15   PTO issued an office action confirming 63 of the 86 claims, including the 10 claims Fujitsu is

16   presently asserting in this action, but canceling the other 23 claims, 8 of which had previously been

17   asserted in this case, including independent claims 38 and 39.  *See* Herring Decl. Ex. W at

18   BLKN37242.  On April 12, 2012, Fujitsu submitted a response in which Fujitsu cancelled the 23

19   rejected claims.  On August 21, 2012, the PTO issued an *Ex Parte* Reexamination Certificate,

20   thereby concluding the reexamination proceeding.

21             **C.  The Accused Products**

22        The accused products include 57 card interface devices.  Of those card interface devices, 47

23   are wireless cards that comply with the 802.11 standards, and 10 are wired cards that include an

24   Ethernet connector.  Decl. of Thomas E. Garten in Supp. of Fujitsu's Mot. for Summ. J. and

25   Summ. Adjudication of Infringement ("Garten Decl.") ¶¶ 3, 7.  The accused products also include

26   136 wireless access points and routers ("external devices"), *id.* ¶¶ 5, 15; and 14 network kits, which

27   consist of one wireless card interface device and one wireless router or access point device that are

28   bundled together and offered for sale in a single package, *id.* ¶¶ 4-5.  In addition, Fujitsu accuses

4

Defendants of inducing infringement by encouraging use of the accused wireless access points and routers with 19 different third-party wireless card interface devices that allegedly meet the card-related limitations of claims 20, 27, 47, and 48.  *Id.* ¶¶ 6-7.

### D. The Asserted Claims

Fujitsu is asserting ten claims of the '769 Patent: independent claims 41 and 47, and dependent claims 2, 4, 8, 9, 14, 20, 27, and 48.

#### 1. Claims 2, 4, 9, 14, and 41

Fujitsu seeks summary judgment that Defendants' accused card interface devices directly infringe claims 2, 4, 9, 14, and 41, which are all "device" claims directed to the "card-type input/output interface device" itself.  Fujitsu also seeks summary adjudication that certain third-party cards meet each and every limitation of claims 2, 4, 9, 14, and 41.

Dependent claims 2, 4, 9, and 14 depend from claim 38, which recites the following:

> A card type input/output interface device for operatively connecting an electronic device to an external device, comprising:
> > a card, to be inserted into a slot provided in the electronic device;
> > a first data interface unit, provided on one end of the card, for coupling to the electronic device to transfer input information to the electronic device and output information from the electronic device when the card is inserted into the slot;
> > a second data interface unit, provided on an opposing end of the card, for coupling to the external device to transfer the output information to the external device and the input information from the external device; and
> > a data transfer circuit, incorporated with the card, in response to the input information being received by the second data interface unit, for transferring the input information to the first data interface unit and, in response to the output information being received by the first data interface unit, for transferring the output information to the second data interface unit.

'769 Patent, col.10:61-11:14.

Claim 2 recites:

> A card type input/output interface device as claimed in claim 38, wherein said second data interface unit comprises radio transmitter/receiver means for transferring the data between said external device and the card type input/output interface device through a radio communications channel.

'769 Patent, col.7:65-8:3.

5

Claim 4 recites, "A card type input/output interface device as claimed in claim 2, wherein said second data interface unit comprises an antenna coupled to said radio transmitter/receiver means." '769 Patent, col.8:9-12.

Claim 9 recites:

A card type input/output interface device as claimed in claim 38, wherein:
   said card has a projection in which said second data interface unit is provided;
   said first data interface unit is located in a first end portion of said card and said
      second data interface unit is located in a second end portion opposite said
      first end portion; and
   a thickness of said second end portion of said card including said projection is
      greater than a thickness of said first end portion of said card.

'769 Patent, col.8:24-36.

Claim 14 recites, "A card type input/output interface device as claimed in claim 9, wherein said second data interface unit comprises a connector formed in said projection for electrically connecting the card type input/output interface device to said external device." '769 Patent, col.8:55-59.

Independent claim 41 recites the following:

A card type input/output interface device for operatively connecting an electronic
device to an external device, comprising:
   a card, to be inserted into a slot provided in the electronic device;
   a data connector for transferring input information to the electronic device and
      output information from the electronic device when the card is inserted into
      the slot;
   a wireless data transmitter/receiver for transmitting the output information to the
      external device and for receiving the input information from the external
      device via a wireless communication channel; and
   a data transfer circuit, in response to receiving the input information by the
      wireless data transmitter/receiver, for transferring the input information to
      the data connector and, in response to receiving the output information by
      the data connector, for transferring the output information to the wireless
      data transmitter/receiver,
   wherein the data connector, the wireless data transmitter/receiver and the data
      transfer circuit are incorporated with the card.

'769 Patent, col.11:54-12:8.

## 2.   Claims 20, 27, 47, and 48

1   Fujitsu seeks summary adjudication that Defendants' accused card interface devices and

2   certain third-party cards satisfy the card-related limitations of claims 20, 27, 47, and 48.  Fujitsu

3   also seeks summary adjudication that use of Defendants' accused card interface devices and certain

4   third-party wireless card interface devices with any of Defendants' accused wireless access points

5   or routers in the United States constitutes direct infringement of claims 20, 27, 47, and 48.

6   Claims 47 and 48 are "system" claims directed to a system comprised of the card interface

7   device and an "external device" to which the card interface device connects.  Independent system

8   claim 47 recites as follows:

A system, to be operatively connected to an electronic device, comprising:
    an external device providing a peripheral function for the electronic device;
    a card interface, operatively connected to the external device via a wireless
        communication channel, to be inserted into a slot provided in the electronic
        device;
    a data connector for transferring input information to the electronic device and
        output information from the electronic device when the card interface is
        inserted into the slot;
    a wireless data transmitter/receiver for transmitting the output information to the
        external device and for receiving the input information from the external
        device via the wireless communication channel; and
    a data transfer circuit, in response to receiving the input information by the
        wireless data transmitter/receiver, for transferring the input information to
        the data connector and, in response to receiving the output information by
        the data connector, for transferring the output information to the wireless
        data transmitter/receiver,
    wherein the data connector, the wireless data transmitter/receiver and the data
        transfer circuit are incorporated with the card.

20   '769 Patent, col.13:19-44.

21   System claim 48 depends from claim 47 and recites, "A system according to claim 47,

22   wherein the wireless data transmitter/receiver transmits the output information to the external

23   device and receives the input information from the external device via a radio communication

24   channel."  '769 Patent, col.13:45-48.

25   Dependent claims 20 and 27 are "electronic system" claims directed to an electronic system

26   comprised of the card interface device, an "external device," and an "electronic device."  Both

27   claims 20 and 27 depend from independent claim 39, which recites as follows:

28   An electronic system, comprising:

7

1
2
3
4
5
6
7
8
9

> an electronic device, provided with a slot thereof;
> an external device providing a peripheral function for the electronic device;
> a card, inserted into the slot of the electronic device, for coupling the electronic device to the external device;
> a first data interface unit, provided on one end of the card, for coupling to the electronic device to transfer input information to the electronic device and output information from the electronic device;
> a second data interface unit, provided on an opposing, end of the card, for coupling to the external device to transfer the output information to the external device and the input information from the external device; and
> a data transfer circuit, incorporated with the card, in response to the input information being received by the second data interface unit, for transferring the input information to the first data interface unit and, in response to the output information being received by the first data interface unit, for transferring the output information to the second data interface unit.

'769 Patent, col.11:15-36.

Electronic system claim 20 recites: "An electronic system as claimed in claim 39, wherein: said second data interface unit comprises first radio transmitter/receiver means for transferring the data between said external device and said card type input/output interface device through a radio communications channel." '769 Patent, col.9:37-48.

Electronic system claim 27 recites:

> An electronic system as claimed in claim 39, wherein:
> said card has a projection in which said second data interface unit is provided;
> said first data interface unit is located in a first end portion of said card and said second data interface unit is located in a second end portion opposite said first end portion; and
> a thickness of said second end portion of said card including said projection is greater than a thickness of said first end portion of said card.

'769 Patent, col.10:7-18.

Defendants contend that all nine claims for which Fujitsu seeks summary judgment of infringement, as well as claim 8 (the only asserted claim not at issue in Fujitsu's summary judgment motion), are invalid as either anticipated or obvious in light of the prior art, and accordingly move for summary judgment of invalidity.

### E. *Markman* Order

The Court issued a Claim Construction Order on February 3, 2012, following a tutorial and *Markman* hearing. ECF No. 232. Although the parties originally briefed eight disputed claim

8

terms, the Court adopted the parties' stipulation as to the construction of six of the eight disputed

terms as follows:

>   (1) "card" and "card interface" are to be given their ordinary and customary meaning;

>   (2) "data interface unit" is to be construed as "a unit for buffering or receiving/transmitting
>       data";

>   (3) "data transfer circuit" is to be construed as "a circuit for transferring data";

>   (4) "slot" is to be given its ordinary and customary meaning;

>   (5) "to be inserted into a slot provided in the electronic device" is to be given its plain
>       meaning; and

>   (6) "wireless data transmitter/receiver" is to be construed as "electronics that can send and
>       receive data wirelessly."

ECF No. 232 at 4.  The Court construed the remaining two disputed claim terms as follows:

>   (7) "edge term" is to be given its plain and ordinary meaning; and

>   (8) "providing a peripheral function for the electronic device" is to be given its plain and
>       ordinary meaning.

ECF No. 232 at 22.

## II.  SUMMARY JUDGMENT STANDARD

Summary adjudication is appropriate if, viewing the evidence and drawing all reasonable

inferences in the light most favorable to the nonmoving party, "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  At the summary

judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines

whether there is a genuine factual issue for trial."  *House v. Bell*, 547 U.S. 518, 559-60 (2006).  A

fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute

as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to

decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  Mere conclusory, speculative testimony in affidavits and moving papers is insufficient to

9

United States District Court
For the Northern District of California

1   raise genuine issues of fact and defeat summary judgment.  *See Thornhill Publ'g Co. v. GTE Corp.*,

2   594 F.2d 730, 738 (9th Cir. 1979).

3          The moving party bears the initial burden of identifying those portions of the pleadings,

4   discovery, and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

5   *Corp.*, 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue at trial,

6   it must affirmatively demonstrate that no reasonable trier of fact could find other than for the

7   moving party, but on an issue for which the opposing party will have the burden of proof at trial,

8   the party moving for summary judgment need only point out "that there is an absence of evidence

9   to support the nonmoving party's case."  *Id.* at 325; *accord Soremekun v. Thrifty Payless, Inc.*, 509

10  F.3d 978, 984 (9th Cir. 2007).  Once the moving party meets its initial burden, the nonmoving

11  party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that

12  there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 250 (internal quotation marks

13  omitted).  If the nonmoving party's "evidence is merely colorable, or is not significantly probative,

14  summary judgment may be granted."  *Id.* at 249-50 (internal citations omitted).

## III.  FUJITSU'S MOTION FOR SUMMARY JUDGMENT AND SUMMARY
   ADJUDICATION OF INFRINGEMENT

17          Fujitsu seeks summary judgment or adjudication regarding 57 card interface devices (47

18  wireless cards and 10 wired cards), 136 wireless access points and routers, and 14 network kits.

19  Infringement Mot. at 6; Garten Decl. ¶¶ 7, 11, 13, 15.  Specifically, Fujitsu seeks the following: (1)

20  summary judgment that Defendants' accused card interface devices directly infringe claims 2, 4, 9,

21  14, and 41; (2) summary adjudication that certain third-party cards meet each and every limitation

22  of claims 2, 4, 9, 14, and 41; (3) summary adjudication that Defendants' accused card interface

23  devices and certain third-party cards satisfy the card-related limitations of claims 20, 27, 47, and

24  48; (4) summary adjudication that use of Defendants' accused card interface devices and certain

25  third-party wireless card interface devices with any of Defendants' accused wireless access points

26  or routers in the United States constitutes direct infringement of system claims 47 and 48, and that

27  such use in combination with a laptop constitutes direct infringement of electronic system claims

28

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

20 and 27; and (5) summary judgment that Defendants' network kits directly infringe system claims 47 and 48. *Id.* at 1.

Summary judgment of infringement requires a two-step analysis. "First, the claims of the patent must be construed to determine their scope. Second, a determination must be made as to whether the properly construed claims read on the accused device." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (internal citations omitted). To find infringement, "the court must determine that every claim limitation is found in the accused device." *Playtex Prods., Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 909 (Fed. Cir. 2005). The determination of infringement is generally a question of fact. *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003). As the patentee, Fujitsu bears the burden of proving infringement by a preponderance of the evidence. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1467 (Fed. Cir. 1998).

### A. Defendants' Motion to Strike Third-Party Cards and 3 Belkin Products

Before proceeding to the merits of Fujitsu's motion for summary judgment and summary adjudication of infringement, the Court first addresses Defendants' objection to and motion to strike evidence relating to three Belkin products and 19 third-party cards, which Defendants assert were never identified in Fujitsu's original Infringement Contentions (served March 3, 2011) or Amended Infringement Contentions (served February 2, 2012), nor ever disclosed during fact discovery.[2] ECF No. 267, Defendants' Opposition to Fujitsu's Mot. for Summ. J. and Summ. Adjudication of Infringement ("Infringement Opp'n") at 5-9.

---

[2] Fujitsu filed an Administrative Motion for Leave to File an Opposition to Defendants' "Motion to Strike" Three Belkin Products and Non-Party Cards. ECF No. 280. Defendants opposed. *See* ECF No. 286. Fujitsu argues that Defendants were required to separately notice their motion to strike and that Defendants' failure to do so deprived Fujitsu of the opportunity to fully respond. However, Defendants' objection to and motion to strike Fujitsu's untimely disclosed evidence was properly raised in their opposition to Fujitsu's motion for summary judgment and summary adjudication of infringement, consistent with Civil Local Rule 7-3, which requires that "[a]ny evidentiary or procedural objections to the motion must be contained within the [opposition] brief or memorandum," which may not exceed 25 pages. Civ. L.R. 7-3(a). Fujitsu had an opportunity to, and did, respond to Defendants' evidentiary objection and motion to strike in Fujitsu's reply brief. Accordingly, Fujitsu is not entitled to file a separate opposition, and its administrative motion for leave to do so is therefore DENIED.

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

As for the three Belkin products—models DX-WEGRTR, AWGR54, and F5D7132—these accused models were clearly disclosed in Fujitsu's February 2, 2012 Amended Infringement Contentions. *See* Decl. of Thomas E. Garten in Supp. of Fujitsu's Reply in Supp. of Mot. for Summ. Judgment and Summ. Adjudication of Infringement ("Garten Reply Decl.") Ex. 3, Belkin Appendix A at 6, 12. Accordingly, Defendants' motion to strike these three products is without basis and is DENIED.

As for the 19 third-party cards, however, the Court agrees with Defendants that Fujitsu has not adequately complied with this District's Patent Local Rules. The 19 third-party cards consist of 5 Buffalo cards, 6 Cisco cards, 8 Linksys cards, 1 Sohoware card, and 1 TrendNet card. *See* Garten Decl. ¶¶ 6-7. Patent Local Rule 3-1 requires that within 14 days after the initial case management conference, the patentee must serve on each opposing party a "Disclosure of Asserted Claims and Infringement Contentions," identifying "[s]eparately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware." Patent L.R. 3-1(b). The identification of Accused Instrumentalities must be "as specific as possible," and should include the "name or model number, if known." *Id.* For claims of indirect infringement, the Infringement Contentions must include "an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described." Patent L.R. 3-1(d).

There is no dispute here that neither Fujitsu's original Infringement Contentions nor Amended Infringement Contentions identifies these 19 third-party cards by manufacturer, product name, or model number. *See generally* Garten Reply Decl. Exs. 2 [original Infringement Contentions] & 3 [Amended Infringement Contentions]. Rather, Fujitsu asserts that it complied with Patent Local Rule 3-1(d) because, "In its contentions, Fujitsu clearly stated that use of Defendants' external devices with cards sold by others infringes the system claims and provided exemplary claim charts showing the use of the external devices with cards sold by others."

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

1    Fujitsu's Reply in Support of Its Mot. for Summ. J. and Summ. Adjudication of Infringement

2    ("Infringement Reply") at 15 n.4.

3         Fujitsu's Infringement Contentions do, indeed, provide a general description of the alleged

4    inducement.  For example, in its Infringement Contentions against D-Link, Fujitsu describes

5    "Systems Including a Third Party Card Interface Device and a D-Link External Device," and

6    provides a representative claim chart.  *See* Garten Reply Decl. Ex. 2 D-Link at 6.  Fujitsu identifies,

7    however, only one representative card interface device.  Moreover, the representative card interface

8    device identified is simply a Netgear RangeMax Wireless PC Card, Model No. WPN511, which is

9    one of Netgear's accused devices.  *Id.*  For each contention of inducement against each Defendant,

10   Fujitsu simply identifies one accused card interface device manufactured by a different Defendant,

11   not a card interface device manufactured by a third party not party to this suit.

12        This level of disclosure is insufficient.  Under the Patent Local Rules of this District, a

13   patentee's Infringement Contentions must identify the alleged third-party direct infringers in order

14   to allege indirect infringement.  *See* Patent L.R. 3-1(d); *see, e.g.*, *Life Techs. Corp. v. Biosearch

15   Techs., Inc.*, No. 12-00852, 2012 WL 1831595, at *1 (N.D. Cal. May 18, 2012) (granting

16   patentee's motion to amend infringement contentions to add the newly discovered identities of

17   alleged direct infringers for purposes of alleging indirect infringement, which was necessary in

18   order for patentee to comply with this District's Local Patent Rules); *Bender v. Maxim Integrated

19   Prods., Inc.*, No. 09-01152, 2010 WL 1135762, at *3 (N.D. Cal. Mar. 22, 2010) (plaintiff failed to

20   comply with Patent Local Rule 3-1(d) where plaintiff's infringement contentions did not specify

21   any third party and did not describe any acts committed by a third party that would suggest direct

22   infringement).  The Court agrees with Defendants that Fujitsu was required to identify these third-

23   party cards in its Infringement Contentions, so as to put Defendants on notice of the alleged direct

24   infringement supporting Fujitsu's claims of indirect infringement.

25        The Court also agrees with Defendants that it is too late for Fujitsu to amend its

26   Infringement Contentions to comply with the Patent Local Rules, and that to allow such

27   amendment would unduly prejudice Defendants.  A patentee must seek leave of the Court to amend

28   its Infringement Contentions and may do so only "upon a timely showing of good cause," which

13

United States District Court
For the Northern District of California

1    may include: "(a) a claim construction by the Court different from that proposed by the party

2    seeking amendment; (b) recent discovery of material, prior art despite earlier diligent search; and

3    (c) recent discovery of nonpublic information about the Accused Instrumentality which was not

4    discovered, despite diligent efforts, before the service of the Infringement Contentions."  Patent

5    L.R. 3-6.  To determine if good cause exists, the Court considers: (1) whether the moving party

6    was diligent in amending its contentions, and (2) whether the non-moving party would suffer

7    prejudice if the motion to amend were granted.  *Acer, Inc. v. Tech. Props. Ltd.*, Nos. 5:08-00877,

8    5:08-00882, 5:08-05398, 2010 WL 3618687, at *3 (N.D. Cal. Sept. 10, 2012); *accord O2 Micro*

9    *Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1366-67 (Fed. Cir. 2006) (citation

10   omitted).

11       Here, Fujitsu has not sought to amend its infringement contentions, but instead has sought

12   summary adjudication of infringement based on these 19, untimely disclosed third-party cards.

13   Defendants assert that the only discovery Fujitsu provided about these 19 third-party products "was

14   a handful of manuals among a nearly 30,000-page document dump 45 minutes past midnight *after*

15   the fact discovery deadline."  Infringement Opp'n at 7.  Defendants further assert that these third-

16   party products were disclosed for the first time in Fujitsu's expert report, served May 4, 2012, after

17   the close of fact discovery.  *Id.*  As a result, Defendants have been deprived of an opportunity to

18   conduct fact discovery on these third-party cards.  The deadline for fact and expert discovery has

19   passed, the deadline for filing dispositive motions has passed, and this case is set for a final pretrial

20   conference on November 1, 2012, and for trial on November 26, 2012.  The Court finds that

21   Defendants would be significantly prejudiced if Fujitsu were allowed to proceed with its claims

22   based on these 19 third-party cards.  Accordingly, Defendants' motion to strike the portions of Dr.

23   Williams' Declaration and expert report that rely on these third-party products for alleged

24   infringement is GRANTED.

25       In light of this ruling striking all evidence related to the 19 third-party cards: (1) Fujitsu's

26   motion for summary adjudication that these third-party cards meet each and every limitation of

27   claims 2, 4, 9, 14, and 41 is DENIED; (2) Fujitsu's motion for summary adjudication that these

28   third-party cards satisfy the card-related limitations of claims 20, 27, 47, and 48 is DENIED; and

(3) Fujitsu's motion for summary adjudication that use of these third-party cards with any of Defendants' accused wireless access points or routers in the United States constitutes direct infringement of claims 20, 27, 47, and 48 is DENIED.

### B.  Defendants' Card Interface Devices

The Court now turns to Fujitsu's summary judgment motion with respect to Defendants' accused card interface devices.  In support of its infringement claims, Fujitsu has submitted: (a) Defendants' responses to Fujitsu's Requests for Admission; (b) the declaration of Dr. Williams ("Williams Infringement Decl.") and accompanying tear-down photographs of the accused products; (c) Dr. Williams' expert report on infringement ("Williams Infringement Rep."); and (d) product manuals and other documentation for certain accused products.  *See, e.g.*, Garten Decl. ¶ 8. The Court follows the parties' lead in addressing claims 41, 47, and 48 together; addressing the common limitations of claims 2, 4, 9, 14, 20, and 27 together; and finally addressing the projection limitation of claims 9, 14, and 27 together.

### 1.   Claims 41, 47, and 48

Defendants have conceded that the accused card products meet all the limitations of claims 41, 47, and 48.  *See* Infringement Opp'n at 25.  Specifically, Defendants have admitted infringement in their responses to Fujitsu's Requests for Admission, and Defendants' expert does not dispute that each of Defendants' accused cards meet every limitation of these claims. Defendants' only defense is a bare assertion that "to the extent that the Court allows Fujitsu to rely on constructions other than those ordered by the Court, then Defendants' products would not infringe under those constructions."  *Id.*  However, Defendants offer no explanation as to *why* their products would not infringe under any alternative constructions, and they do not even identify which claim terms they believe are dispositive.  In any event, the Court rejects Fujitsu's proposed construction of "card" and "slot," as discussed in the section on invalidity below.  Accordingly, Fujitsu's motion for summary judgment that Defendants' accused card interface devices directly infringe claim 41, and for summary adjudication that Defendants' accused card interface devices satisfy the card-related limitations of claims 47 and 48, is GRANTED.

### 2.   Claims 2, 4, 9, 14, 20, and 27

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

Fujitsu seeks summary judgment that the accused card interface devices infringe claims 2, 4, 9, and 14, which all depend from claim 38, and summary adjudication that the accused card interface devices satisfy the card-related limitations of electronic system claims 20 and 27, both of which depend from claim 39.  Claims 2, 4, 9, 14, 20, and 27 all require "a card," "a first data interface unit," "a second data interface unit," and "a data transfer circuit."  Claims 2, 4, and 20 additionally require a "radio transmitter/receiver means," while claims 9, 14, and 27 additionally require a "projection."  Most of these limitations are not in dispute.  However, Defendants advance three reasons why Fujitsu is not entitled to summary judgment of infringement of these claims: (1) the "first data interface unit" and "second data interface unit" are not provided for on "opposing end[s]" of the accused cards, as is required by all claims; (2) the accused cards do not disclose a second data interface unit that is located entirely "within" the projection, as is required by claims 9, 14 and 27; and (3) the accused cards do not disclose a "radio transmitter/receiver means," as is required by claims 2, 4, and 20.  The Court addresses these arguments in turn.

### a.   Data Interface Units

Defendants argue that Fujitsu relies on improper claim constructions of the claim terms "data interface unit," "provided on one end of the card," and "provided on an opposing end."  Defendants also argue that Fujitsu has failed to meet its evidentiary burden.  The Court begins with Defendants' claim construction arguments.

First, Defendants argue that Fujitsu has advanced an improper claim construction of "data interface unit" that is contrary to the Court's construction.  *See* Infringement Opp'n at 11-13.  Defendants represent that Fujitsu's infringement analysis employs a construction of "data interface unit" meaning "a unit for buffering and receiving/transmitting data," whereas the Court's construction of the term is "a unit for buffering or receiving/transmitting data."  *Id.* at 12.  However, Defendants fail to explain how this purported claim construction dispute impacts Defendants' non-infringement defense.[3]  Defendants appear to be arguing that the "or" in the

---

[3] Defendants argue that under the Court's construction of "data interface unit," both the HP 82950A and Mizutani references disclose a "first data interface unit" and a "second data interface unit," *see* Infringement Opp'n at 12-13, but Defendants did not make this argument in their motion

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

construction is an "exclusive or" (i.e., one or the other, but not both), rather than a "logical or" (i.e., either or both).  There is no basis for this construction, and Defendants offer none.  The Court's construction of "data interface unit" is not "a unit for buffering or receiving/transmitting data, but not both."  Thus, presumably any card that satisfies the narrower limitation of "a unit for buffering *and* receiving/transmitting data" also satisfies the broader limitation of "a unit for buffering *or* receiving/transmitting data."

Second, Defendants' principal argument here concerns not the first and second "data interface units" themselves, but rather the location of said units on the accused cards.  Defendants argue that Fujitsu's infringement analysis ignores the requirement that the respective data interface units be "provided on" opposing "end[s]" of the card, relying instead on an improper construction that permits only a "portion" of the data interface unit to be located on an end.  Under a proper claim construction, Defendants posit, none of the accused products infringe because the data interface unit on the accused cards extends past the mid-point of the card (i.e., "the 50-yard line"), and thus are only partially provided, not fully "provided," "on one end of the card."

Defendants' efforts to defeat summary judgment of infringement by manufacturing an untimely claim construction argument and recanting on their previous admissions are not persuasive.  Defendants admitted in their responses to Requests for Admission that each of the accused cards "comprises a first data interface unit, provided on one end of the card, . . . within the meaning of claim 38."  *See* Garten Decl. Ex. 2 [Belkin RFA Nos. 4.01-4.76]; Ex. 4 [D-Link RFA Nos. 4.01-4.02]; Ex. 7 [Netgear RFA Nos. 4.01-4.72].  Defendants have not sought, and this Court has not granted, leave to withdraw or amend these admissions, and they are thus binding.  *See* Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."); *Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1111-12 (9th Cir. 2006) ("[T]he parties are bound by such admissions.").  Defendants maintain that they have not sought leave to withdraw or amend their admissions because their admissions were premised upon applying the Court's actual

for summary judgment of invalidity, and the argument has no bearing on the question of infringement.

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

1    construction, and they reserved the right to modify, supplement, or change their positions should

2    Fujitsu attempt to take inconsistent positions regarding the meaning and scope of the '769 Patent.

3    Infringement Opp'n at 13.  Defendants further argue that their admissions are non-binding because

4    Fujitsu has now taken a position contrary to the Court's claim construction of the term "data

5    interface unit."  *Id.*  But Fujitsu is not taking a position contrary to the Court's claim construction

6    of the term "data interface unit," which did not include any limitations as to location or size.  The

7    claim construction issue that Defendants raise now—for the first time on summary judgment—

8    concerns the limitation "provided on one end," not "data interface unit."  Moreover, Fujitsu's

9    contentions regarding the "first data interface unit" have not changed since the beginning of this

10   case.  Fujitsu identified the same circuitry at issue now in its original March 2011 infringement

11   contentions, in its February 2012 supplemental infringement contentions, and in Dr. Williams'

12   May 2012 expert report.  *See* Garten Reply Decl. Exs. 2 & 3; ECF No. 257, Decl. of Tim A.

13   Williams in Supp. of Fujitsu's Mot. for Summ. J. and Summ. Adjudication of Infringement

14   ("Williams Infringement Decl.") ¶¶ 45-47.  Thus, there is no reason Defendants should not be

15   bound by their admissions pursuant to Federal Rule of Civil Procedure 36(b).

16        In any event, even if Defendants were not bound by their Rule 36(b) admissions,

17   Defendants' new claim construction argument is unsupported by the intrinsic record.  The plain

18   meaning of the term "provided on one end" does not imply an additional limitation that the object

19   to be provided must not extend past a 50-yard line.  Reading the phrase in the context of claim 38

20   as a whole, it is clear that the '769 Patent claims a card type input/output interface device

21   comprising a card, a first data interface unit on one end of the card, a second data interface unit on

22   the opposing end of the card, and a data transfer circuit connecting the two data interface units.  *See*

23   '769 Patent, col.10:61-11:14.  Thus, the plain meaning of the claim language is directed towards

24   the location of the two data interface units in relation to one another, each on opposing ends of the

25   data transfer circuit.  Nothing in the claim language suggests that the patent limits the size of the

26   respective data interface units.

27        Defendants argue that their position is supported by the specification, disregarding the fact

28   that their own expert Dr. Brody testified that his "50-yard line" construction is based exclusively

18

on the plain meaning of the claim language.  *See* Garten Reply Decl. Ex. 4 at 62:4-63:9.  In their

opposition brief, Defendants point to Figure 1 of the '769 Patent—described as a "perspective view

of a first embodiment"—which Defendants argue plainly shows the first data interface unit on one

end of the card and a second data interface unit on the opposing end, with neither data interface

unit touching the 50-yard line.  Meanwhile, Defendants attack Fujitsu's reliance on Figure 3A of

the specification, which Fujitsu argues would be improperly excluded under Defendants'

specification.  Defendants attempt to distinguish their reliance on Figures 1 and 9 from Fujitsu's

reliance on Figure 3A by asserting that the former two figures depict physical layout or

dimensions, whereas the latter figure depicts only functional connectivity as a block diagram.

Infringement Opp'n at 14-15.

   Defendants are right that the Federal Circuit "has repeatedly cautioned against overreliance

on drawings that are neither expressly to scale nor linked to quantitative values in the

specification."  *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1268 (Fed. Cir. 2012) (citing *Nystrom

v. TREX Co.*, 424 F.3d 1136, 1149 (Fed. Cir. 2005); *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l,

Inc.*, 222 F.3d 951, 956 (Fed. Cir. 2000); *In re Wright*, 569 F.2d 1124, 1127 (C.C.P.A. 1977)).

However, while Fujitsu's reliance on Figure 3A is misplaced, Defendants' reliance on Figures 1

and 9 fares no better.  The Court finds nothing in the patent indicating that Figures 1 and 9 are

drawn to scale or linked to quantitative values of size.  "[I]t is well established that patent drawings

do not define the precise proportions of the elements and may not be relied on to show particular

sizes if the specification is completely silent on the issue."  *Hockerson-Halberstadt*, 222 F.3d at

956.  Moreover, it is equally well established that "patent coverage is not necessarily limited to

inventions that look like the ones in the figures.  To hold otherwise would be to import limitations

onto the claim from the specification, which is fraught with 'danger.'"  *MBO Labs., Inc. v. Becton,

Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (quoting *Phillips v. AWH Corp.*, 415 F.3d

1303, 1323 (Fed. Cir. 2005) (en banc)); *see also Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,

632 F.3d 1246, 1254 (Fed. Cir. 2011) ("[D]rawings in a patent need not illustrate the full scope of

the invention.").  "Limiting claims from the specification is generally not permitted absent a clear

disclosure that the patentee intended the claims to be limited as shown."  *MBO Labs.*, 474 F.3d at

19

United States District Court
For the Northern District of California

1    1334 (citing *Phillips*, 415 F.3d at 1323). Defendants point to no such clear disclosure that the

2    inventors intended to limit the claims of the '769 Patent to the spatial configurations depicted in

3    Figures 1 and 9.

4           In sum, the Court finds no support for imposing a limitation that the data interface unit not

5    extend beyond the 50-yard line of the card. Defendants' claim construction is therefore rejected.

6           Finally, Defendants also argue that Fujitsu has failed to meet its evidentiary burden with

7    respect to each of the accused cards. Defendants contend that Fujitsu's expert, Dr. Williams,

8    provided only a "narrative description" with conclusory opinions and no analysis, addressing only

9    so-called "representative" cards for each Defendant. Defendants contend that Dr. Williams'

10   analysis does not support summary judgment of infringement, as Dr. Williams himself

11   acknowledged that there are structural differences in each of the accused cards, warranting

12   individualized analysis of each accused product.

13          Fujitsu defends the sufficiency of Dr. Williams' report, pointing to Dr. Williams' repeated

14   assurances that he analyzed each accused device individually, and that his analysis applies to each

15   and every accused device. Reply at 11. In addition, Mr. Williams provided a tear-down analysis

16   for 55 accused cards, and attached to his report approximately 12 tear-down photographs for each

17   card. *See* Williams Infringement Decl. ¶ 4 & Ex. B (providing 4 exemplary tear-down photos for

18   each accused card). Moreover, because the cards at issue comply with various standards, such as

19   the PC Card Standard, the 802.11 standards, and the Ethernet standard, Fujitsu contends that many

20   of the cards therefore have the same or similar characteristics for purposes of Mr. Williams'

21   infringement analysis, allowing him to present his conclusions in summary form. Infringement

22   Reply at 12.

23          Although the Court rejects Defendants' claim construction argument, the Court agrees that

24   Fujitsu has failed to meet its evidentiary burden on summary judgment for all accused cards except

25   Belkin F5D7010, D-Link DWL-G630, and Netgear WG511, the only cards for which Dr. Williams

26   identified all relevant limitations. *See* Williams Infringement Decl. Ex. A [Williams Infringement

27   Rep.] ¶¶ 46 (first data interface unit), 66 (second data interface unit). Fujitsu's expert, Dr.

28   Williams, explains in his infringement report that for each of the accused cards, the "first data

20

United States District Court
For the Northern District of California

1    interface unit" includes a physical connector, the traces connecting the physical connector and the

2    main chip, and one or more bus buffers located in the main chip.  Williams Infringement Decl. ¶¶

3    37, 46, 55.  However, his tear-down photographs of each accused card device are not annotated in

4    any way and do not identify any of the components that he states comprise the "first data interface

5    unit" and the "second data interface unit."  Based on this report alone, in which Dr. Williams states

6    his opinions in conclusory fashion without performing limitation-by-limitation analysis as to each

7    accused card, the Court is unable to say that no reasonable jury could find that Fujitsu had failed to

8    prove satisfaction of the "data interface unit" limitations by a preponderance of the evidence.[4]  *See*

9    *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1319 (Fed. Cir. 2011); *TechSearch,*

10   *L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1372 (Fed. Cir. 2002).  To carry its burden of proof on a

11   motion for summary judgment of infringement, a patentee must show infringement "literally or

12   equivalently for each limitation; general assertions of facts, general denials, and conclusory

13   statements are insufficient . . . ."  *TechSearch*, 286 F.3d at 1372; *see Moore U.S.A., Inc. v. Standard*

14   *Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000).  On this record, the Court is unable to grant

15   Fujitsu summary judgment of infringement of claims 2, 4, 9, 14, 20, and 27 with regard to all

16   accused cards.  Whether Fujitsu is entitled to summary judgment of infringement as to Belkin

17   F5D7010, D-Link DWL-G630, and Netgear WG511 can only be resolved after the Court considers

18   Defendants' remaining two arguments, discussed below.  As to all other accused cards, the motion

19   is DENIED based on insufficient evidence that the "data interface unit" limitations are met.

20                               **b.  Projection (claims 9, 14, and 27 only)**

21              Defendants argue that Fujitsu's motion for summary judgment of infringement should also

22   be denied as to claims 9, 14, and 27 because the accused cards lack the "projection" limitation of

23   those claims.  Claims 9, 14, and 27 require a card device wherein (1) said card has a projection, (2)

24   in which said second data interface unit is provided, and (3) wherein the thickness of said second

25   end portion of said card including said projection is greater than a thickness of said first end

26

27   ───────────────────────────

[4] Although Dr. Williams analyzed certain representative products, he did not analyze the same
28   representative products for every limitation, and thus the Court is unable to conclude that Fujitsu
     has met its burden of proof for any given representative product.

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    portion of said card.  *See* '769 Patent, col.8:26-27, 34-36.  Claim 14 depends from claim 9 and

2    further requires "a connector formed in said projection."  Only the 10 wired cards are accused of

3    infringing claim 14.[5]  The parties stipulated that "projection" means "a portion of the card that

4    extends away from a surface of the card."  ECF No. 164 ("Am. Joint Claim Construction

5    Statement").

6            As with the "data interface unit" limitations, Defendants' argument with respect to the

7    "projection" limitation is twofold.  First, Defendants argue that Fujitsu relies on an improper claim

8    construction that ignores the plain-language requirement of the claims that the second data

9    interface unit be provided entirely, and not just partially, within the projection.  Second,

10   Defendants challenge the sufficiency of Fujitsu's proffered evidence.

11           Defendants advocate for a construction that requires the second data interface unit to be

12   contained entirely, and not just partially, within the projection.  Under such a construction,

13   Defendants maintain, the accused cards do not infringe claims 9, 14, and 27, because not all of the

14   circuitry that comprises the second data interface unit is contained entirely within the projection.

15   *See* Brody Rep. ¶¶ 122-25.  For each of the accused cards, only the antenna (for wireless cards) or

16   the connector (for wired cards), plus additional circuitry, is located within the projection.  *Id.*

17   Other circuitry, such as the buffers in the main chip, is located outside of the projection toward the

18   middle of the card.  *Id.*  Fujitsu does not dispute this characterization of the accused cards.

19   Infringement Mot. at 22-23.  Thus, the only dispute is one of claim construction.

20           The Court agrees with Defendants that the plain meaning of the claim language requires the

21   second data interface unit to be provided entirely within the projection.  Claim 9 plainly requires "a

22   projection *in which* said second data interface unit *is provided*."  '769 Patent, col.8:26-27

23   (emphases added).  Thus, if a mere connector on its own does not constitute a second data interface

24   unit, as Fujitsu argues, and the connector is all that is provided within the projection, then the

25   limitation is not met.  The construction issue here is different than the one previously discussed

---

[5] Defendants do not challenge the "connector formed in said projection" limitation of claim 14 in their opposition or in Dr. Brody's report.  *See generally* Infringement Opp'n; Garten Decl. Ex. 10 [Brody Rep.].  Dr. Williams opines that this limitation is satisfied in each of the accused wireless cards.  *See* Williams Infringement Decl. ¶¶ 115-18; Williams Infringement Rep. ¶¶ 182-85.

22

1    with regard to the location of the first data interface unit "provided on one end of the card."  As the

2    Court explained, "end" as used in the claims is a relative term referring to placement of the two

3    data interface units in relation to one another.  Thus, a first data interface unit can be entirely

4    "provided" on one "end" of the card even if the first data interface unit extends beyond the

5    midpoint of the card.  By contrast, a "projection" as used in the claims is a clearly defined

6    structure, and thus the grammatical syntax, "in which," and the plain meaning of "provided,"

7    require that the second data interface unit be provided within the projection.

8        Fujitsu's argument that Defendants' construction would improperly read out disclosed

9    embodiments is not persuasive.  Fujitsu argues that the specification depicts connector-shaped

10    projections that are "only large enough to accommodate a connector socket," pointing specifically

11    to Figures 7B-7C, 9B-9C, 10B-10C, and 11B-11C.  Infringement Mot. at 22.  Fujitsu adds, without

12    citation to any support, that "[t]he connector-shaped projections are not large enough to contain []

13    additional components" that "may be included in a second data interface (*e.g.*, a buffer)."  *Id.*  But

14    Fujitsu cites nothing in the specification that supports this conclusion.  Fujitsu also argues that,

15    because a data interface unit *may* include both a unit for buffering and a unit for

16    receiving/transmitting data, claim 9 must be construed to include cards where the buffer extends

17    beyond the projection.  This argument, too, is unavailing.  While the presence of a buffering unit in

18    addition to a transceiving unit does not remove a card from the claim scope, the data interface unit

19    limitation is satisfied by the presence of only one of the two.

20        Because Fujitsu admits that not all of the circuitry that comprises the second data interface

21    unit is provided entirely within the projection on each of the accused cards, Fujitsu's motion for

22    summary judgment of infringement of claims 9, 14, and 27 is DENIED as to all accused cards.

23                c.    **"Radio Transmitter/Receiver Means" (claims 2, 4, and 20
24                      only)**

25        Defendants argue that Fujitsu's motion for summary judgment of infringement should also

26    be denied as to claims 2, 4, and 20 because the accused cards lack the "radio transmitter/receiver

27    means" limitation of those claims.  Claims 2 and 20 recite a "radio transmitter/receiver means for

28    transferring the data between said external device and the card type input/output interface device

United States District Court
For the Northern District of California

through a radio communications channel." '769 Patent, col.7:67-8:3.  The parties agree that this limitation is a means-plus-function limitation as defined by 35 U.S.C. § 112, ¶ 6.[6]  *See* ECF No. 164 at 2.  Claim 4 depends from claim 2 and further recites "an antenna coupled to said radio transmitter/receiver means."[7]  '769 Patent, col.8:12-13.

        "Construction of a means-plus-function limitation involves two steps.  First, the court must identify the claimed function.  Second, the court must identify the corresponding structure in the specification that performs the recited function."  *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1367 (Fed. Cir. 2012) (citing *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006)).  To prove infringement of a means-plus-function claim, the patentee must show that the accused product performs the claimed function using a structure identical or equivalent to the structure identified by the Court's construction.  *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1178 (Fed. Cir. 2005).

        The parties agree here that the claimed function is "transferring data between the external device and the card type input/output interface device through a radio communications channel." ECF No. 164 at 2.  The parties further agree that the corresponding structure described in the specification comprises "at least radio transmitter/receiver unit 12-2, frequency modulator 12c, frequency demodulator 12d, amplifiers 12e and 12h, band-pass filter 12f, and antenna sharing device 12g."[8]  *Id.*  To show that each of the accused wireless cards meets the "radio

_____

[6] 35 U.S.C. § 112, ¶ 6, provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure . . . in support thereof, and such claim shall be construed to cover the corresponding structure . . . described in the specification and equivalents thereof."  Section 112 ¶ 6 "represents a *quid pro quo* by permitting inventors to use a generic means expression for a claim limitation provided that the specification indicates what structure(s) constitute(s) the means."  *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1381 (Fed. Cir. 1999).

[7] Defendants do not challenge the "antenna coupled to said radio transmitter/receiver means" limitation of claim 4 in their opposition or in Dr. Brody's report.  *See generally* Infringement Opp'n; Garten Decl. Ex. 10 [Brody Rep.].  Dr. Williams opines that this limitation is satisfied in each of the accused wireless cards.  *See* Williams Infringement Decl. ¶¶ 101-07; Williams Infringement Rep. ¶¶ 154-60.

[8] The parties further agree that the specification discloses an alternate embodiment with the structure comprising at least "radio modulator 15, frequency modulator 15c, amplifiers 15e and 15k, antenna sharing device 15g, radio demodulator 16, band-pass filter 15f, and frequency demodulator 15d."  ECF No. 164 at 2-3.

24

1    transmitter/receiver" means-plus-function claim limitation, Fujitsu offers the opinion of its expert,

2    Dr. Williams, who opines that (1) each accused wireless card contains a radio transmitter/receiver

3    unit, a frequency modulator, a frequency demodulator, amplifiers, a band-pass filter, and an

4    antenna sharing device; and (2) these components are connected in the same way as the

5    corresponding structure disclosed in the '769 Patent.  *See* Williams Infringement Decl. ¶¶ 93-100;

6    Williams Infringement Rep. ¶¶ 146-53.

7          Defendants offer no rebuttal evidence to the contrary.  Nor do Defendants appear to dispute

8    that the accused wireless cards perform the claimed function of "transferring data between the

9    external device and the card type input/output interface device through a radio communications

10   channel."  Rather, Defendants' sole argument against summary judgment is that Fujitsu has

11   proffered insufficient evidence that the required corresponding structure for the transceiver means

12   is found in any of the accused wireless cards.  *See* Infringement Opp'n at 23-25.

13          The Court is not convinced.  While infringement is typically a question of fact for the jury

14   to decide, a court may nonetheless "determine infringement on summary judgment 'when no

15   reasonable jury could find that every limitation recited in the properly construed claim either is or

16   is not found in the accused device.'"  *Innovention Toys*, 637 F.3d at 1319 (quoting *Bai v. L&L

17   Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)).  As the patentee and the movant, Fujitsu bears

18   the initial burden of showing a *prima facie* case for summary judgment, but if Fujitsu meets that

19   burden, "then the burden of production shifts to the nonmovant to present specific evidence

20   indicating there is a genuine issue for trial."  *Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d

21   701, 708 (Fed. Cir. 2005) (citing *Liberty Lobby*, 477 U.S. at 250).  Here, Fujitsu has presented

22   competent expert testimony in support of its infringement contention, and Defendant has countered

23   with nothing that would create a genuine issue of fact.  While Defendants are correct that "[t]o

24   establish infringement under § 112, ¶ 6, it is insufficient for the patent holder to present testimony

25   'based only on a functional, not a structural, analysis,'" *CytoLogix*, 424 F.3d at 1178 (quoting

26   *Alpex Computer*, 102 F.3d at 1222), Dr. Williams' report was not deficient in this manner.  Dr.

27   Williams' opinion that each accused wireless card includes circuitry identical to the corresponding

28   structure disclosed in the '769 Patent was informed, in part, by the fact that: (1) the structures

United States District Court
For the Northern District of California

disclosed in the patent are "high-level components that would be found in any standard-compliant wireless interface card device," Williams Infringement Decl. ¶ 97; *see* Williams Infringement Rep. ¶ 150; and (2) the wireless cards comply with the 802.11 standards, and in order to do so, each card must include a radio transmitter/receiver unit, a frequency modulator and demodulator, amplifiers, and a band-pass filter, Williams Infringement Decl. ¶ 97; Williams Infringement Rep. ¶ 150. However, Dr. Williams did not stop there.  Rather, Dr. Williams stated that his conclusions were confirmed by: (3) his tear-down analysis of each accused wireless card, which confirmed that each card includes both an antenna sharing device and radio transceiver circuitry that implements the requirements set forth in the 802.11 standards, Williams Infringement Decl. ¶¶ 98, 100; Williams Infringement Rep. ¶¶ 151, 153; and (4) his review of the available technical documentation concerning the radio transceiver components found in the wireless cards, which also confirmed that the cards include circuitry identical to the corresponding structure disclosed in the '769 patent, Williams Infringement Decl. ¶ 99; Williams Infringement Rep. ¶ 152.  Under Ninth Circuit law, "'[e]xpert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not.'" *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1008 (9th Cir. 2007) (quoting *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir. 1985) (per curiam)); *cf. Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001) ("We look to regional circuit law for the applicable standard controlling the factual foundation necessary to support an expert's opinion, which is not a matter peculiar to patent law.").  Dr. Williams' opinion sufficiently establishes prima facie support for this limitation.

In *Lucent Techs., Inc. v. Microsoft Corp.*, 544 F. Supp. 2d 1080, 1090-91 (S.D. Cal. 2008), the district court found that a patentee's expert's declaration was sufficient to survive summary judgment, where the infringement analysis was based "both on the implications of compliance with the [MPEG-2 or VC-1] standard and on review of the product source code as applied to the Court's construction."  544 F. Supp. 2d at 1090-91.  While recognizing that "standards compliance is not necessarily equivalent to an infringement analysis for claims under section 112 ¶ 6," the court

United States District Court
For the Northern District of California

1   nevertheless noted that "analysis of standards implemented by a product may be relevant to

2   infringement and provide support for the patentee's position, provided that standards compliance

3   does not replace the ultimate legal standard for infringement." *Id.* at 1091.  Here, Dr. Williams'

4   uncontroverted analysis of the accused cards' implementation of the 802.11 standard is buttressed

5   by his uncontroverted tear-down analysis of the accused products and review of the available

6   technical documentation.  In the face of this uncontroverted evidence, no reasonable jury could find

7   that the "radio transmitter/receiver means" limitation is not found in the accused wireless cards.

8          Accordingly, in light of the Court's ruling with respect to the "data interface unit"

9   limitation above, Fujitsu's motion for summary judgment that Defendants' accused card interface

10  devices infringe claims 2, 4, and 20 is therefore GRANTED as to Belkin F5D7010, D-Link DWL-

11  G630, and Netgear WG511 only.  The motion is DENIED as to all other accused cards.

12          **C. Defendants' Wireless Access Points and Routers**

13          Fujitsu also seeks summary adjudication that use of Defendants' accused cards with the

14  accused wireless access points and routers constitutes an act of direct infringement of system

15  claims 47 and 48, and that such use in combination with a laptop constitutes direct infringement of

16  electronic system claims 20 and 27.  Infringement Mot. at 9.  Fujitsu contends there is no dispute

17  that: (1) the accused wireless access points and routers "provid[e] a peripheral function for the

18  electronic device," and thus are "external devices" within the meaning of system claims 47 and 48

19  and electronic system claims 20 and 27; (2) a laptop is an "electronic device" within the meaning

20  of electronic system claims 20 and 27; and (3) the accused wireless cards satisfy the card-related

21  elements of claims 20, 27, 47, and 48.

22          With respect to claims 47 and 48, Defendants offer no non-infringement defense, as

23  discussed above.  Accordingly, Fujitsu's motion for summary adjudication that use of Defendants'

24  accused cards with the accused wireless access points and routers constitutes an act of direct

25  infringement of system claims 47 and 48 is GRANTED.

26          With respect to claims 20 and 27, Defendants offer no non-infringement defense

27  independent of its arguments concerning the card-related limitations of those claims, discussed

28  above.  Accordingly, for the reasons discussed above with respect to the accused cards, Fujitsu's

**United States District Court**
For the Northern District of California

1    motion for summary adjudication that use of Defendants' accused cards with the accused wireless

2    access points and routers and with a laptop constitutes direct infringement of electronic system

3    claim 20 is GRANTED as to Belkin F5D7010, D-Link DWL-G630, and Netgear WG511, and

4    DENIED as to all other accused products.  Fujitsu's motion for summary adjudication that use of

5    Defendants' accused cards with the accused wireless access points and routers and with a laptop

6    constitutes direct infringement of electronic system claim 27 is DENIED as to all accused products.

7              **D.  Defendants' Network Kits**

8              Finally, Fujitsu seeks summary judgment that Defendants' network kits directly infringe

9    claims 47 and 48, which, as previously discussed, are both system claims.  The 14 accused network

10   kits[9] consist of one wireless card interface device and one wireless router or access point device,

11   which are bundled together and offered for sale in a single package.  As discussed above,

12   Defendants offer no non-infringement defense to claims 47 and 48.  Thus, Fujitsu's motion for

13   summary judgment that Defendants' network kits directly infringe claims 47 and 48 is GRANTED.

14        **IV.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY**

15             Defendants move for summary judgment of invalidity of all asserted claims, specifically

16   seeking summary judgment that: (1) claims 41, 47, and 48 of the '769 Patent are invalid as

17   anticipated under 35 U.S.C. § 102(a) and (b) in light of the ARLAN 450 interface card reference

18   ("ARLAN"), or alternatively invalid as obvious under 35 U.S.C. § 103(a) in light of ARLAN and

19   Murakami; (2) claims 2, 4, 8, 20, 41, 47, and 48 of the '769 Patent are invalid as anticipated under

20   § 102(b) in light of the Mizutani reference, or alternatively are invalid as obvious under § 103(a) in

21   light of Mizutani and Murakami; (3) claims 2, 4, 8, 20, 41, 47, and 48 of the '769 Patent are invalid

22   as anticipated under § 102(b) in light of the Murakami reference, or alternatively are invalid as

23   obvious under § 103(a) in light of Murakami in combination with ARLAN, Mizutani, or HP

24   82950A; and (4) claims 9, 14, and 27 of the '769 Patent are invalid as anticipated under § 102(b) in

25   light of the HP 82950A reference, or alternatively are obvious in light of HP 82950A and

26   Murakami.

27   _____

28   [9] At issue in this motion are 3 Belkin network kits, 8 D-Link network kits, and 3 Netgear network
     kits.  Garten Decl. ¶ 13.

28

**United States District Court**
For the Northern District of California

1    Patents are presumed to be valid.  35 U.S.C. § 282(a).  A party challenging the validity of a

2    patent bears the burden of proving invalidity by clear and convincing evidence.  *Pfizer, Inc. v.*

3    *Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007).  As with infringement, "[b]oth anticipation

4    under § 102 and obviousness under § 103 are two-step inquiries."  *Medichem, S.A. v. Rolabo, S.L.*,

5    353 F.3d 928, 933 (Fed. Cir. 2003) (citations omitted).  The first step is claim construction.  *Id.*; *see*

6    *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("'A claim

7    must be construed before determining its validity just as it is first construed before deciding

8    infringement.'" (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 996 n.7 (Fed. Cir.

9    1995) (Mayer, J., concurring), *aff'd*, 517 U.S. 370 (1996)).  The second step is a comparison of the

10   properly construed claim to the prior art.  *Medichem*, 353 F.3d at 933.

11        **A.  Claim Construction**

12        Although the parties stipulated that "card" and "slot" should carry their plain meanings, the

13   parties now disagree over the content of each term's "plain meaning."  "A determination that a

14   claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate

15   when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary'

16   meaning does not resolve the parties' dispute."  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

17   *Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  Accordingly, the Court has a duty to resolve the

18   parties' dispute concerning the scope of these claim terms.  *Id.* at 1361-62; *see also Jack Guttman,*

19   *Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002) ("District courts may engage

20   in a rolling claim construction, in which the court revisits and alters its interpretation of the claim

21   terms as its understanding of the technology evolves.").

22        A claim term is generally "construed in accordance with the ordinary and customary

23   meaning [it] would have to one of ordinary skill in the art in light of the specification and the

24   prosecution history" at the time of the invention.  *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d

25   1324, 1329 (Fed. Cir. 2012) (citing *Phillips*, 415 F.3d at 1312).  In construing disputed terms, the

26   court looks first to the claims themselves, read in context, for "[i]t is a 'bedrock principle' of patent

27   law that 'the claims of a patent define the invention to which the patentee is entitled the right to

28   exclude.'"  *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration*

29

*Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)).  Importantly, however, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313; *see also Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part.").  Because the specification must contain a description of the invention sufficiently clear "to teach and enable those of skill in the art to make and use the invention," *Phillips*, 415 F.3d at 1323, the specification is "'always highly relevant'" and "'[u]sually [ ] dispositive; it is the single best guide to the meaning of a disputed term,'" *id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1320 (Fed. Cir. 2011).

The court should also consider, if it is in evidence, the patent's prosecution history, which consists of the complete record of proceedings before the United States Patent and Trademark Office ("PTO") and includes the prior art references cited during the examination.  *Phillips*, 415 F.3d at 1317.  Although the prosecution history is generally less useful than the specification for claim construction, the prosecution history nevertheless "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be."  *Id.*  For example, "where the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender."  *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003).

Finally, the court is also authorized to consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries, and learned treatises."  *Markman*, 52 F.3d at 980.  While the court may look to sources extrinsic to the patent and prosecution history, such evidence is considered "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms."  *Phillips*, 415 F.3d at 1317-18 (internal quotation marks and citation omitted).  Thus, while extrinsic evidence may be useful in claim construction, ultimately "it is unlikely to result in a reliable interpretation of patent claim

30

1    scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.  Any expert

2    testimony "'that is clearly at odds with the claim construction mandated by the claims themselves,

3    the written description, and the prosecution history'" will be significantly discounted.  *Id.* at 1318

4    (quoting *Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998)).

5         "Because the claims of a patent measure the invention at issue, the claims must be

6    interpreted and given the same meaning for purposes of both validity and infringement analyses."

7    *Amazon.com*, 239 F.3d at 1351 (citing *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859

8    F.2d 878, 882 (Fed. Cir. 1988)).  "'A patent may not, like a 'nose of wax,' be twisted one way to

9    avoid anticipation and another to find infringement.'"  *Id.* (quoting *Sterner Lighting, Inc. v. Allied

10   Elec. Supply, Inc.*, 431 F.2d 539, 544 (5th Cir. 1970) (internal citation omitted)).

### 1.  "Card"

12        Whereas Defendants have always maintained that no construction of "card" is necessary,

13   Fujitsu argued during the *Markman* proceedings that the term should be construed as "[1] a thin

14   device (approximately 10 mm or less in thickness for the portion of the card to be inserted into a

15   slot) that, [2] when inserted, resides substantially within the electronic device and [3] is exposed to

16   the external environment."   ECF No. 168 at 17.  Fujitsu later abandoned these three specific

17   limitations, stipulating that "card" should be construed to have its ordinary and customary

18   meaning.  Fujitsu now seeks a construction of "card" to mean an "IC-type card," contending that a

19   person of ordinary skill in the art would understand the plain meaning of "card" as claimed in the

20   '769 Patent to be an IC-type card.  ECF No. 270, Fujitsu's Response to Defs.' Mot. for Summ. J. of

21   Invalidity ("Invalidity Opp'n") at 5; *see* ECF No. 272, Decl. of Dr. Tim A. Williams in Supp. of

22   Fujitsu's Resp. to Defs.' Mot. for Summ. J. of Invalidity ("Williams Invalidity Decl."), Ex. A

23   ("Williams Invalidity Rep.") ¶¶ 188-90, 349, 353.  Fujitsu argues that "Defendants advance an

24   interpretation of 'card' that is virtually limitless, encompassing cartridges, any PCB [printed circuit

25   board], and any device containing a PCB," thus ignoring the context of the '769 Patent.  Invalidity

26   Opp'n at 5.

27        Here, the claim terms themselves do not include any universal thickness or size limitations

28   applicable to all "cards," and both parties' experts agree that a person of ordinary skill in the art in

31

1991 would understand the plain meaning of "card" to include not only IC cards, but also internal expansion boards, also known as printed circuit boards ("PCBs").  Indeed, Fujitsu's own expert explained that, in 1991, "the term 'card' was sometimes used to refer generically to PCBs and sometimes used to refer to an IC-type card."  Invalidity Opp'n at 5; Williams Invalidity Rep. ¶ 188.

Nonetheless, Fujitsu argues that a person of ordinary skill in the art reading the term "card" in light of the specification and prosecution history would understand "card" to mean "IC-type card."  The specification of the '769 Patent does make several references to IC cards.  First, in discussing the "Background of the Invention," the specification discusses IC memory cards and IC memory cards that have processors for processing data, noting that such IC cards had been developed to facilitate the downsizing of laptop computers.  '769 Patent, col.1:19-21; 1:10-26; 1:41-44.  The specification notes that these IC memory card-type devices have exemplary dimensions of 85.6 x 54.0 x 3.3 mm, and are "inserted into slots of electronic device systems, such as word processors and personal computers."  *Id.* col.1:45-48.  Immediately following the description of the invention's background, the specification provides a "Summary of the Invention," which notes, "It is a general object of the present invention to provide a card type input/output interface device in which the above disadvantages are eliminated.  A more specific object of the present invention is to facilitate down-sizing of the main body of an electronic device system by means of a card type input/output interface device, which is inserted into a slot formed in the main body."  *Id.* col.1:65-2:4.  Elsewhere in describing the preferred embodiments of the invention, the specification continues to make comparisons or references to IC cards.  *See id.* col.3:32-34 ("The connection part 1 comprises a connector 18 formed on a single side or both opposing sides of the card 4, as in the case of conventional IC cards."); *id.* col.7:2-5 ("When the card is 3 mm thick, the projection 42a is designed to have a thickness of approximately 6 mm. Thus, the total thickness is equal to approximately 9 mm – 10 mm.  This thickness does not degrade the performance of the IC cards."); *id.* col.7:28-31 ("[T]he use of radio transmitter/receiver units can provide the card type input/output devices having a thickness almost the same as the thickness of conventional IC memory cards and IC cards.").

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

1      The prosecution history sheds only limited light on the matter.  Fujitsu argued during

2  reexamination, and the Examiner accepted, that the '769 Patent is distinguishable from certain

3  prior art references such as Japanese Patent Application Publication No. S61-212140 ("Mizutani")

4  because Mizutani discloses a cartridge 16.8 mm thick, rather than a card.  *See* ECF No. 271, Decl.

5  of R. Jason Fowler in Supp. of Fujitsu's Opp'n to Defs.' Mot. for Summ. J. of Invalidity ("Fowler

6  Decl."), Ex. 3 at FUJ0002374-*75.  However, as Dr. Williams explains, various characteristics

7  distinguish a "cartridge" from a "card."  *See* Williams Invalidity Rep. ¶¶ 171-72.  Thus, Fujitsu's

8  disavowal of "cartridges" is not dispositive of Fujitsu's argument now that "card" as used in the

9  '769 Patent is limited to "IC-type cards."

10      Fujitsu is correct that claim terms are not interpreted "in a vacuum, devoid of the context of

11  the claim as a whole."  *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed.

12  Cir. 2008).  As noted above, the claim language itself, read in the context of the specification, is

13  paramount in ascertaining the ordinary and customary meaning of a claim term, as understood by a

14  person of ordinary skill in the art at the time of the invention.  *See Phillips*, 415 F.3d at 1312-13.

15  At the same time, however, the Federal Circuit has recognized that "'there is sometimes a fine line

16  between reading a claim in light of the specification, and reading a limitation into the claim from

17  the specification,'" the latter of which is strongly disfavored.  *Kyocera Wireless*, 545 F.3d at 1347

18  (quoting *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998)).  For

19  example, in *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324 (Fed. Cir. 2012), the patentee

20  acknowledged that the term "perfusion" as normally understood in the art did not include an eight-

21  hour stability limitation, but nonetheless argued for such a limitation, explaining that "based on

22  how the term is used in the context of the '561 patent, the claimed 'perfusion' must demonstrate at

23  least hours of stability."  675 F.3d at 1330.  The Federal Circuit rejected the patentee's attempt to

24  import an eight-hour stability limitation to the claim term "perfusion," reiterating the "stringent

25  standard for narrowing a claim term beyond its plain and ordinary meaning."  *Id.*

26      In general, a claim term will be interpreted more narrowly than its ordinary meaning under

27  only two circumstances: "(1) when a patentee sets out a definition and acts as [its] own

28  lexicographer, or (2) when the patentee disavows the full scope of a claim term either in the

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

specification or during prosecution." *Thorner v. Sony Computer Entm't Am. L.L.C.*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  Neither of those circumstances exists here.

"To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Id.* (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).  "[T]he patentee must 'clearly express an intent' to redefine the term." *Id.*  "This clear expression need not be in *haec verba* but may be inferred from clear limiting descriptions of the invention in the specification or prosecution history." *Aventis Pharma*, 675 F.3d at 1330.  However, "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments," nor is it "enough that the only embodiments, or all of the embodiments, contain a particular limitation" to limit a claim term more narrowly than its ordinary meaning. *Thorner*, 669 F.3d at 1366.  Here, Fujitsu's repeated reference to conventional IC memory cards in discussing the background of the invention and the preferred embodiments falls far short of "clearly set[ting] forth a definition" of "card" different from its plain and ordinary meaning. *Id.* at 1365.  Fujitsu therefore did not act as its own lexicographer with respect to the term "card."

Likewise, a patentee's disavowal of claim scope, either in the specification or during prosecution, must be clear in order to narrow a claim term beyond its ordinary and customary meaning.  "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002); *see also Home Diagnostics Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").  "Mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Thorner*, 669 F.3d at 1366; *see Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (holding that even a direct criticism of a particular technique did not rise to the level of clear disavowal).  Similarly, "even where a particular structure makes it 'particularly difficult' to obtain certain benefits of the claimed invention, this does not rise to the

34

United States District Court
For the Northern District of California

1    level of disavowal of the structure." *Thorner*, 669 F.3d at 1366 (quoting *Spine Solutions, Inc. v.*

2    *Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1315 (Fed. Cir. 2010)).  Here, Fujitsu's

3    argument that a printed circuit board such as the ARLAN device would not achieve the

4    "downsizing" purpose of the invention is unavailing.[10]  *See id.*  Fujitsu is unable to point to a "clear

5    disavowal" of claim scope in either the specification or the prosecution history, and thus the Court

6    finds no support for limiting the plain and ordinary meaning of "card," which both parties agree

7    can encompass both IC-type cards and PCB cards, to only IC-type cards.

8        Accordingly, the Court declines to adopt Fujitsu's construction of "card" as limited to "IC-

9    type card."

10                    **2.  "Slot"**

11       Whereas Defendants have always maintained that no construction of "slot" is necessary,

12   Fujitsu argued during the *Markman* proceedings that the term should be construed as "an opening

13   in the exterior of the electronic device adapted to receive the card or card interface."   ECF No. 168

14   at 10.  Fujitsu later abandoned the "exterior" opening limitation, stipulating that "slot" should be

15   construed to have its ordinary and customary meaning.  Fujitsu now revives its argument that "[t]he

16   plain meaning of 'slot,' as that term is used in the '769 [P]atent, is an opening in the exterior of the

17   electronic device," and does not include openings in the interior of the electronic device.  Invalidity

18   Opp'n at 8.

19       To support its position, Fujitsu relies primarily on the specification, as it originally did

20   during the *Markman* proceedings.  Fujitsu argues that the '769 Patent "repeatedly refers to a 'slot

21   formed in the main body' of the computer into which the card is inserted."  *Id.* (citing '769 Patent,

22   Abstract; 1:19-21; 2:1-4; 3:23-26; 3:33-37).  Fujitsu also points to Figure 1, which depicts "a slot

23   22 formed on a sidewall of a main body 20 of an electronic device system," '769 Patent, col.3:23-

24   26, and argues that "[a]ll of the slots described and shown in the '769 [P]atent are the same: they

----

[10] Moreover, Fujitsu's expert stated during his deposition that an electronic device as disclosed in
the claims could be "as large as this room."  ECF No. 282-3, Second Decl. of Joshua S. Wyde in
Supp. of Defs.' Corrected Reply in Supp. of Mot. for Summ. J. of Invalidity ("Wyde Reply Decl."),
Ex. 45 at 368:20-22.  Consistent with that observation, Defendants' expert Dr. Mihran noted that
"there's really no fundamental limit on how large a printed circuit board might be for a particular
application."  Fowler Decl. Ex. 8 at 75:19-76:4.

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

are openings in the exterior of the electronic device." Invalidity Opp'n at 9. In addition, Fujitsu

argues that "the IC-type cards described in the patent were all inserted into this type of slot." *Id.*

Defendants argue that the ordinary and customary meaning of "slot" is simply "an

opening." ECF No. 285-1, Defs.' Corrected Reply to Fujitsu's Resp. to Defs.' Mot. for Summ. J.

of Invalidity ("Invalidity Reply") at 2. Defendants argue that there is no basis for limiting "slot" to

a particular location. The PTO recently concluded that the plain meaning of a "slot" to a person of

ordinary skill in the art includes "a groove, slit, or aperture for receiving or admitting something[,]

which in this case is a card . . .," and that Fujitsu "failed to act as [its] own lexicographer . . . to

define the term 'slot' in a manner contrary to its ordinary meaning." Wyde Decl. Ex. 30 at

BLKN0037243.

The Court agrees with Defendants that Fujitsu's proposed construction is supported by

neither the specification nor the prosecution history. First, Fujitsu's construction of "slot" as

limited only to slots on the exterior of the electronic device violates the doctrine of claim

differentiation, which instructs that limitations added to a term in dependent claims are

presumptively not to be read into that term as used in independent claims. *See Acumed LLC v.

Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007). Claim 38 merely describes "a card, to be

inserted into a slot provided in the electronic device." '769 Patent col.10:64-65. Dependent claims

78, 79, 80, and 84, which depend from claim 38, add the external limitation: "wherein the slot

comprises an opening formed in a sidewall of a main body of the electronic device." *See, e.g.*,

'769 Reexam. Certificate col.4:54-56 (claim 78). An opening formed in a sidewall is an opening in

the exterior of the electronic device. Thus, under the doctrine of claim differentiation, it would be

improper to import the limitation of a slot comprised of an "opening in the exterior of the

electronic device" into the claim term 'slot.'" *See Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177

F.3d 968, 972 (Fed. Cir. 1999) (holding it improper to read the limitation in the dependent claims

"into the independent claim[s] from which they depend"); *accord Allvoice Computing PLC v.

Nuance Comm'ns*, 504 F.3d 1236, 1247-48 (Fed. Cir. 2007).

Nor does anything in the prosecution history overcome the presumptive construction under

the principles of claim differentiation. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d

36

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1473, 1480 (Fed. Cir. 1998). To the contrary, the prosecution history supports Defendants' plain

meaning construction. Fujitsu's original patent *did* include the limitation "in the exterior of the

electronic device," as the original claim 38 recited "a slot provided in *an external wall* in the body

of the electronic device." ECF No. 176-6 at 15. However, Fujitsu then filed a broadening reissue

application, advising the PTO that its original claims were too narrow. In response to the PTO's

rejection of Fujitsu's reissue application, Fujitsu amended claim 38 by deleting the "external wall"

and "body" limitations so that it recited more broadly "a slot provided in the electronic device."

ECF No. 176-8 at 1-2. The Court agrees with Defendants that Fujitsu's deletion of "external wall"

from independent claim 38, and later inclusion of the "opening formed in a sidewall" limitation in

dependent claim 78, strongly suggest that the plain meaning of the term "slot" as used in the '769

Patent is not confined to the exterior of an electronic device.

Fujitsu argues that it disavowed internal slots, such as those that accept internal PCI cards,

during reexamination proceedings. "When the patentee makes clear and unmistakable prosecution

arguments limiting the meaning of a claim term in order to overcome a rejection, the courts limit

the relevant claim term to exclude the disclaimed matter." *SanDisk Corp. v. Memorex Prods., Inc.*,

415 F.3d 1278, 1286 (Fed. Cir. 2005). The standard for a "clear disavowal," however, is a high

one. "An ambiguous disclaimer . . . does not advance the patent's notice function or justify public

reliance, and the court will not use it to limit a claim term's ordinary meaning." *Id.* at 1287. Here,

Fujitsu's specific statement during reexamination was that "Arlan fails to disclose, teach, or

suggest, 'a card, inserted into the slot of the electronic device. . . . The Arlan 450 device is

installed by inserting the card into a connector on the motherboard. Therefore, the Arlan 450

device is not inserted into a slot and does not teach or suggest 'a card, inserted into the slot of the

electronic device.'" Fowler Decl. Ex. 3 at FUJ0002403; Williams Invalidity Rep." ¶ 354 (internal

citation omitted). This statement does not rise to the level of a "clear disavowal" of internal slots,

as an equally reasonable interpretation of Fujitsu's statement is that Fujitsu was narrowly

disclaiming "installation" into a "connector on the motherboard" as opposed to "insertion" of a

card into an internal slot generally. While "[a] patentee's statement during reexamination can be

considered during claim construction, in keeping with the doctrine of prosecution disclaimer, . . .

37

United States District Court
For the Northern District of California

1   [t]here is no 'clear and unmistakable' disclaimer if a prosecution argument is subject to more than

2   one reasonable interpretation, one of which is consistent with a proffered meaning of the disputed

3   term." *O1 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012)

4   (internal quotation marks and citations omitted).  Fujitsu's disavowal of a card that must be

5   "installed by inserting the card into a connector on the motherboard" does not amount to a "clear

6   disavowal" of all interior slots.

7           Accordingly, the Court declines to adopt Fujitsu's proposed construction of "slot" as

8   limited to "an opening in the exterior of the electronic device."  Instead, the Court agrees with

9   Defendants that "slot" should be construed to mean simply "an opening."

10          **B.  Anticipation**

11          A patent claim is invalid by reason of anticipation if "the invention was known or used by

12  others in this country, or patented or described in a printed publication in this or a foreign country,

13  before the invention thereof by the applicant for patent."  35 U.S.C. § 102(a).  A claim is

14  anticipated under § 102, and thus invalid, "if each and every limitation is found either expressly or

15  inherently in a single prior art reference."  *Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246

16  F.3d 1368, 1374 (Fed. Cir. 2001) (internal quotation marks and citation omitted); *accord Eli Lilly

17  & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006).  Put simply, "[t]hat

18  which infringes, if later, would anticipate, if earlier."  *Peters v. Active Mfg.*, 129 U.S. 530, 537

19  (1889).  To anticipate, the prior art reference must also "enable one of ordinary skill in the art to

20  make the invention without undue experimentation."  *Orion IP, LLC v. Hyundai Motor Am.*, 605

21  F.3d 967, 975 (Fed. Cir. 2010) (quotation marks and citation omitted).

22          **1.  Whether ARLAN 450 anticipates claims 41, 47, and 48**

23          The ARLAN 450 wireless interface card ("ARLAN"), manufactured by Telesystems SLW,

24  is an internal expansion board, i.e., a device for upgrading or expanding the capabilities of a

25  desktop computer.  Williams Invalidity Rep. ¶¶ 59-66.  ARLAN is a complete wireless

26  communication card designed to work with IBM PC/AT compatible computers and provides these

27  PCs with access to a wireless network within or between buildings without the need for cables.

28  ECF No. 262, Decl. of Joshua S. Wyde in Supp. of Defs.' Mot. for Summ. J. of Invalidity ("Wyde

                                                    38

1  Decl."), Ex. 6 at 1.  Typical applications for ARLAN include creating wireless Local Area

2  Networks (LANs) and PC-to-host connections.  *Id.* Ex. 6 at 2.  It is undisputed that the ARLAN

3  card was manufactured and sold as of 1989 and thus constitutes prior art.  *Id.* Ex. 14 at 26:5-26:25,

4  30:2-31:8, 47:13-48:13.  The PTO considered publications about ARLAN, though not the ARLAN

5  system itself, during reexamination.

6         Fujitsu argues that ARLAN does not anticipate claims 41, 47, or 48 because: (1) ARLAN

7  does not disclose a "slot;" (2) ARLAN does not disclose a "card;" and (3) ARLAN does not

8  disclose a card to be "inserted into a slot."  Invalidity Opp'n at 10-12.  The Court concludes that

9  there is a genuine dispute of material fact at least as to whether ARLAN discloses a "slot" and

10 whether ARLAN discloses a card to be "inserted into a slot."  As noted above in construing the

11 term "slot," Fujitsu distinguished ARLAN based on the fact that it "is installed by inserting the

12 card into a connector on the motherboard," and thus "fails to disclose, teach, or suggest, 'a card,

13 inserted into the slot of the electronic device.'"  Williams Invalidity Rep. ¶ 354.  Fujitsu's expert Dr.

14 Williams further explains that the ARLAN device is merely inserted into an ISA connector, which

15 is not itself a "slot" within the scope of the '769 Patent.  *Id.* ¶ 366.  Moreover, Dr. Williams opines

16 that, unlike insertion into a slot as disclosed in the '769 Patent, "installation of an internal

17 expansion board [onto a connector on a motherboard] . . . is cumbersome and results in a semi-

18 permanent installation of the device."  *Id.* ¶¶ 365, 367; *see id.* ¶¶ 361-72.  Dr. Williams' opinions

19 create a genuine issue of material fact, and thus Defendants' motion for summary judgment of

20 invalidity based on the ARLAN reference is DENIED.

21               **2.  Whether Mizutani anticipates claims 2, 4, 8, 20, 41, 47, and 48**

22        Iwoa Mizutani's Japanese Patent Application 1985-51934, titled "Transmitting Apparatus

23 and Transmitter-Receiver" ("Mizutani"), was published on September 20, 1986, as Publication No.

24 1986-212140, over three years before the '769 Patent's priority date.  Wyde Decl. Ex. 18 at

25 JIC0002854; *id.* Ex. 2, No. 11.05 [Fujitsu's Responses to Requests for Admission Nos. 1-47].

26 Mizutani discloses a "transmission and reception device . . . to be directly inserted into a cartridge

27 slot of a personal computer" to allow for wireless radio transmission and reception of data between

28 the computer and an external device.  Wyde Decl. Ex. 18 at JIC0002854.

39

United States District Court
For the Northern District of California

1    Fujitsu argues that Mizutani does not anticipate claims 2, 4, 8, 20, 41, 47, or 48 because

2 "Mizutani teaches a cartridge, not a 'card.'"  Invalidity Opp'n at 13.  With respect to claim 8 only,

3 Fujitsu additionally argues that Mizutani does not anticipate for failure to disclose an antenna that

4 is an edge portion of the device.  *Id.* at 15.  The Court agrees that there is a genuine dispute of

5 material fact at least as to whether Mizutani discloses a "card."  Mizutani specifies that the

6 "[t]ransmission and reception device 10 is designed to have the same outer dimensions as those of

7 a cartridge to be inserted into a cartridge slot of personal computer 11 . . . ."  Mizutani at 2;

8 Williams Invalidity Rep. ¶ 50.  Specifically, Mizutani explains that the cartridge "has width W of

9 109mm, height H of 16.8mm, and length L of no less than 44mm."  Mizutani at 2; Williams

10 Invalidity Rep. ¶ 50.  Fujitsu's expert Dr. Williams explains in his report that there were several

11 significant distinctions between cards and cartridges, as understood by one of ordinary skill in the

12 art in April 1991, and that a skilled artisan would not understand a cartridge to be subsumed within

13 the plain and ordinary meaning of "card."  *See* Williams Invalidity Rep. ¶¶ 171-93.  Based on

14 Fujitsu's evidence, a reasonable jury could find that Mizutani failed to disclose a "card."

15 Accordingly, summary judgment of invalidity based on the Mizutani reference is DENIED.[11]

16          **3.   Whether Murakami anticipates claims 2, 4, 8, 20, 41, 47, and 48**

17    Japanese Publication JP 64-8495 of Japanese Application 62-162277, published on January

18 12, 1989 to Junzo Murakami ("Murakami"), lists a publication date of December 1, 1989 on its

19 face, and is thus prior art.  *See* Wyde Decl. Ex. 22.  Murakami is directed to a "portable electronic

20 apparatus" with a keyboard, a display, and a slot for loading "a plurality [] of card type electronic

21 circuits."  Wyde Decl. Ex. 22 at FUJ0000064; Williams Invalidity Rep. ¶¶ 43-48.  Murakami

22 provides several examples of different possible card type electronic circuits, which can give the

23 electronic apparatus differing functionalities, including "radio message communication [via]

24 transceiver."  Wyde Decl. Ex. 22 at FUJ0000061-62; Williams Invalidity Rep. ¶¶ 45-46.

25

26 [11] The Court does not rely on Defendants' arguments regarding the Nukata reference raised at the
   September 20 hearing on the summary judgment motions.  Accordingly, Fujitsu's Administrative
27 Motion for Leave to File Motion to Strike Defendants' New Arguments Raised at Summary
   Judgment Hearing in Support of Their Motion for Summary Judgment of Invalidity is DENIED as
28 moot.  *See* ECF No. 304.

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

Murakami was disclosed to the PTO with an English abstract but was otherwise not substantively considered by the PTO in any reexamination proceeding for the '659 Patent.

Unlike the other prior art references at issue in Defendants' motion, Fujitsu does not dispute that Murakami discloses "a card to be inserted into a slot provided in an electronic device." *See* Wyde Decl. Ex. 2, 20.15 at 117:10-15. Fujitsu also admits that Murakami discloses the same layout "with a first data interface unit, provided on one end of the card, for coupling to an electronic device" and a "second data interface unit, provided on an opposing end of the card, for coupling to an external device," *id.* Ex. 2, 15.16 at 56:17-23, 16.16 at 67:15-20, and admits that the card communicates wirelessly with an external device, *id.* Ex. 2, 22.11, at 137:1-6. Rather, Fujitsu argues only that: (1) Murakami does not anticipate claims 2, 4, 8, 20, 41, 47, or 48 because it does not disclose a data transfer circuit that transfers data "in response to" the data being received by the second data interface unit, Invalidity Opp'n at 16; *see* Wyde Decl. Ex. 2, 23.12 at 144:27-28; and (2) Murakami is not an enabling reference.

*"In response to."* Claims 2, 4, 8, 20, 41, 47, and 48 all require the following limitation: "a data transfer circuit, incorporated with the card, *in response to* the input information being received by the second data interface unit, for transferring the input information to the first data interface unit and, *in response to* the output information being received by the first data interface unit, for transferring the output information to the second data interface unit." '769 Patent, col.11:8-14 (emphases added). Pursuant to the parties' stipulation, the Court construed "data transfer circuit" as "a circuit for transferring data." Fujitsu does not dispute that Murakami discloses a "circuit for transferring data." However, the parties now seek construction of "in response to." Fujitsu argues that the data transfer circuit in Murakami does not automatically transfer data "in response to" the data being received by the second data interface unit, as the patent claims require, but rather only in response to a user key stroke. Invalidity Opp'n at 16-17; Williams Invalidity Rep. ¶¶ 136-38. Fujitsu argues that the plain meaning of the "in response to" clause requires a direct cause-and-effect relationship, and that "if the data is transferred in response to anything other than receipt of that data then it does not satisfy this claim limitation—whether that additional event constitutes human intervention or the action of some other component." Invalidity Opp'n at 18. Thus, under

41

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   this plain meaning construction of "in response to," Fujitsu argues that Murakami does not

2   anticipate.

3       Defendants dispute Fujitsu's plain-meaning construction, arguing that Fujitsu is in fact

4   improperly imposing limitations on the term "data transfer circuit" not supported by the claim

5   language, specification, or prosecution history.  Defendants appear to argue that the phrase "in

6   response to" should be construed simply to mean "after."  Because these are "comprising" claims

7   not limited exclusively to the structure disclosed in the patent, Defendants argue, the presence of an

8   additional step, such as human intervention, is irrelevant.  Invalidity Reply at 11 (citing *Mars Inc.*

9   *v. H.J. Heinz Co.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004)).

10      Having considered the parties' arguments, the Court agrees with Fujitsu that a person of

11  ordinary skill in the art, reading the '769 Patent in light of the intrinsic evidence, would construe

12  the "in response to" clause as connoting a cause-and-effect relationship rather than a straight

13  temporal sequence.  The claim language recites a specific relationship between the receipt of

14  information and its transfer, i.e., the information is transferred "in response to" its receipt.  As Dr.

15  Williams explains, this relationship is significant to the '769 Patent, because the nature of the

16  invented card is an interface that facilitates communication between a computer and an external

17  device providing a peripheral function.  Williams Invalidity Rep. ¶ 96.  The automatic transfer of

18  data facilitates such communication.  *Id.*

19      The Federal Circuit recently affirmed this precise construction of "in response to"

20  appearing in a grammatically analogous claim.  *See Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651

21  F.3d 1318, 1339-40 (Fed. Cir. 2011).  In *American Calcar*, the claim at issue recited: "1. A system

22  for use in a vehicle comprising: . . . a processing element for determining based on the at least one

23  measure a vehicle condition for which a selected service of the vehicle is needed, the processing

24  element identifying one of the plurality of providers *in response to* the vehicle condition . . . ."  *Id.*

25  at 1324.  The Federal Circuit agreed with the district court that "'[i]n response to' connotes that the

26  second event occur in reaction to the first event.  The language of the claim itself suggests that

27  when a vehicle condition is detected, the processing element identifies a provider automatically as

28  opposed to requiring further user interaction."  *Id.* at 1340.  Likewise here with respect to the '769

1    Patent, the language of the claim itself suggests that when the input information is received by the

2    second data interface unit, the data transfer circuit transfers the data to the first data interface unit,

3    and vice versa.  The claim language suggests that this data transfer occurs automatically as opposed

4    to requiring further user interaction.  *See id.*  Furthermore, the claim construed in *American Calcar*

5    was also a "comprising" claim, and thus Defendants' "comprising" argument is unavailing.

6         Accordingly, the Court construes the phrase "in response to" in the relevant claims as

7    requiring a cause-and-effect relationship between the receipt of input information by the second

8    data interface unit and the transfer of such information to the first data interface unit.

9         Turning to the question of anticipation, the Court finds that Fujitsu has presented admissible

10   evidence that, under this construction, Murakami does not anticipate because it does not disclose

11   the "in response to" limitation.  According to Dr. Williams, Murakami explains that when

12   receiving wireless data, the radio message transceiver demodulates the message, and "[t]he

13   demodulated signal is stored in the memory 47 as the receiving message."  Wyde Decl. Ex. 22

14   [Murakami] at FUJ0000072; Williams Invalidity Rep. ¶ 137.  When the message is received, a

15   buzzer sounds to let the user know that a message has been received.  The message, however,

16   remains in memory 47 after the buzzer sounds until (a) the card is inserted into the electronic

17   device (if it is not already inserted), and (b) the user makes a key stroke.  Wyde Decl. Ex. 22

18   [Murakami] at FUJ0000072; Williams Invalidity Rep. ¶ 137.  If the user does not make the

19   appropriate key strokes, then the data will never be transferred to the first data interface unit.

20   Williams Invalidity Rep. ¶ 138.  Thus, Dr. Williams opines that Murakami does not disclose a data

21   transfer circuit that transfers data to the first data interface unit "in response to" the receipt of input

22   information by the second data interface unit.

23        In their Reply, Defendants present a new argument that, even under Fujitsu's proposed

24   construction of "in response to," Murakami still discloses a data transfer circuit because data

25   received at the second data interface unit is transferred to memory (47), which is a type of

26   "buffering" and thus is a component of the first data interface unit.  Reply at 12.  Fujitsu filed an

27   Administrative Motion for Leave to File Motion to Strike New Arguments Raised in Defendants'

28   Reply in Support of their Motion for Summary Judgment of Invalidity, or in the Alternative, to

43

United States District Court
For the Northern District of California

1    Supplement the Record ("Administrative Motion").  *See* ECF No. 297.  Fujitsu's Administrative

2    Motion was not filed until September 13, 2012, twenty-eight days after Defendants filed their

3    reply, and is thus untimely under Civil Local Rule 7-3(d)(1).  Nonetheless, because Defendants'

4    argument that the memory in Murakami is a buffer, if credited, would be case dispositive, and

5    because Fujitsu would otherwise have no opportunity to respond, the Court GRANTS Fujitsu's

6    Administrative Motion to the extent it seeks to supplement the record in response to Defendants'

7    Murakami argument.  In all other respects, Fujitsu's Administrative Motion is DENIED.

8         In its supplemental response brief, Fujitsu points to the 1988 IEEE Standard Dictionary of

9    Electrical and Electronics Terms, which defines "buffer" as: "A device in which data are stored

10   temporarily, in the course of transmission from one point to another; used to compensate for a

11   difference in the flow of data, or time of occurrence of events, when transmitting data from one

12   device to another."  ECF No. 297-5, Decl. of Jason Fowler, Ex. S2.  Fujitsu argues that memory 47

13   in Murakami does not constitute a "buffering component" because, as Dr. Williams explained, the

14   information stored in memory 47 may never be transferred but rather may reside in the memory

15   indefinitely, if no intervening user action is ever taken to retrieve the data.  ECF No. 297-2 at 6.

16        Based on the foregoing, the Court determines that Fujitsu has successfully raised a genuine

17   issue of material fact as to whether Murakami discloses the "in response to" limitation of claims 2,

18   4, 8, 20, 41, 47, and 48.  As such, Defendants' motion for summary judgment of invalidity based

19   on Murakami is DENIED, and the Court need not separately address Fujitsu's enablement

20   argument at this time.

21                **4.    Whether HP 82950A anticipates claims 9, 14, and 27**

22        Hewlett-Packard's HP 82950A Modem Owner's Manual Series 80 (Jan. 1982) ("HP

23   82950A") was sold a decade before the '769 Patent application.  The HP 82950A Modem is

24   described as a modem "interface module" that provides data communications capability for HP

25   Series 80 personal computers by connecting directly to the telephone line via a cable.  Williams

26   Invalidity Rep. ¶ 72.  According to Defendants, HP 82950A was one of many interface cards that

27   were designed to be inserted into the slot of a Hewlett-Packard Series 80 computer to provide

28

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

1    connectivity to external devices.  Wyde Decl. Ex. 19.  HP 82950A was disclosed to the PTO but

2    was not substantively considered by the PTO in any reexamination proceeding.

3         Fujitsu argues that HP 82950A does not anticipate claims 9, 14, or 27 because: (1) HP

4    82950A does not disclose a "card;" and (2) HP 82950A does not disclose a card to be "inserted into

5    a slot."  Invalidity Opp'n at 10-12.  The Court concludes that there is a genuine dispute of material

6    fact at least as to the "card" limitation.  Dr. Williams opines that the manuals and websites relating

7    to HP 82950A describe it as a "module," never referring to it as a "card," and further opines that

8    one of ordinary skill in the art would identify HP 82950A not as a card, but as a cartridge, based on

9    its physical characteristics.  Williams Invalidity Rep. ¶¶ 561-64.  In light of this material dispute,

10   Defendants' motion for summary judgment of invalidity based on HP 82950A is DENIED.

11        **C.  Obviousness**

12        A patent is invalid for obviousness "if the differences between the subject matter sought to

13   be patented and the prior art are such that the subject matter as a whole would have been obvious at

14   the time the invention was made to a person having ordinary skill in the art to which said subject

15   matter pertains."  35 U.S.C. § 103(a).  Obviousness is a question of law based on underlying

16   factual findings regarding: (1) "the scope and content of the prior art"; (2) the "differences between

17   the prior art and the claims at issue"; (3) "the level of ordinary skill in the pertinent art"; and (4)

18   any relevant secondary considerations, such as commercial success, long felt but unsolved needs,

19   and the failure of others (known as objective indicia of nonobviousness).  *KSR Int'l Co. v. Teleflex,*

20   *Inc.*, 550 U.S. 398, 406 (2007) (quoting *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966));

21   *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1338-39 (Fed. Cir. 2008).  Under this

22   framework, "a patent composed of several elements is not proved obvious merely by demonstrating

23   that each of its elements was, independently, known in the prior art."  *KSR*, 550 U.S. at 418.  On

24   the other hand, "when a patent 'simply arranges old elements with each performing the same

25   function it has been known to perform' and yields no more than one would expect from such an

26   arrangement, the combination is obvious."  *Id.* at 417 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S.

27   273, 282 (1976)).

28

45

1        Defendants argue in the alternative that, even if ARLAN, Mizutani, Murakami, and HP

2   82950A are not anticipatory references, they render the '769 Patent obvious in light of one another.

3   Specifically, Defendants assert that: (1) claims 41, 47, and 48 are obvious in light of ARLAN and

4   Murakami; (2) claims 2, 4, 8, 20, 41, 47, and 48 are obvious in light of Mizutani and Murakami;

5   (3) claims 2, 4, 8, 20, 41, 47, and 48 are obvious in light of Murakami and other prior art,

6   especially Mizutani; and (4) claims 9, 14, and 27 are obvious in light of HP 82950A and

7   Murakami.  For each of these combinations, Defendants essentially argue that the references are

8   directed to the same field of endeavor, and thus it would have been obvious to an ordinary artisan

9   to combine their respective teachings.

10        Defendants' obviousness arguments all suffer from the same flaw.  Generally, a party

11   asserting obviousness must "demonstrate 'by clear and convincing evidence that a skilled artisan

12   would have been motivated to combine the teachings of the prior art references to achieve the

13   claimed invention, and that the skilled artisan would have had a reasonable expectation of success

14   from doing so.'"  *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir.

15   2009) (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).  While

16   Defendants recite this standard summarily for each of their asserted obviousness combinations,

17   they provide virtually no facts or expert testimony supporting their bare, conclusory assertions,

18   aside from noting that the PTO has treated Mizutani, Murakami, and publications related to

19   ARLAN as analogous art without objection from Fujitsu during reexamination proceedings.  *See*

20   Invalidity Reply at 14.  Meanwhile, Fujitsu's expert opines that the combinations would not have

21   been obvious.  Specifically, Dr. Williams opines that: (1) ARLAN and Murakami were in different

22   fields of endeavor and were directed to solving different problems, *see* Williams Invalidity Rep.

23   ¶¶ 143-60, 388-404, 418-28; *see also id.* ¶¶ 43-48, 59-66; (2) Mizutani and Murakami were in

24   different fields and directed to solving different problems, *see id.* ¶¶ 143-52, 221-26, 238-42; (3) it

25   would not have been obvious to modify Murakami's data transfer circuit because Murakami

26   teaches away from such a modification, *see id.* ¶¶ 48, 143, 151; and (4) HP 82950A and Murakami

27   were in different fields and directed to solving different problems, *see id.* ¶¶ 43-48, 72-77, 143-60,

28   582-85, 591-92.

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

The Court recognizes that, "while an analysis of any teaching, suggestion, or motivation to combine known elements is useful to an obviousness analysis, the overall obviousness inquiry must be expansive and flexible." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1069 (Fed. Cir. 2012) (citing *KSR*, 550 U.S. at 415, 419). Nonetheless, Dr. Williams' rebuttal opinions are sufficient to create a genuine issue of material fact as to whether ARLAN, Murakami, Mizutani, and HP 82950A are analogous art and whether it would have been obvious to a person of ordinary skill in the art to combine these references. *See In re Harris*, 409 F.3d 1339. Summary judgment of invalidity based on obviousness is therefore improper, and Defendants' motion is DENIED.

## V. DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION OF NO WILLFULNESS

Defendants move for summary adjudication of no willful infringement of the '769 Patent. A finding of willful infringement allows an award of enhanced damages under 35 U.S.C. § 284. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1368 (Fed. Cir. 2007). A finding of willful infringement requires more than a showing of mere negligence. Rather, to establish willful infringement, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* at 1371. "If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *Id.*; *accord Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012).

### A. *Seagate*'s First Prong: Objective Recklessness

Defendants argue that they are entitled to summary adjudication of no willful infringement because Fujitsu cannot establish by clear and convincing evidence that Defendants were objectively reckless in continuing to sell the accused products after receiving notice of the '769 Patent, given that: (1) the PTO granted three separate reexamination requests for the '769 Patent, each time finding, by definition, "substantial new questions of patentability" regarding the '769 Patent, and these reexaminations resulted in cancellation of multiple claims of the '769 Patent that

United States District Court
For the Northern District of California

1    Fujitsu previously asserted against Defendants; (2) Defendants each obtained and relied upon

2    multiple opinions of counsel that the '769 Patent was invalid and thus could not be infringed; and

3    (3) Defendants have "consistently raised credible defenses before and during this litigation,"

4    including during pre-suit negotiations.  Willfulness Mot. at 2-3.  Fujitsu opposes the motion,

5    arguing that a variety of factors create a genuine issue of fact for the jury, namely: (1) the

6    significance of the fact that the ten asserted claims have survived repeated PTO reexaminations; (2)

7    the reliability of Defendants' opinions of counsel; and (3) the reasonableness of Defendants'

8    invalidity arguments, which turn on underlying factual findings.  ECF No. 273, Fujitsu's Opp'n to

9    Defs.' Mot. for Summ. J. and Summ. Adjudication of No Willful Infringement and No Active

10   Inducement ("Willfulness Opp'n") at 1-3.

11        Generally, an accused infringer is not objectively reckless where it "relies on a reasonable

12   defense to a charge of infringement."  *Spine Solutions*, 620 F.3d at 1319; *see In re Seagate*, 497

13   F.3d at 1374 ("A substantial question about invalidity or infringement is likely sufficient not only

14   to avoid a preliminary injunction, but also a charge of willfulness based on post filing conduct.").

15   The Federal Circuit has explained that the threshold determination of objective recklessness

16   essentially distills to "whether a defense or noninfringement theory [is] 'reasonable.'"  *Bard*

17   *Peripheral*, 682 F.3d at 1006 (citing *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed.

18   Cir. 2011).  The accused infringer's subjective state of mind is not relevant to this threshold

19   objective inquiry.  *In re Seagate*, 497 F.3d at 1371.  Thus, while the second prong of *Seagate* is

20   typically a question of fact for the jury, the first prong "should always be decided as a matter of law

21   by the judge."  *Bard Peripheral*, 682 F.3d at 1008 (citing *DePuy Spine, Inc. v. Medtronic Sofamor*

22   *Danek, Inc.*, 567 F.3d 1314, 1324 (Fed. Cir. 2009)).

23                            **1.  Reexamination Proceedings**

24        First, Defendants argue that the fact that the PTO granted three separate reexamination

25   requests for the '769 Patent supports summary adjudication of no willfulness.  Several facts are

26   undisputed.  The '769 Patent claims priority from a failed Japanese patent application filed by

27   Fujitsu on April 30, 1991, in Japan.  On May 18, 2005, Fujitsu itself submitted the '769 Patent for

28   reexamination, admitting as part of its reexamination request that there were "substantial new

48

questions of patentability" for the '769 Patent.  Herring Decl. ¶ 22 & Ex. U at FUJ0000579.

Fujitsu cited several references provided by Defendants over the course of the parties' pre-suit

negotiations, including May, Gordon, PCMCIA Standard 1.0, ARLAN, Mizutani, and WaveLAN.

*Id.* Ex. U at FUJ0000580-*583.  The PTO granted Fujitsu's request on August 1, 2005, based on 23

prior art references not previously considered by the initial Examiner, including some of the

references Defendants had provided to Fujitsu during their pre-suit negotiations.  *Id.* Ex. U at

FUJ0001769.

On June 28, 2006, Bryan Cave filed on behalf of Belkin a request for an independent *ex

parte* reexamination of the '769 Patent.  *See id.* ¶ 23 & Ex. V at FUJ0002750-*88.  The PTO

granted this request on August 31, 2006, finding that substantial new questions of patentability

were raised by seven prior art references, including ARLAN, May, and Gordon, all of which

Defendants had provided Fujitsu during pre-suit negotiations.  *Id.* Ex. V at FUJ0002944.

The PTO later consolidated the Belkin and Fujitsu reexaminations.  On September 29,

2007, the PTO initially rejected all claims of the '769 Patent.  *Id.* ¶ 23 & Ex. V.  Of particular note,

among the claims initially rejected were many of the claims asserted or previously asserted in this

action: claims 2, 4, 9, 20, 27, 38, 39, 47, and 48.  *See id.* Ex. V at FUJ0002990 (claims rejected as

anticipated by Inoue), *3018 (rejected as anticipated by Gordon), *3057 (rejected as anticipated by

Mizutani), *3058 (rejected as anticipated by ARLAN).  One year later, after Fujitsu filed a

response to the PTO's initial action, the PTO issued an office action on September 26, 2008,

confirming the patentability of claims 2, 4-18, 20, 22-39, 41-43, 45, 47-49, and 52-54, as well as

allowing various new claims, but also rejecting 19 claims.  *Id.* Ex. V at FUJ0003425.  On April 17,

2009, the PTO issued a final action confirming the patentability of 45 claims in the '769 Patent,

including all ten presently asserted in this action, but canceling six claims of the '769 Patent.  *Id.*

Ex. V at FUJ0003674.

On March 3, 2011, approximately six months after Fujitsu filed this lawsuit, Belkin filed a

second request for an independent *ex parte* reexamination of the '769 Patent.  *Id.* ¶ 24 & Ex. W.

The PTO granted Belkin's request, again finding substantial new questions of patentability for

claims 2, 4-18, 20, 22-39, 41-43, 45, 47-49, 52-54, and 56-59—in other words, all of the asserted

49

United States District Court
For the Northern District of California

1    claims in this case, and then some—in light of multiple prior art references, including Inoue, May,

2    and Mizutani.  *Id.* Ex. W at BLKN0027980.  On March 14, 2012, the PTO again confirmed the

3    patentability of all ten claims presently asserted in this action.  *See id.* Ex. W at BLKN037242.

4    However, the PTO also cancelled multiple claims of the '769 Patent, including independent claims

5    38 and 39, which Fujitsu had previously asserted against Defendants in this case, and from which

6    seven of the ten remaining asserted claims depend.  *See id.* Ex. W at BLKN0037242.  Specifically,

7    claims 38 and 39 were found to be unpatentable over U.S. Patent No. 4,994,963 to Rorden

8    ("Rorden") in view of Mizutani.  *Id.* Ex. W at BLKN 0037250.

9         The significance of these reexamination proceedings on the question of willful infringement

10   is somewhat mixed.  The Federal Circuit has held that the PTO's mere grant of a request for

11   reexamination, "although surely evidence that the criterion for reexamination has been meet (*i.e.*,

12   that a 'substantial new question of patentability' has been raised, 35 U.S.C. § 303), does not

13   establish a likelihood of patent invalidity."  *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d

14   1575, 1584 (Fed. Cir. 1996).  Moreover, the "initial rejection by the [PTO] of original claims that

15   later were confirmed on reexamination hardly justifies a good faith belief in the invalidity of the

16   claims."  *Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed. Cir.), *cert. denied*,

17   502 U.S. 863 (1991).  Applying these two cases, several trial courts have determined that "the grant

18   of a reexamination and interim PTO rejections," on their own, "are not probative . . . on the

19   question of patentability."  *Krippelz v. Ford Motor Co.*, 675 F. Supp. 2d 881, 895 (N.D. Ill. 2009);

20   *see DataQuill Ltd. v. High Tech Computer Corp.*, No. 08-543, 2011 WL 6013022, at *14-15 (S.D.

21   Cal. Dec. 1, 2011) (holding that a willfulness finding was not precluded by the PTO's rejection of

22   all of the claims asserted in the suit in a non-final office action, where the claims were later

23   confirmed); *see also Safoco, Inc. v. Cameron Int'l Corp.*, No. 05-0739, 2009 WL 2424108, at *21

24   (S.D. Tex. July 31, 2009) (concluding that the "reexamination of the [patents], alone, do not

25   foreclose Plaintiff's claims of willful infringement").

26        On the other hand, however, Defendants point to other trial courts that have held that the

27   substantial new question raised by a reexamination proceeding, while not dispositive, is "one

28   factor" to consider "among the totality of the circumstances."  *Lucent Techs., Inc. v. Gateway, Inc.*,

50

1   Nos. 07-2000, 02-2060, 03-0699, 03-1108, 2007 WL 6955272, at *7 (S.D. Cal. Oct. 30, 2007); *see*

2   *Plumley v. Mockett*, 836 F. Supp. 2d 1053, 1075 (C.D. Cal. 2010) ("While a substantial question of

3   patentability raised by a reexamination request is not dispositive in a willfulness inquiry, it is

4   certainly relevant."); *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 579 (E.D. Tex. 2007).  In

5   *Plumley*, the court found it "[o]f particular note . . . that on their second request for reexamination,

6   Defendants were successful in persuading the PTO to reject various claims as unpatentable in view

7   of prior art."  836 F. Supp. 2d at 1075.  In fact, the *Plumley* Court went so far as to hold that "a

8   patentee's willful infringement claim fails as a matter of law where the PTO requires amendments

9   to the patent before issuing a reexamination certificate."  *Id.* (citing *TGIP*, 527 F. Supp. 2d at 578-

10  79).  Similarly, after a jury finding of willfulness in *TGIP*, the district court granted defendant's

11  motion for judgment as a matter of law, reasoning that the defendant did not act objectively

12  unreasonably because, among other reasons, the patentee had requested reexamination of one of

13  the asserted patents, and the PTO had granted the request and required amendments to the patent

14  before issuing a reexamination certificate.  *TGIP*, 527 F. Supp. 2d at 579.

15       The Court does not agree that the mere grant of a reexamination request or an interim

16  rejection by the PTO precludes a finding of willfulness as a matter of law.  Indeed, such a holding

17  would appear to be contrary to *Hoechst Celanese* and *Acoustical Design*, neither of which is cited

18  in either *Plumley* or *TGIP*.  At the same time, however, the Court finds the facts of this case

19  distinguishable from *Hoechst Celanese* and *Acoustical Design*.  In *Hoechst Celanese*, the

20  defendant's willfulness defense was predicated solely on the grant of reexamination proceedings.

21  Likewise, in *Acoustical Design*, the claims initially rejected were later confirmed by a final action.

22  Here, by contrast, Defendants rely not on the mere grant of a reexamination request, but rather on

23  the PTO's interim rejection of all asserted claims, and most notably, its recent cancellation of

24  previously asserted independent claim 38, from which asserted claims 2, 4, 8, 9, and 14 depend,

25  and cancellation of previously asserted independent claim 39, from which asserted claims 20 and

26  27 depend.  *See* Garten Reply Decl. Ex. 2 [original Infringement Contentions] at 2 (asserting

27  claims 38 and 39).

28

United States District Court
For the Northern District of California

1    Nonetheless, the Court also agrees with Fujitsu that due weight must be given to the fact

2    that all of the currently asserted claims have now survived three reexamination proceedings.  In

3    sum, therefore, the Court finds that the history of the reexamination proceedings does not strongly

4    favor either party.  The Court next considers Defendants' advice of counsel defense.

5                                   **2.  Advice of Counsel**

6           Netgear obtained a total of three invalidity opinions.  Netgear first obtained an opinion

7    letter on August 20, 2003, roughly one year after being contacted by Fujitsu about the '769 Patent,

8    from Bernard Chao of the law firm Chao & Hadidi LLP.  *See* Herring Decl. ¶ 9 & Ex. H.  Mr.

9    Chao prepared a 50-page letter setting forth a detailed analysis of the specification, claims, and

10   prosecution history of the '769 Patent, as well as the relevant prior art and legal standards.  Mr.

11   Chao's opinion letter presented a claim-by-claim analysis under both 35 U.SC. §§ 102 and 112,

12   and opined that the patent was invalid due to obviousness and lack of sufficient written description.

13   *Id.*  Netgear's Vice President of Engineering Charles Olson reviewed Mr. Chao's August 2003

14   letter and concurred with its findings, based on his layperson understanding of patents and the

15   underlying technology.  Herring Decl. ¶ 16 & Ex. O at 196:13-14; 196:24-197:15.  On September

16   4, 2004, Netgear commissioned a supplemental opinion letter from Mr. Chao in response to

17   specific arguments raised by Fujitsu in correspondence with Netgear.  *Id.* ¶ 16 & Ex. O at 221:2-

18   11; 222:4-14.  Mr. Chao opined in this second opinion letter that the '769 Patent was invalid,

19   notwithstanding Fujitsu's arguments to the contrary.  *See id.* ¶ 10 & Ex. I.  Finally, after the '769

20   Patent emerged from reexamination in 2009, and Fujitsu again sent Netgear a letter in February

21   2010 demanding that Netgear secure a license, Netgear commissioned a third opinion letter from

22   Mr. Chao.  *Id.* ¶ 11 & Ex. J.  On April 2, 2010, Mr. Chao provided a 31-page opinion letter,

23   confirming his prior two opinions that the '769 Patent was invalid.  *Id.* ¶ 11 & Ex. J.  Netgear's Mr.

24   Olson again reviewed Mr. Chao's opinion and found it reasonable.  *See, e.g.*, *id.* Ex. O at 236:10-

25   17237:15-20, 239:20-240:4, 244:9-246:7.

26          Belkin obtained an opinion of counsel from Lawrence Kurland of the firm Bryan Cave

27   shortly after Fujitsu first contacted Belkin about the '769 Patent in November 2003.  Herring Decl.

28   ¶ 19 & Ex. R at 29:12-30:14.  Bryan Cave identified several prior art references, including

                                                        52

United States District Court
For the Northern District of California

1    ARLAN, May, and Gordon, which in Bryan Cave's opinion invalidated all claims of the '769

2    Patent. *Id.* Ex. R at 40:8-42:2. Bryan Cave prepared an invalidity claim chart showing that all of

3    the currently asserted claims were invalid in view of ARLAN, May, or Gordon, and a version of

4    this claim chart was provided to Fujitsu on March 4, 2004. *Id.* ¶ 8 & Ex. G at FUJ0153847-*890.

5    Based on these opinions, Bryan Cave filed, on Belkin's behalf, an *ex parte* request for

6    reexamination of the '769 Patent in June 28, 2006. *See id.* ¶ 23 & Ex. V. After the '769 Patent

7    emerged from reexamination in 2009, and Fujitsu again demanded that Belkin take a license in

8    May 2009, Belkin again sought the advice of Bryan Cave, who advised Belkin that the examiner

9    had misunderstood the disclosures of several references and that the '769 Patent was invalid. *Id.*

10   ¶ 19 & Ex. R at 79:25-80:13, 92:8-96:18. During his deposition, Mr. Kurland explained that he

11   communicated his invalidity opinions to Chris Flower, Belkin's General Counsel, who authorized

12   Bryan Cave to file the second *ex parte* reexamination request on March 3, 2011. *See id.* Ex. R at

13   86:18-25, 92:8-96:16.

14         D-Link obtained an opinion of counsel on March 31, 2004, from E. Robert Yoches of

15   Finnegan Henderson Farabow Garrett & Dunner LLP regarding Fujitsu's defective reissue

16   declaration. *See* Herring Decl. ¶ 12 & Ex. K. The opinion concluded that if Fujitsu failed to file a

17   reissue declaration, the claims are invalid, and that if Fujitsu filed the reissue declaration it

18   provided D-Link, then the claims may be invalid, "although the issue is less clear in the law."

19   Herring Decl. Ex. K at DKUS746377. On August 30, 2004, D-Link received an additional opinion

20   of counsel from Mr. Yoches, opining that the '769 Patent was invalid in view of the prior art. *Id.*

21   ¶ 13 & Ex. L. Finally, after the '769 Patent emerged from reexamination in 2009, and Fujitsu

22   again demanded that D-Link take a license in September 2009, D-Link obtained two additional

23   opinions of counsel from Mr. Yoches in 2011. By that time, D-Link had already ceased sales of

24   any products into the U.S. *See* ECF No. 53-3, Decl. of Chia Yu Chang in Supp. of D-Link's Mot.

25   to Dismiss for Lack of Personal Jurisdiction, ¶ 8. In any event, Mr. Yoches opined that the '769

26   Patent was invalid in light of the prior art before the PTO during the reexamination proceedings,

27   and also opined that routers and other external devices should not be part of the case because there

28   was no indirect infringement of the '769 Patent. *See* Herring Decl. ¶¶ 14-15 & Exs. M & N. D-

53

United States District Court
For the Northern District of California

1  Link asserts that it "reviewed and relied on these opinions." Willfulness Mot. at 7. However, D-

2  Link's evidence on reliance is weak. D-Link points to an excerpt from the deposition transcript of

3  A.J. Wang, but Mr. Wang is quoted only as saying, "D-Link Systems is relying on Bob Yoches'

4  opinion on March 31st, 2004 that this patent at this stage had a legal defect and the patent is

5  invalid." Herring Decl. ¶ 20 & Ex. S. This bare, conclusory assertion of reliance is insufficient to

6  establish that any such reliance was reasonable. The only other evidence to which D-Link points is

7  an excerpt from the deposition transcript of Robert Lin stating, "Our counsel found American

8  patent legal opinion on this patent and the report came that the patent was invalid. Based on this

9  report we continue our product development." Herring Decl. ¶ 21 & Ex. T at 95:24-96:2.

10  However, D-Link provides no evidence that Mr. Lin or anyone else at D-Link reviewed Mr.

11  Yoches' various opinions or independently determined that it was reasonable to rely on them.

12  Moreover, as Fujitsu points out, D-Link's 30(b)(6) designee on the topic of opinions of counsel

13  could not confirm when D-Link received the letter and had never seen the opinion letters himself.

14  *See* Garten Opp'n Decl. Ex. 26 at 104:8-107:25. Thus, there is a genuine issue of fact as to

15  whether D-Link relied on Mr. Yoches' opinions at all.

16        An accused infringer's reasonable reliance on advice of counsel that the asserted patent is

17  invalid, unenforceable, or not infringed is "crucial to the analysis" of willfulness, but is not

18  necessarily dispositive. *In re Seagate Tech.*, 497 F.3d at 1369; *see also Finisar*, 523 F.3d at 1339

19  (holding that "a competent opinion of counsel concluding either [non-infringement or invalidity]

20  would provide a sufficient basis for [the defendant] to proceed without engaging in objectively

21  reckless behavior with respect to the [asserted] patent"). While "[f]avorable opinions of counsel

22  normally present a well-grounded defense to willfulness, [] the protection they afford is not

23  absolute." *Acumed*, 483 F.3d at 810. "'Those cases where willful infringement is found despite

24  the presence of an opinion of counsel generally involve situations where opinion of counsel was

25  either ignored or found to be incompetent.'" *Id.* (quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816,

26  828-29 (Fed. Cir. 1992), *abrogated on other grounds by Markman*, 52 F.3d 967. "That an opinion

27  is 'incompetent' must be shown by objective evidence." *Read Corp.*, 970 F.2d at 829. An opinion

28  may be incompetent if it lacks an adequate foundation, for example, if the attorney who prepared it

54

United States District Court
For the Northern District of California

1   failed to look into the necessary facts.  *Id.* (citing *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820,

2   828-29 (Fed. Cir. 1989), *cert. denied*, 493 U.S. 1024 (1990)).  Likewise, an opinion may be

3   incompetent on its face if it contains "merely conclusory statements without discussion of facts or

4   obviously present[s] only a superficial or off-the-cuff analysis."  *Id.* (citing *Underwater Devices,*

5   *Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1390 (Fed. Cir. 1983)).  Because the patentee must

6   prove willfulness by clear and convincing evidence, the patentee bears the burden of showing that

7   the opinion of counsel on which the defendant relies is incompetent.  *See In re Katz Interactive*

8   *Call Processing Patent Litig.*, Nos. 07-1816, 07-2322, 2009 WL 8635161, at *19 (C.D. Cal. May

9   1, 2009) (citing *In re Seagate*, 497 F.3d at 1371).

10          Here, Fujitsu's attempt to discredit Defendants' favorable opinions of counsel by faulting

11   them for addressing only invalidity and not non-infringement is without support in the case law.  In

12   fact, the Federal Circuit has outright rejected this logic, expressly holding that "a competent

13   opinion of counsel concluding either that [the defendant] did not infringe the [asserted] patent *or*

14   that it was invalid would provide a sufficient basis for [the defendant] to proceed without engaging

15   in objectively reckless behavior with respect to the [asserted] patent."  *Finisar*, 523 F.3d at 1339

16   (emphasis in original); *see also Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 793 (Fed. Cir. 1995)

17   ("There is no requirement that an opinion *must* address validity to negate a finding of willful

18   infringement") (emphasis in original).

19          Thus, Netgear and Belkin have presented strong evidence that they reasonably relied on

20   competent opinions of counsel that the '769 Patent is invalid, a factor that weighs in favor of the

21   objective reasonableness of their conduct.  D-Link's evidence of reliance on advice of counsel is

22   weaker, and thus this factor does not weigh in favor of the reasonableness of D-Link's conduct.

### 3.   Reasonableness of Defenses

24          Third, and finally, Defendants argue that they are entitled to summary adjudication because

25   they have consistently raised credible defenses, both during pre-suit negotiations, and throughout

26   this litigation.  A defendant's credible defense to alleged infringement can support a finding of no

27   willfulness.  *See, e.g.*, *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 Fed. App'x 284, 291

28   (Fed. Cir. 2008) (unpublished) ("Under [the *Seagate*] standard, . . . credible invalidity arguments

55

demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent."); *see also Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1377-78 (Fed. Cir. 2012) (affirming district court's summary judgment of no willfulness based, in part, on defendant's "compelling non-infringement and invalidity arguments," even while altering the district court's claim construction and consequently vacating summary judgment of noninfringement and remanding); *Spine Solutions*, 620 F.3d at 1319 (upholding the jury's verdict of nonobviousness, while finding that the accused infringer raised a 'substantial question' of obviousness sufficient to defeat the charge of willfulness); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 & n.4 (Fed. Cir. 2008) (finding that a sufficiently close question of proper claim construction foreclosed a finding of willfulness); *ResQnet.com, Inc. v. Lansa, Inc.*, 533 F. Supp. 2d 397, 420 (S.D.N.Y. 2008), *vacated in part on other grounds*, 594 F.3d 860 (Fed. Cir. 2010), (finding no willfulness because "[defendant's] arguments [of non-infringement and invalidity] were substantial, reasonable, and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon"); *TGIP*, 527 F. Supp. 2d at 579 (no willful infringement because defendant's invalidity defense was not objectively unreasonable, even though it ultimately did not prove that defense by clear and convincing evidence).

Here, Defendants have raised invalidity arguments that are not patently meritless on their face.  Indeed, Defendants have even been successful in convincing the PTO to reject several of the claims of the '769 Patent as unpatentable in light of the prior art.  Furthermore, while the Court denies Defendants' motion for summary judgment of invalidity, the Court recognizes that Defendants have raised significant invalidity arguments that are worthy of jury consideration.

That said, Defendants' anticipation and obviousness arguments, at this point, turn on questions of fact for a jury to decide.  The Federal Circuit has explained that "[i]n considering the objective prong of *Seagate*, the judge may when the defense is a question of fact or a mixed question of law and fact allow the jury to determine the underlying facts relevant to the defense in the first instance, for example, the questions of anticipation or obviousness." *Bard Peripheral*, 682 F.3d at 1008.  In *Bard Peripheral*, the Federal Circuit remanded for the trial court to determine the

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

objective reasonableness of the defendant's defenses of inventorship, inadequate written description, obviousness, and anticipation, instructing the lower court to "determine, 'based on the record ultimately made in the infringement proceedings,' whether a 'reasonable litigant could realistically expect' those defenses to succeed." *Id.* In light of *Bard Peripheral*, the Court determines that it would be more appropriate to decide the legal issue of willfulness with the benefit of the jury's factual findings on anticipation and obviousness.

### B. *Seagate*'s Second Prong: Subjective Intent

Defendants further argue that, even if their actions were objectively reckless, there is no evidence showing that Defendants either knew or should have known that there was a high risk of infringement. In light of the outstanding issue of objective reasonableness under prong one, the Court does not agree with Defendants that the second prong of *Seagate* can be resolved on the present record. While Defendants argue that they lacked subjective intent because they relied on advice of counsel, Fujitsu questions the reasonableness of Defendants' reliance on their advice of counsel in light of the reexamination's confirmation of the asserted claims. Thus, in light of the foregoing, Defendants' motion for summary judgment of no willfulness is DENIED.

## VI. DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION OF NO ACTIVE INDUCEMENT

### A. Legal Standard

Defendants also move for summary adjudication of no active inducement of infringement of the '769 Patent. Pursuant to 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." To prevail on a claim for active inducement under § 271(b), a patentee bears the burden of proving by a preponderance of the evidence: (1) direct infringement; and (2) that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement. *See Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005). A patent holder must prove that once the alleged infringer knew of the patent, "they 'actively and *knowingly* aid[ed] and abet[ed] another's direct infringement.'" *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (en banc) (quoting *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988)) (emphasis in *Water Techs.*;

57

1    alterations in *DSU*).  Mere "knowledge of the acts alleged to constitute infringement" is not

2    enough.  *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003); *DSU*, 471

3    F.3d at 1305.  That is to say, "'mere knowledge of possible infringement by others does not amount

4    to inducement; [rather,] specific intent and action to induce infringement must be proven.'"  *DSU*,

5    471 F.3d at 1305 (quoting *Warner-Lambert*, 316 F.3d at 1364) (internal citation omitted).

6              **B.  Discussion**

7              As discussed above, the Court has already granted Fujitsu summary judgment of

8    Defendants' infringement of claims 41, 47, and 48.  Thus, Fujitsu has proven direct infringement,

9    and the only issue in dispute is whether Fujitsu has raised a genuine issue of material fact that

10   Defendants possessed the requisite specific intent to induce direct infringement.  Defendants argue

11   that the same evidence on which they rely for their willfulness defense—namely, their reliance on

12   competent opinions of counsel that the '769 Patent is invalid, the multiple reexamination

13   proceedings and the resulting cancellation of certain claims, and their various invalidity defenses—

14   precludes Fujitsu from meeting its burden of proving specific intent to induce by a preponderance

15   of the evidence.

16             While these defenses to Fujitsu's willfulness claims are also relevant to inducement, "a lack

17   of culpability for willful infringement does not compel a finding of non-infringement under an

18   inducement theory."  *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008).

19   Unlike the objective determination of reasonableness in a willfulness analysis, which is a matter

20   best decided by the Court, the issue of specific intent for purposes of inducement is "a factual

21   determination particularly within the province of the trier of fact."  *Id.* at 700.  Furthermore, a

22   patentee's burden of proof is lower for inducement than for willfulness.  Whereas a patentee bears

23   the burden of proving willfulness by clear and convincing evidence, a patentee need only establish

24   inducement by a preponderance of the evidence.

25             While Defendants rely on the same evidence for their inducement motion as they did for

26   their willfulness motion, Fujitsu points to other evidence that must be considered as part of the

27   totality of the circumstances.  In particular, Fujitsu relies on the fact that: (1) Fujitsu provided

28

58

**United States District Court**
For the Northern District of California

1    Defendants with notice of infringement approximately nine to ten years ago;[12] (2) Defendants

2    distributed marketing materials and user manuals affirmatively instructing users to combine

3    accused external devices with allegedly infringing cards and made no effort to delete these

4    instructions after being contacted by Fujitsu, *see* Decl. of Thomas E. Garten in Supp. of Fujitsu's

5    Opp'n to Defs.' Mot. for Summ. Adjudication of No Willful Infringement and No Active

6    Inducement ("Garten Willfulness/Inducement Decl."), Exs. 16-25; and (3) each of the Defendants

7    made opening offers to license the '769 Patent, suggesting they did not think their invalidity

8    defenses were strong.[13]   Courts have held that knowledge of the patent combined with instructions

9    to customers on how to infringe can demonstrate specific intent to infringe.  *See, e.g.*, *i4i Ltd.*

10   *P'ship v. Microsoft Corp.*, 598 F.3d 831, 851-52 (Fed. Cir. 2010); *Mformation Techs., v. Research*

11   *in Motion Ltd.*, 830 F. Supp. 2d 815, 842 (N.D. Cal. 2011) (denying summary judgment of no

12   inducement and finding an issue of triable fact when defendants had knowledge of the patent

13   before the suit and had also instructed customers with regard to use of the accused product.).  For

14   example, in *i4i*, the Federal Circuit found that the instruction materials and internal e-mails

15   showing Microsoft's knowledge of the patent was evidence that Microsoft intended the product to

16   be used in an infringing manner and that it knew the product would be used in such a manner, thus

17   supporting the jury's finding of inducement.  *i4i*, 598 F.3d at 851-52.

18       Fujitsu need only prove inducement by a preponderance of the evidence, not clear and

19   convincing evidence.  The Court determines that Fujitsu has raised a genuine issue of material fact

20   as to whether Defendants had specific intent to induce infringement, notwithstanding evidence of

21   Defendants' opinions of counsel of invalidity, the reexamination proceedings, and the credibility of

22   their invalidity defenses generally.  Defendants' motion for summary judgment of inducement is

23   therefore DENIED.

24       **VII.   CONCLUSION**

---

25   [12] Fujitsu provided Netgear notice on March 19, 2002 (ECF No. 264 at 2-5); D-Link notice on
26   November 7, 2003 (ECF No. 264-4 at 2-3); and Belkin notice on November 7, 2003 (ECF No. 264-
     6 at 2-3).
27   [13] Belkin and D-Link made offers in 2003, soon after receiving Fujitsu's infringement charts, *see*
     ECF No. 264-7 at 85-86 (Belkin); ECF No. 264-5 at 20-26 (D-Link); and Netgear made an offer in
28   2004, *see* ECF No. 264-2 at 46.

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

1      For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Fujitsu's

2   motion for summary judgment and summary adjudication of infringement; DENIES Defendants'

3   motion for summary judgment of invalidity; DENIES Defendants' motion for summary

4   adjudication of no willfulness; and DENIES Defendants' motion for summary adjudication of no

5   active inducement.

6   **IT IS SO ORDERED.**

7

8   Dated: September 28, 2012

9                                                 LUCY H. KOH
                                                  United States District Judge

Case No.: 10-CV-03972-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTIONS FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California