Robert D. Fram (rfram@cov.com) (CA Bar No. 126750)
Thomas E. Garten (tgarten@cov.com) (CA Bar No. 247122)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Telephone:    415.591.6000
Facsimile:    415.591.6091

Philip A. Irwin (pirwin@cov.com) (admitted *pro hac vice*)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone:    212.841.1000
Facsimile:    212.841.1010

Gary M. Rubman (grubman@cov.com) (admitted *pro hac vice*)
R. Jason Fowler (jfowler@cov.com) (admitted *pro hac vice*)
William E. Zapf (wzapf@cov.com) (admitted *pro hac vice*)
Brianne Bharkhda (bbharkhda@cov.com) (admitted *pro hac vice*)
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401
Telephone:    202.662.6000
Facsimile:    202.662.6291

Attorneys for Plaintiff Fujitsu Limited

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION**

| | |
|---|---|
| FUJITSU LIMITED,<br><br>           Plaintiff,<br><br>     v.<br><br>BELKIN INTERNATIONAL, INC., BELKIN, INC., D-LINK CORPORATION, D-LINK SYSTEMS, INC., NETGEAR, INC., ZYXEL COMMUNICATIONS CORPORATION, and ZYXEL COMMUNICATIONS, INC.,<br><br>           Defendants.<br><br>AND RELATED COUNTERCLAIMS | Case No. 10-cv-03972-LHK (PSG)<br><br>**FUJITSU LIMITED'S CONSOLIDATED MOTIONS *IN LIMINE* AND MOTIONS TO EXCLUDE TESTIMONY OF DEFENDANTS' EXPERTS**<br><br>**Date:**       **November 1, 2012**<br>**Time:**       **1:30 p.m.**<br>**Location:**  **Courtroom 8, 4th Floor**<br>**Judge:**      **Hon. Lucy H. Koh**<br><br>**PUBLIC REDACTED VERSION** |

# TABLE OF CONTENTS

Page

I. DEFENDANTS SHOULD BE BARRED FROM ARGUING THAT FUJITSU MISCHARACTERIZED REFERENCES BEFORE THE PTO OR THAT THE PTO'S EXAMINATION OF THE '769 PATENT WAS INADEQUATE. ........................................................................................... 1

II. THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT REGARDING CERTAIN IRRELEVANT OFFICE ACTIONS OF THE PTO. ................................................................................................................... 2

    A. Interim office actions from the proceedings at the PTO. .......................... 2

    B. The PTO's rejection of claims not asserted against Defendants. ............... 3

III. THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT REGARDING IRRELEVANT JAPANESE PATENT APPLICATIONS. .......................... 3

IV. THE COURT SHOULD PRECLUDE DEFENDANTS FROM INTRODUCING EVIDENCE OF PRE-SUIT SETTLEMENT COMMUNICATIONS. ................................................................................... 5

V. DEFENDANTS' INVALIDITY EXPERT SHOULD BE BARRED FROM TESTIFYING CONTRARY TO THE COURT'S SUMMARY JUDGMENT DECISION AND FROM TESTIFYING BEYOND THE OPINIONS SET FORTH IN HIS REPORT. ................................................................................. 7

    A. Dr. Mihran should be barred from testifying that the plain meaning of "card" includes cartridges. ........................................................................ 7

    B. Dr. Mihran should be barred from testifying that the plain meaning of "inserted into a slot" includes installation onto the connector of a motherboard. ................................................................................................ 8

    C. Defendants should be barred from advancing their new "data transfer circuit" theory for *Murakami*, which is not disclosed in Dr. Mihran's report and which conflicts with the Court's claim construction. ............... 9

    D. Defendants should be barred from asserting references or combinations not disclosed in their invalidity contentions and discussed in Dr. Mihran's report. ............................................................. 10

VI. THE COURT SHOULD BAR DR. BRODY'S OPINION THAT DEFENDANTS LACKED SPECIFIC INTENT TO INDUCE INFRINGEMENT. ................................................................................................ 11

VII. OPINIONS OF DEFENDANTS' DAMAGES EXPERTS SHOULD BE EXCLUDED. .................................................................................................. 12

    A. Leonard's and Mangum's Calculations of Effective Royalty Rates Based on Lump Sum Agreements Are Highly Misleading and Entirely Unreliable. ................................................................................. 12

i

B.   Mangum's Analysis of Agere License Is Misleading and Unreliable. ................... 17

C.   Mangum Improperly Relies on the Via Licensing Patent Pool Agreement. .............................................................................................. 17

D.   Leonard and Mangum Improperly Excluded From the Royalty Base External Devices Based on an Erroneous Understanding of the Scope of the Patent and an Incorrect Application of the Entire Market Value Rule. .................................................................................................................. 18

E.   Leonard Ignored a Subpoena and Failed to Produce Supporting Calculations that are Necessary to Understand His "Back Up" Methodology. ................................................................................................... 20

F.   Leonard Failed to Perform a Georgia-Pacific Analysis For External Devices. ................................................................................................. 21

G.   Leonard Improperly Seeks to Offer Opinions on Technical Issues. ........................ 22

H.   Leonard and Mangum Improperly Rely on Rule 408 Settlement Communications................................................................................................ 22

I.   Leonard's and Mangum's Opinions On FRAND Issues Should Be Excluded................................................................................................... 23

J.   Leonard's and Mangum's Intervening Rights Opinions Should Be Excluded................................................................................................... 23

1

# TABLE OF AUTHORITIES

2

Page

3

**CASES**

4
*Acoustical Design, Inc. v. Control Elecs. Co.*,
  932 F.2d 939 (Fed. Cir. 1991) ................................................................................................ 3

5

6
*Aerotech Res., Inc. v. Dodson Aviation, Inc.*,
  No. 00-2099-CM, 2001 WL 474296 (D. Kan. Apr. 4, 2001) ................................................. 11

7
*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001) ............................................................................................... 3

8

9
*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
  No. 11-CV-01846-LHK, 2012 WL 2571332 (N.D. Cal. June 30, 2012) .................................. 1

10

11
*BorgWarner, Inc. v. Honeywell Int'l, Inc.*,
  750 F. Supp. 2d 596 (W.D.N.C. 2010) ................................................................................... 11

12
*Cook Inc. v. Endologix, Inc.*,
  1:09-cv-01248-TWP (S.D. Ind. Oct. 1, 2012) .......................................................................... 2

13

14
*Cordis Corp. v. Boston Scientific Corp.*,
  Civ. No. 03-27-SLR, 2010 WL 331792 (D. Del. Jan. 28, 2010) ............................................. 3

15

16
*Cornell Univ. v. Hewlett-Packard Co.*,
  609 F. Supp. 2d 279 (N.D.N.Y. 2009) .................................................................................... 20

17
*Daubert v. Merrell Down Pharms., Inc.*,
  509 U.S. 579 (1993) ................................................................................................... 11, 12, 13

18

19
*Diet Drugs Prods. Liab. Litig.*,
  2000 WL 876900 (E.D. Pa. June 20, 2000) ............................................................................ 11

20

21
*Edwards Lifesciences AG v. CoreValve, Inc.*,
  Civ. Action No. 08-91-GMS, 2011 WL 446203 (D. Del. Feb. 7, 2011) .................................. 5

22
*ePlus, Inc. v. Lawson Software, Inc.*,
  764 F. Supp. 2d 807 (E.D. Va. 2011) ..................................................................................... 13

23

24
*Halliburton Co. v. Western Co.*,
  No. Civ-85-430R, 1989 WL 1677414 (W.D. Okla. Jan. 27, 1989) ........................................ 25

25

26
*Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*,
  21 F.3d 1068 (Fed. Cir. 1994) .................................................................................................. 4

27
*Hoechst Selanese Corp. v. BP Chems. Ltd.*,
  78 F.3d 1575 (Fed. Cir. 1996) .................................................................................................. 3

28

*Hypotherm, Inc. v. Am. Torch. Tip Co.*,
  Civ. No. 05-cv-373-JD, 2009 WL 435324 (D.N.H. Feb. 19, 2009) .......................................... 6

*In re Dulberg*,
  472 F.2d 1394 (C.C.P.A. 1973)................................................................................................ 5

*In re: Rezulin Prods. Liab. Litig.*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004) ..................................................................................... 11

*Island Intellectual Prop. LLC v. Deutsche Bank AG*,
  No. 09 Civ. 2675 (KBF), 2012 WL 526722 (S.D.N.Y. Feb. 1, 2012) .................................... 11

*J. Wilderman Autoplex Corp. v. Norton*,
  Civil No. 09-154-PMF, 2010 WL 2925965 (S.D. Ill. July 22, 2010) ........................................ 6

*Key Energy Servs., Inc. v. C.C. Forbes, LLC*,
  Civ. Action No. 2:08-cv-346-CE, 2011 WL 7429433 (E.D. Tex. June 3, 2011).................... 10

*LadaTech, LLC v. Illumina, Inc.*,
  Civ. No. 09-627-SLR, 2012 WL 1188266 (D. Del. Feb. 14, 2012)........................................... 3

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  No. 2:06-CV-348-TJW, 2011 WL 7563818 (E.D. Tex. Jan. 7, 2011)............................... 17, 18

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) .............................................................................................. 13

*Magnivision, Inc. v. Bonneau Co.*,
  115 F.3d 956 (Fed. Cir. 1997) .................................................................................................. 2

*Medtronic, Inc. v. Daig Corp.*,
  789 F.2d 903 (Fed. Cir. 1986).................................................................................................. 4

*Minemyer v. B-Roc Representatives Inc.*,
  No. 07-c-1763, 2012 WL 346621 (N.D. Ill. Feb. 2, 2012) ...................................................... 3

*Norian Corp. v. Stryker Corp.*,
  363 F.3d 1321 (Fed. Cir. 2004)............................................................................................ 1, 2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)............................................................................................ 8, 9

*Oki Am., Inc. v. Advanced Micro Devices, Inc.*,
  No. 04-03171, 2006 WL 3290577 (N.D. Cal. 2006) ............................................................... 4

*Oxford Gene Tech. Ltd. v. Mergen Ltd.*,
  345 F. Supp. 2d 431 (D. Del. 2004) ....................................................................................... 11

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*,
  984 F.2d 1182 (Fed. Cir. 1993) ................................................................................................ 1

*Portugues-Santana v. Rekomdiv Int'l*,
   657 F.3d 56 (1st Cir. 2011) ............................................................................... 6

*Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*,
   No. CV 02-01087-VAP, 2008 WL 6873811 (C.D. Cal. Jan. 3, 2008) .................... 24

*Rhoades v. Avon Prods., Inc.*,
   504 F.3d 1151 (9th Cir. 2007).............................................................................. 7

*Springs Window Fashions LP v. Novo Indus., L.P.*,
   323 F.3d 989 (Fed. Cir. 2003)............................................................................. 9

*SynQor, Inc. v. Artesyn Techs. Inc.*,
   No. 2:07-CV-497-TJW, 2011 WL 3625036 (E.D. Tex. Aug. 17, 2011) .................. 3

*Thayer v. Nydigger*,
   No. CIV 95-2004-AS, 1999 WL 372552 (D. Or. Apr. 15, 1999) .......................... 24

*Visto Corp. v. Sproqit Techs., Inc.*,
   413 F. Supp. 2d 1073 (N.D. Cal. 2006) ........................................................ 23, 25

*Waddington North Am., Inc. v. Sabert Corp.*,
   Civ. Action No. 09-4883, 2011 WL 3444150 (D.N.J. Aug. 5, 2011)............... 1, 2, 5

*Whitserve, LLC v. Computer Packages, Inc.*,
   -- F.3d --, 2012 WL 3573845 (Fed. Cir. Aug. 7, 2012) ....................... 13, 19, 20, 22

*Wordtech Sys. Inc. v. Integrated Networks Solutions, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010)............................................................................ 13

**STATUTES**

35 U.S.C. § 102(a)..................................................................................................... 4

35 U.S.C. § 282 ........................................................................................................ 3

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26 ........................................................................................ 10, 20, 21

Fed. R. Civ. P. 37(c)(1) ........................................................................................... 10

Fed. R. Evid. 408................................................................................................ 5, 6, 22

Fed. R. Evid. 401 ............................................................................................... 11, 12

Fed. R. Evid 402 ...................................................................................... 1, 2, 5, 11, 12

Fed. R. Evid and 403 ...................................................................................... 1-5, 11, 12

Patent Local Rule 3-3(a) ......................................................................................... 10

v

Patent Local Rule 3-6 ................................................................................................................... 10

## I. DEFENDANTS SHOULD BE BARRED FROM ARGUING THAT FUJITSU MISCHARACTERIZED REFERENCES BEFORE THE PTO OR THAT THE PTO'S EXAMINATION OF THE '769 PATENT WAS INADEQUATE.

Because Defendants have withdrawn their inequitable conduct defenses, the Court should bar Defendants from asserting that Fujitsu allegedly misrepresented prior art references to the PTO. The Court should also preclude Defendants from disparaging the PTO's examinations of the patent. Both arguments are irrelevant and unfairly prejudicial and thus barred under FRE 402 and 403.

On June 24, 2011, after Fujitsu filed a motion to strike, Defendants withdrew their inequitable conduct allegations. Dkt. Nos. 139, 141, 142, 143, 177. Even without an inequitable conduct defense, Defendants continue to argue—inaccurately—that Fujitsu's statements to the PTO misrepresented a number of prior art references (ARLAN, Mizutani, May, Gordon, and O'Sullivan references).[1] *See, e.g.*, Ex. 1 at 75-81; Ex. 2 at ¶¶ 50–54, 506–07, 547–550, 618–630, 635–646.[2]

With no inequitable conduct allegations remaining in the case, evidence of alleged misrepresentations to the PTO is inadmissible. First, it is well-settled that "flawed arguments made by the patentee in prosecution [are] irrelevant to patent validity if inequitable conduct ha[s] been dismissed." *Waddington North Am., Inc. v. Sabert Corp.*, Civ. Action No. 09-4883, 2011 WL 3444150, *9 (D.N.J. Aug. 5, 2011); *see also Norian Corp. v. Stryker Corp.*, 363 F.3d 1321 (Fed. Cir. 2004). Second, even if Defendants were asserting inequitable conduct defenses in this action, it would still be impermissible to present this evidence before the jury, as inequitable conduct is an issue for the Court. *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed. Cir. 1993); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-CV-01846-LHK, 2012 WL 2571332, at *3 (N.D. Cal. June 30, 2012). Third, Defendants cannot revive their inequitable conduct allegations under the guise that they go to willfulness or inducement, because there is no basis for concluding that these allegedly misleading statements—which have no bearing on the actual validity of the '769 patent—caused the PTO to confirm the claims or informed Defendants' belief regarding

---

[1]    As Fujitsu's expert explained in detail in his report, Defendants' accusations that Fujitsu mischaracterized these references are substantively incorrect. Dkt. No. 272-1 at ¶¶ 285-88, 335-40, 435-41, 671-82. Moreover, the Gordon and O'Sullivan references are not even being asserted by Defendants as invalidating references.

[2]    "Ex. ___" refers to exhibits to the Declaration of Brianne Bharkhda in Support of Fujitsu Limited's Consolidated Motions *In Limine* and Motions To Exclude Testimony of Defendants' Experts.

validity.  Fourth, even if there were some marginal relevance of Defendants' inequitable conduct allegations, this evidence would unfairly prejudice Fujitsu and should be barred under Rule 403. *Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 961 (Fed. Cir. 1997).  Indeed, it "is likely to encourage the jury to punish the perceived offender instead of passing on the merits of invalidity." *Waddington*, 2011 WL 3444150, *9.

Defendants also argue that due to Fujitsu's representations and the general volume of references included in the various PTO proceedings, the PTO was not able to conduct an adequate review of the '769 patent.  *See, e.g.*, Ex. 1 at 72-74.  This is improper.  *Cook Inc. v. Endologix, Inc.*, 1:09-cv-01248-TWP, at 11 (S.D. Ind. Oct. 1, 2012), Ex. 3.  After a patent has issued—and been sustained through multiple reexaminations—"validity is objectively based on prior art and the other requirements of patentability."  *Norian*, 363 F.3d at 1329 (Fed. Cir. 2004).  "[S]peculation into the examiner's understanding of the prior art or the completeness or correctness of the examination process is not part of the objective review of patentability."  *Id.*  Accordingly, Defendants should not be permitted to distract the jury by pointing to alleged inadequacies in the PTO's review.  These arguments have no bearing on the real validity issues in the case, would undoubtedly prejudice Fujitsu, and would waste the Court's time on a mini-trial regarding the completeness and correctness of the examination process.

## II.   THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT REGARDING CERTAIN IRRELEVANT OFFICE ACTIONS OF THE PTO.

The Court should preclude Defendants from offering evidence and/or argument at trial regarding certain office actions of the USPTO.  This evidence is irrelevant under FRE 402, and would do nothing more than confuse and mislead the jury in violation of FRE 403.

### A.   Interim office actions from the proceedings at the PTO.

Defendants have argued that interim office actions from the PTO's reexaminations of the '769 patent constitute evidence that their belief in the patent's invalidity was reasonable.  *See* Dkt. No. 261 at 2-3, 11-14, 20.  Evidence and arguments of this nature should not be permitted at trial because "the Federal Circuit has stressed that initial rejection by the PTO of original claims that were later confirmed on re-examination is so commonplace that they hardly justify a good faith

belief in the invalidity of the claims." *Minemyer v. B-Roc Representatives Inc.*, No. 07-c-1763, 2012 WL 346621, *4 (N.D. Ill. Feb. 2, 2012) (*quoting Hoechst Selanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996)); *id.* at *5 (barring evidence in the alternative under Rule 403 because "office actions are the norm and do not remotely presage the outcome of the patent process" and thus will not be helpful to the jury in evaluating willfulness).  The same rationale applies to the intent prong for inducement.  *See LadaTech, LLC v. Illumina, Inc.*, Civ. No. 09-627-SLR, 2012 WL 1188266, *2 (D. Del. Feb. 14, 2012); *SynQor, Inc. v. Artesyn Techs. Inc.*, No. 2:07-CV-497-TJW, 2011 WL 3625036, *12 (E.D. Tex. Aug. 17, 2011).

### B.  The PTO's rejection of claims not asserted against Defendants.

Defendants should also be precluded from offering evidence that the PTO's reexaminations of the '769 patent resulted in the cancellation of certain claims which are not currently asserted. The PTO's rejection of unasserted claims is not probative of the validity of the asserted claims or of Defendants' inducement or willful infringement of the asserted claims.  *See* 35 U.S.C. § 282 (each claim independently presumed valid); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("infringement and validity analyses must be performed on a claim-by-claim basis").  Indeed, courts have said that where, as here, the claims at issue have been confirmed on reexamination, other office actions taken during the reexamination proceedings are not probative of invalidity or willfulness.  *See, e.g.*, *Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991) (willfulness); *Minemyer*, 2012 WL 346621 at *4 (invalidity and willfulness). Evidence about the cancellation of claims which are not at issue in the case should also be excluded under Rule 403.  "Courts routinely refuse to permit evidence of reexamination proceedings to be introduced before a jury, fearing that it will confuse, distract, mislead, and unfairly prejudice the jury." *Minemyer*, 2012 WL 346621 at *4; *see also Cordis Corp. v. Boston Scientific Corp.*, Civ. No. 03-27-SLR, 2010 WL 331792, *3 (D. Del. Jan. 28, 2010) (citing Rule 403 and holding that "[n]o statements issued in any re-examination [ ] proceedings shall be admitted").

### III.  THE COURT SHOULD PRECLUDE EVIDENCE AND ARGUMENT REGARDING IRRELEVANT JAPANESE PATENT APPLICATIONS.

Defendants have improperly attempted to bolster their invalidity arguments by pointing to

1   Japanese Patent Office rejections of patent applications which allegedly claim priority to the same

2   patent application as the '769 patent.  *See* Dkt. No. 259 at 4:7-9;6:18-21; Dkt. No. 285-1 at 9 n.9;

3   Ex. 4 at 83:1-16; 68:9-19; 70:15-25.  Defendants' statements have erroneously implied that the JPO

4   rejected all of the patent applications stemming from the Japanese priority application.  In fact, one

5   of these applications issued as a Japanese patent.  *See* Ex. 5.

6           Interim actions of the JPO are irrelevant for the same reasons as USPTO interim actions, as

7   explained above.  Moreover, interim or final actions of the JPO are inadmissible for the additional

8   reason that the JPO adheres to procedures, legal standards, and substantive laws that differ

9   substantially from those of the American patent system.[3]  *Heidelberger Druckmaschinen AG v.*

10  *Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072 n.2 (Fed. Cir. 1994).  As a result, the

11  Federal Circuit has cautioned against admitting evidence of the conclusions of foreign patent

12  tribunals in actions involving U.S. patents, recognizing that it is irrelevant and potentially

13  prejudicial.  *Id.*; *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 907-08 (Fed. Cir. 1986); *Oki Am.,*

14  *Inc. v. Advanced Micro Devices, Inc.*, No. 04-03171, 2006 WL 3290577, *8 n.2 (N.D. Cal. 2006).

15  Admitting the JPO's conclusions would be particularly problematic in the instant case, because the

16  JPO considered and relied upon at least one reference, *Kitamura*, which does not qualify as prior art

17  under U.S. law.[4]  *See* Exs. 7 & 8 (citing *Kitamura* in office actions).  Furthermore, due to the

18  recognized distinctions between Japanese and U.S. patent law, office actions by the JPO are not

19  germane to intent for willfulness or inducement because they would not inform Defendants' belief

20  as to whether the '769 patent is valid and infringed in the United States.

21          Even if the Court were to find that these foreign office actions are somehow relevant, they

22  should nonetheless be excluded pursuant to Federal Rule of Evidence 403.  The jury is likely to

23  afford the JPO rejections undue weight and may draw improper inferences regarding the validity of

24  
       _____

25  [3]      For example, the JPO does not examine patent applications for American-style obviousness, but
       rather to determine whether the claimed invention involves a sufficient "inventive step."  Japanese Patent
       Act, Article 29, ¶ 2, Ex. 6.

26  [4]      Kitamura qualifies as prior art under Japanese law because it was filed before the application to
       which the '769 patent claims priority, but does not qualify as prior art under U.S. law because it was not
27  available to the public before the priority application for the '769 patent was filed.  *See* 35 U.S.C. § 102(a);
       *see also* Mihran Rep. at 39 n.6 (conceding *Kitamura* is not prior art in U.S.).

28  

4

the '769 patent.  In addition, if admitted, an inordinate amount of the trial would be wasted examining the details of the Japanese proceedings and debating their applicability to this case.  Any minimal value of this evidence is far outweighed by its potential to prejudice Fujitsu, distract they jury, and waste time at trial.  *Waddington*, 2011 WL 3444150, *9 n.5; *Edwards Lifesciences AG v. CoreValve, Inc.*, Civ. Action No. 08-91-GMS, 2011 WL 446203, *11 (D. Del. Feb. 7, 2011).

For the same reason, the Court should bar Defendants from introducing documents and testimony which pertain solely to patentability under Japanese law.  Specifically, ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████  Ex. 9 at 350:1-353:9; Ex. 10.  This evidence is inadmissible under Rule 402 for the same reason described above:  the invention's Japanese patentability is irrelevant to the validity of the '769 patent.  *In re Dulberg*, 472 F.2d 1394, 1398 (C.C.P.A. 1973) (foreign patentability "has no relevance to the determination of whether the same 'invention' would be obvious within the ambit of § 103"); *see also* Toshiko Takenaka, Chief Judge Rader's Contribution to Comparative Patent Law, 7 Wash. J.L. Tech. & Arts 379, 391-92 (Spring 2012) (explaining that Japanese inventive-step test has historically been more stringent than U.S. obviousness test).  This evidence is also inadmissible under Rule 403, as any probative value it may have is outweighed by the prejudice and confusion that will result from introducing Japanese patentability standards to the jury.

## IV.   THE COURT SHOULD PRECLUDE DEFENDANTS FROM INTRODUCING EVIDENCE OF PRE-SUIT SETTLEMENT COMMUNICATIONS.

Fujitsu requests that the Court preclude Defendants from introducing evidence of pre-suit settlement communications between Fujitsu and Defendants under Federal Rule of Evidence 408.  While Fujitsu is relying on a subset of the communications for the limited purpose of showing notice of the '769 patent—an exception expressly recognized by the Rule, *see* Advisory Committee Notes ("Rule 408 is inapplicable when evidence of the compromise is offered to prove notice")— Defendants are attempting to use the communications for improper purposes.  Specifically, they intend to use such evidence at trial to (1) "identify the positions Fujitsu took during pre-suit negotiations," Ex. 11; (2) inform their experts' damages analyses; and (3) attempt to show that they

5

1  lacked intent for purposes of inducement and willfulness.

2      Defendants admittedly plan to introduce "the positions Fujitsu took during pre-suit

3  negotiations."  This falls squarely within the prohibition of Rule 408.  For example, Defendants

4  have used a protected Rule 408 communication (Ex. 12) to argue that Fujitsu's current position

5  regarding whether *Murakami* teaches a "data transfer circuit" is inconsistent with the position it

6  took during pre-suit negotiations that Defendants' products include a "data transfer circuit."  Ex. 1

7  at 26; Dkt. No. 285-1 at 10:25-28.  While Defendants' argument is not correct, they should be

8  barred from making it.  Rule 408 expressly precludes the use of settlement communications to

9  "either to prove or disprove the validity … of a disputed claim or to impeach by a prior inconsistent

10  statement or a contradiction."  The Advisory Committee Notes explain that admitting settlement

11  communications to show a party's prior inconsistent statement would "swallow the exclusionary

12  rule and would impair the public policy of promoting settlements."  Defendants should be

13  precluded from using settlement communications to support the merits of their contentions.

14      Defendants' damages experts, Gregory Leonard and Russell Mangum, both improperly rely

15  on Rule 408 settlement offers.  ████████████████████████████

16  ████████████████████████████████████

17  ██████████████████████████████████████

18  ██████████████████████████████████████

19  ██████    *See* Ex. 14 at 47.  Under Rule 408, however, settlement communications are not

20  admissible "either to prove or disprove the … amount of a disputed claim."  Thus, pre-suit

21  settlement communications may not be used to prove or disprove damages.  *Portugues-Santana v.*

22  *Rekomdiv Int'l*, 657 F.3d 56, 63 (1st Cir. 2011); *J. Wilderman Autoplex Corp. v. Norton*, Civil No.

23  09-154-PMF, 2010 WL 2925965, *2 (S.D. Ill. July 22, 2010).  As a result, Defendants should be

24  precluded from offering any settlement communications as evidence of damages.

25      Finally, Defendants should be precluded from using pre-suit settlement communications as

26  evidence of lack of intent to induce infringement or willfulness.  Such evidence would be offered to

27  disprove Defendants' liability as to those claims, which is expressly prohibited by Rule 408.  *See*

28  *Hypotherm, Inc. v. Am. Torch. Tip Co.*, Civ. No. 05-cv-373-JD, 2009 WL 435324, *6 (D.N.H. Feb.

MOTIONS IN LIMINE AND MOTIONS TO EXCLUDE EXPERTS    CASE NO. 10-CV-03972-LHK (PSG)

19, 2009) (excluding settlement communications offered to negate willfulness); *cf. Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007) (distinguishing permissible use of settlement communications from situation in which such communications were precluded when offered for the purpose of showing specific intent to establish antitrust conspiracy and, therefore, liability).

## V.   DEFENDANTS' INVALIDITY EXPERT SHOULD BE BARRED FROM TESTIFYING CONTRARY TO THE COURT'S SUMMARY JUDGMENT DECISION AND FROM TESTIFYING BEYOND THE OPINIONS SET FORTH IN HIS REPORT.

### A.   Dr. Mihran should be barred from testifying that the plain meaning of "card" includes cartridges.

In its summary judgment decision, the Court recognized that Fujitsu disavowed cartridges during the reexamination when Fujitsu distinguished *Mizutani*.  The Court should therefore preclude Dr. Mihran from testifying—and Defendants from arguing—that a "card" encompasses cartridges.  The Court held:

> Fujitsu argued during reexamination, and the Examiner accepted, that the '769 Patent is distinguishable from certain prior art references such as Japanese Patent Application Publication No. S61-212140 ("Mizutani") because Mizutani discloses a cartridge 16.8 mm thick, rather than a card.

Dkt. No. 307 at 33.  While the Court found that "Fujitsu's disavowal of 'cartridges'" was not dispositive of Fujitsu's proposed construction of "card" (*i.e.*, an "IC-type card"), *id.*, that is all that the Court concluded as regards to a lack of a clear disavowal.  When it came to the question whether *Mizutani* had been distinguished on the ground that it was a cartridge, the Court clearly recognized that the reference had been distinguished on the ground that a "card" does not encompass a "cartridge."  Dr. Mihran and Defendants should not be permitted to argue otherwise.

The Court's denial of summary judgment of anticipation as to *Mizutani* is consistent with the Court's finding of a disavowal.  *See id.* at 40.  The Court cited Dr. Williams' opinion concerning the distinctions between cartridges and cards as supporting the denial of summary judgment.  In so doing, the Court reaffirmed the distinction that it had drawn as regards the treatment of the *Mizutani* reference during prosecution.  If the jury determines that *Mizutani* is a "cartridge," then it similarly can conclude that *Mizutani* is not a "card."

7

Defendants and Dr. Mihran cannot argue or testify to the contrary, including by (erroneously) arguing—as they did in the summary judgment briefing—that the PTO characterized *Mizutani* as a card in its office action in the most recent reexamination. Such argument and testimony would contradict the Court's finding of a disavowal and would be relevant only to claim construction, which is not an issue for the jury. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

**B.** **Dr. Mihran should be barred from testifying that the plain meaning of "inserted into a slot" includes installation onto the connector of a motherboard.**

In its summary judgment decision, the Court recognized "Fujitsu's disavowal of a card that must be 'installed by inserting the card into a connector on the motherboard.'" Dkt. No. 307 at 38. This disavowal was made during the reexamination in connection with ARLAN. While the Court found that there was not a broader disavowal of "all interior slots," *id.*, its recognition of this narrower disavowal should preclude Dr. Mihran from testifying—and Defendants from arguing—that "inserted into a slot" encompasses "installed by inserting the card into a connector on the motherboard."

The Court's denial of summary judgment of anticipation as to ARLAN is consistent with the Court's finding of a disavowal. *See id.* at 38-39. The Court cited Dr. Williams' opinion concerning how ARLAN is installed onto a connector of a motherboard in support of its denial of summary judgment on anticipation. Thus, if the jury determines that ARLAN is installed by being inserted onto a connector on a motherboard, then it will have found that ARLAN falls outside the "inserted into a slot" claim limitation in way that precisely tracks the distinction that was drawn before the PTO.

Defendants and Dr. Mihran should not be permitted to argue or testify to the contrary. This bar would include the argument made by Defendants at the summary judgment hearing that the *Rorden* reference—discussing by the PTO during the most recent reexamination —is the same as ARLAN with respect to the limitation "to be inserted into a slot." Ex. 1 at 11-12. Defendants' argument attempts to suggest that installation of ARLAN onto a connector on a motherboard constitutes insertion of a card into a slot. In fact, the Court has found the opposite to be true by

8

1    recognizing Fujitsu's disavowal.  Moreover, such an argument goes to scope of the claims, which

2    the Court has  determined and which is not an issue for the jury.  *See O2Micro Int'l Ltd.*, 521 F.3d

3    1351, 1360.  Finally, the statements regarding *Rorden* constitute statements by the examiner and not

4    Fujitsu, and therefore do not determine the scope of the claims.  *Springs Window Fashions LP v.*

5    *Novo Indus., L.P.*, 323 F.3d 989, 995 (Fed. Cir. 2003).

6           **C.    Defendants should be barred from advancing their new "data transfer circuit"
                  theory for *Murakami*, which is not disclosed in Dr. Mihran's report and which**

7           **conflicts with the Court's claim construction.**

8           In their reply brief in support of their motion for summary judgment of invalidity,

9    Defendants argued a new theory for why *Murakami* purportedly teaches a data transfer circuit that

10   satisfies the "in response to" limitation of the claims.  Because this theory was not stated in

11   Defendants' invalidity contentions or in Dr. Mihran's expert report—indeed, the new theory

12   *conflicts* with the previous contentions and the report—Dr. Mihran should not be permitted to opine

13   on it at trial.

14          Fujitsu has pointed out that *Murakami* does not teach a data transfer circuit that transfers

15   data from the second data interface unit to the first data interface unit "in response to" the data

16   being received by the second data interface unit.  Instead, the data is held in memory 47 until the

17   user presses a key.  Dkt. No. 270 at 16-17.  The Court agreed with Fujitsu that the "in response to"

18   language requires a cause-and-effect relationship.  Dkt No. 307 at 42-43.

19          Faced with this problem, Defendants have adopted a new theory:  that memory 47 is part of

20   the "first data interface unit," not the "data transfer circuit," as previously alleged.  Defendants

21   should be barred from advancing this argument for two reasons.

22          First, it is not disclosed in Dr. Mihran's report or in Defendants' validity contentions.  In Dr.

23   Mihran's expert report, memory 47 is identified as part of the alleged "data transfer circuit."  Ex. 2

24   ¶ 145.  Dr. Mihran repeatedly identifies the "first data interface unit" as consisting of the connector

25   8 alone, or the connector 8 plus the interface circuit 42.  *See id.* at ¶¶ 134-35.  He nowhere identifies

26   memory 47 as part of the "first data interface unit."  Defendants' invalidity contentions also do not

27   identify memory 47 as part of the first data interface unit.  In fact, they do not address memory 47

28

9

at all.  Ex. 15 at 4.  Defendants acknowledged Dr. Mihran's failure to include this theory in his report when they sought to supplement their expert report.  The Court did not grant that request.

Second, Defendants' new theory conflicts with the Court's construction of "data transfer circuit" as a "circuit for transferring data."  Under Defendants' theory that memory 47 of Murakami is part of the "first data interface unit," the purported "data transfer circuit" is nothing more than a wire.  *See* Dkt No. 285-1 at 12.  The Court previously rejected such a broad construction.  In the Markman briefing, Defendants advocated for a construction under which a data transfer circuit could include a mere "conductive line."  Fujitsu countered with plain meaning.  At the hearing, the Court proposed a variation on plain meaning: "a circuit for transferring data."  At the same time, the Court expressly stated it "d[id]n't like the 'conductive line' language."  Ex. 16 at 86:22–23. Defendants' new *Murakami* argument seeks to resurrect this improper construction.

### D.    Defendants should be barred from asserting previously undisclosed references and obviousness combinations.

While Defendants claim to have narrowed their prior art references to 13, in fact, each of these "references" consists of multiple items of prior art—for an actual total of 57 different references.  Dkt. No. 313-A.  However, 17 of these 57 items were not disclosed in Defendants' Invalidity Contentions.  *See* Bharkhda Decl. ¶ 19 & Ex. 17; Patent Local Rule 3-3(a).  They should be excluded.

Defendants have asserted 85 different obviousness combinations.  Defendants' invalidity contentions disclosed only 15 of these combinations for the asserted claims.  *See* Bharkhda Decl. ¶ 21 & Ex. 17.  Any combinations not in the contentions should be barred.  Patent Local Rule 3-6.

Thirty-eight of Defendants' elected combinations were not identified at all in Defendants' expert report.[5]  An additional twenty combinations were identified only as to claims no longer asserted.  *See* Bharkhda Decl. ¶¶ 22-23 & Ex. 2.  These combinations should be excluded.  *See* Fed. R. Civ. P. 26(a)(2)(B)(i); Fed. R. Civ. P. 37(c)(1); *Key Energy Servs., Inc. v. C.C. Forbes, LLC*, Civ. Action No. 2:08-cv-346-CE, 2011 WL 7429433 (E.D. Tex. June 3, 2011) (granting motion *in*

---

[5] This category includes combinations where Defendants appear to be using their five secondary references (PCMCIA Specification, VMEBus, Arai, Ades, and Xircom) as primary references.  *See* Dkt. No. 313-B. Dr. Mihran did not provide such an obviousness analysis in his report.

1    *limine* to limit expert's testimony to obviousness combinations expressed in his report).

2    **VI.    THE COURT SHOULD BAR DR. BRODY'S OPINION THAT DEFENDANTS**
3    **LACKED SPECIFIC INTENT TO INDUCE INFRINGEMENT.**

4           Defendants' non-infringement expert, Dr. Arthur Brody, opined that the evidence shows

5    that Defendants could not have had specific intent to induce infringement.  *See* Ex. 18 at ¶¶ 165-

6    168.  In support of this opinion, Dr. Brody cites the pre-suit correspondence, the reexamination

7    proceedings, and Defendants' opinions of counsel.  The law is clear, however, that an opinion as to

8    a party's intent is not a proper subject of expert testimony.  Thus, the Court should bar it pursuant to

9    FRE 401, 402, 403 or 702 or *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579 (1993).

10          Courts routinely bar expert opinions concerning a party's intent, including in patent cases

11   with respect to the specific intent prong of induced infringement and the subjective prong of

12   willfulness.  *See, e.g.*, *Island Intellectual Prop. LLC v. Deutsche Bank AG*, No. 09 Civ. 2675

13   (KBF), 2012 WL 526722, at *2, *8 (S.D.N.Y. Feb. 1, 2012) (inducement); *BorgWarner, Inc. v.*

14   *Honeywell Int'l, Inc.,* 750 F. Supp. 2d 596, 611 (W.D.N.C. 2010) (inducement); *Oxford Gene Tech.*

15   *Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 442-43 (D. Del. 2004) (willfulness).  These and other

16   cases outside of the patent context explain that an expert opinion on intent is improper for a variety

17   of reasons, including that it invades the province of the jury as the finder of fact; that it is not based

18   on technical expertise; that it is mere advocacy that argues inferences from facts; and that the

19   opinion usurps the role of the Court in instructing the jury on the legal standard for finding intent.

20   *See, e.g.*, *In re:  Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 546-47 (S.D.N.Y. 2004)

21   (discussing each of these rationales); *see also Diet Drugs Prods. Liab. Litig.*, No. MDL 1203, 2000

22   WL 876900, at *9 (E.D. Pa. June 20, 2000); *Aerotech Res., Inc. v. Dodson Aviation, Inc.*, No. 00-

23   2099-CM, 2001 WL 474296, at *2 (D. Kan. Apr. 4, 2001).

24          Dr. Brody's opinion is improper for the same reasons.  Dr. Brody's opinion is not based on

25   any scientific expertise.  Instead, he simply acts as an advocate, summarizing purported facts that

26   Defendants have spoonfed him.  In so doing, Dr. Brody improperly usurps the role of the factfinder.

27   His opinions on this issue should be barred.

28

## VII.   OPINIONS OF DEFENDANTS' DAMAGES EXPERTS SHOULD BE EXCLUDED.

The Court should exclude numerous opinions of Gregory Leonard (Belkin's and Netgear's damages expert) and Russell Mangum (D-Link's damages expert) because they failed to comply with the Federal Rules of Civil Procedure and/or the Federal Rules of Evidence 401, 402, 403 or 702 or *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579 (1993).  Leonard and Mangum have offered a series of unreliable opinions that are highly misleading and will be unhelpful to the finder of fact.  Certain of Leonard's opinions also should be excluded due to his failure to provide in his report or to otherwise produce during discovery the underlying bases for the opinions.

### A.   Leonard's and Mangum's Calculations of Effective Royalty Rates Based on Lump Sum Agreements Are Highly Misleading and Entirely Unreliable.

Many of Leonard's and Mangum's opinions regarding the appropriate royalty rate are based on unsupportable, speculative and highly misleading calculations of "effective rates" from lump sum license agreements.  Neither Leonard nor Mangum dispute that a running royalty, as opposed to a lump sum payment, is appropriate in this case.

Relying on little more than sheer speculation, Leonard and Mangum both contort various lump sum agreements into running royalty rates.  There is no evidence in any of the agreements, however, indicating that the parties intended the lump sum amounts to represent a running royalty applied over a certain period of time or being calculated as a percentage of revenues or profits.  Indeed, none of Defendants' Rule 30(b)(6) designees on licensing were able to provide even basic information about these agreements, let alone any reason to believe that the lump sum amounts bear any reasonable relation to the volume of sales of accused products.  They did not even know which products were accused in those cases or the amounts of sales of those products.

Leonard and Mangum made no effort to talk with anyone involved with negotiating those agreements, even though their clients were parties to all of them.  Nor did they review any documents relating to those agreements, including publicly-available pleadings that would have shed at least some light on the products accused of infringement in those cases.  Instead, for most agreements, they simply divided the lump sum amounts by the net sales of accused products *in this*

---

1   *case.*[6] █████████████████████████████████

2   ███████████████████████████████████████████

3   ███████████████████████████████████

4   Ex. 20 at 285:1-13 (emphasis added).

5          The Federal Circuit has observed on multiple occasions that "certain fundamental

6   differences exist between lump-sum agreements and running-royalty agreements." *Lucent Techs.,*

7   *Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009).  These "fundamental differences"

8   include the fact that lump sum agreements allocate risks between the parties in entirely different

9   manners than running royalty agreements.  *See id.* at 1326.  ███████████████

10  ███████████████████████████████████████████

11  ██████████████████████████████████████

12         Given these "fundamental differences," Courts routinely reject misleading reverse

13  calculations similar to those conducted by Mangum and Leonard.  *See, e.g., Whitserve, LLC v.*

14  *Computer Packages, Inc.*, -- F.3d --, 2012 WL 3573845, at *13 (Fed. Cir. Aug. 7, 2012).  In fact,

15  another court recently struck on *Daubert* grounds Mangum's calculations of "effective rates" from

16  lump sum agreements.  *See ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 815-16 (E.D.

17  Va. 2011).  The court noted that it "is settled that lump sum settlement agreements have minimal, if

18  any, probative value in establishing a reasonable running royalty."  *Id.* at 814  (citing *Lucent*, 580

19  F.3d at 1329-30 and *Wordtech Sys. Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308,

20  1319-20 (Fed. Cir. 2010)).  As the court explained, in the rare case where a lump sum can be

21  extrapolated to suggest a running royalty, "the methodology must itself be sound and not

22  speculative and far removed from the facts of the case."  *Id.* at 814.  Mangum's and Leonard's

23  extrapolations of "effective rates," however, are entirely speculative and bear little to no relation to

24  the facts of those cases.  *See Wordtech*, 609 F.3d at 1320 (rejecting reliance on lump sum

25  agreements that failed to "describe[] how the parties calculated each lump sum, the licensees'

26

27  ───────────────────
    [6] Leonard and Mangum both assert that their calculations were conservative, but these arguments lack any
28  support other than sheer speculation.

1   intended products, or how many products each licensee expected to produce").[7]

2   ████████████████████████████████████████████████████████

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ███████████████

17          Moreover, Defendants' own Rule 30(b)(6) designees were unable to provide information

18  about how the lump sum amounts were determined. ████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████

23

24  _____

    [7] At his deposition, Mangum acknowledged that expert analysis based on speculation and unreliable
    information is inappropriate.  *See* Ex. 19 at 192:19-25 ████████████████████████

25  ████████████████████████████████████████████████████████

26  [8] ████████████████████████████████████████████ Leonard made no attempt to
    discuss the ██████ agreement with anyone ███████████, nor did he review any documents relating to the

27  agreements.

    [9] *See* Mangum May 29 Rep. at 12 and Updated Exhibit 2 (Documents Reviewed).

28

1   █████████████████████████████████████████████████

2   ████████████████████████████████████████

3        █████████████████████████████████████████████

4   █████████████████████████████████████████████████

5   ████████████████████████████████████████████████

6   █████████████████████████████████████████████████

7   ████████████████████████████████████████████

8   ████████████████████████████████████████████

9   █████████████████████████████████████████████████

10  █████████████████████████████████████████████████

11  ██████████████████████████████████████████████████

12  ████████████████████████████████████████████████

13  █████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ███████████████████████████  ████  ██████████████████████

16  ███████████████████████████

17       Neither Leonard nor Mangum spoke with anyone at ████████ about the agreement or

18  reviewed any documents relating to the litigation.  Nor did they even attempt to determine precisely

19  which products ████████ accused of infringing.  ████████████████████████████████

20  ██████████████████████████████████████████████████

21  █████████████████████████████████████████████████

22  ████████████████████████████████████████████

23  █████████████████████████████████████████████████

24  ████████████████████████████████████████

25       █████████████████████████████████████████████████

26  █████████████████████████████████████████████████

27  ―――――――――――――――――――――

[10] Defendants' technical experts analyzed only the '320 patent.

28



Again, Defendants' Rule 30(b)(6) designees were unable to provide relevant information.

---

[11] Leonard stated that he ███████████████████████████████████. *See* Ex. 20 at 269:17-20.

[12] In contrast, Leonard used sales from 2002 to 2012 for ██████ and from 2003 to 2012 for ████. *See* Ex. 13 at Exh. 2a.

[13] As ██████ has not identified a witness on its Initial Disclosures who may testify on this topic, ██████ will not be able to fill the gaps in Mangum's opinions through testimony by a ██████ employee. Also, it is now too late for Mangum to rely on discussions with a ██████ employee.

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 █████████████████████████████████████████████████████████

5 ███████████████████████████████

6    **B.    Mangum's Analysis of Agere License Is Misleading and Unreliable.**

7    A license between Fujitsu and Agere includes a royalty rate of ████.  *See* Ex. 34 at 4.  The

8 license covers ███████ patents, but does not indicate which patents might cover the accused

9 products.  *See* Ex. 14 at 35.  Indeed, given that it does not involve the asserted patent and none of

10 the defendants in this case took a license from Agere, the royalty rate is not probative under

11 *Georgia-Pacific* factor 1 or 2.  *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-

12 348-TJW, 2011 WL 7563818, at *3 (E.D. Tex. Jan. 7, 2011).  Nevertheless, without analyzing the

13 patents or covered products,[14] Mangum arbitrarily divides the ████ rate in half (based on an

14 assumption that ██████████████████████████████████) to derive a rate of ████ for a

15 single patent.  *See* Ex. 14 at 35.  This arbitrary division is devoid of any analysis as to the

16 relationship among the Agere patents (for example, whether the claims overlap or are mutually

17 exclusive) or how the technology relates to Defendants' accused products in this case, all of which

18 would be needed to determine the applicability of these rates to Defendants' accused products.  As

19 there is no support for this calculation, Mangum's opinions regarding the Agere license are

20 unreliable and should be excluded.  Leonard did not rely on the Agere license.

21    **C.    Mangum Improperly Relies on the Via Licensing Patent Pool Agreement.**

22    Mangum (but not Leonard) relies on a sample license agreement and other information he

23 apparently obtained from the Internet for a patent pool organized by Via Licensing that covers

24 patents purportedly essential to the IEEE 802.11 standard.  *See* Ex. 14. at 41-43; *see also* Ex. 35

25 (sample license agreement cited by Mangum).  Along with the CSIRO agreement, he describes this

26 _____

27 [14] Fujitsu's expert Paul Meyer indicated that the Fujitsu-Agere license was "instructive as to the structure of the royalty base in the hypothetical negotiation" due to ████████████████████████████

28 ████████████████████████ but did not rely upon the rate.

1    patent pool as "[t]he most appropriate measure[] of reasonable royalty." *Id.* at 49.[15]

2         The Via license is not a comparable license for purposes of this case.  The '769 patent is not

3    part of the pool and, in fact, is not essential to the 802.11 standard.  Moreover, as none of the

4    Defendants have taken licenses to the Via patent pool, Defendants apparently believe that none of

5    the accused products in this case fall within the scope of the license.  The fact that the Via license

6    pool does not cover either the '769 patent or the accused products undermines any suggestion that

7    the Via license is comparable.  *See LaserDynamics*, 2011 WL 7563818, at *3 (excluding testimony

8    regarding royalty rates in patent pool license not involving the parties where the expert had not

9    made a showing of comparability).  The only support Mangum identifies for his opinion that the

10   Via patent pool is comparable to the '769 patent is the opinion of Fujitsu's technical expert that the

11   availability of interface cards covered by the '769 patent was a "critical ingredient to the rapid

12   proliferation of wireless networks." *Id.* at 42.  This, of course, does not establish that the technology

13   covered by the Via pool is comparable to the technology claimed in the '769 patent.

14   **D.    Leonard and Mangum Improperly Excluded From the Royalty Base External Devices Based on an Erroneous Understanding of the Scope of the Patent and an Incorrect Application of the Entire Market Value Rule.**

15

16        Leonard's primary opinions are based on the erroneous premise that Fujitsu must

17   demonstrate that the accused cards created demand for external devices before any value for sales

18   of infringing external devices can be included in the royalty base.  This legal error stems from a

19   clear misunderstanding of both the relevant law and the scope of the asserted claims.  According to

20   Leonard, "*Because external devices … are not part of the alleged invention of the '769 patent*, as a

21   matter of valid methodology, they cannot be included in the royalty base without other factors

22   being present."  Ex. 13. at ¶ 25 (emphasis added).  He later explains that the "other factors" are a

23   showing that accused cards drove demand for external devices.  *See id.* ¶ 27.  Mangum relies on the

24   same theory to support his opinion that external devices should not be included in the royalty base.

25   *See* Ex. 14 at 46-47.

26

27   _____

[15] Mangum states that the per-patent royalty rate attributed to each patent in the pool is $0.04 per unit, but does not provide support for this statement.  *See id.* at 43.

28

18

Leonard's underlying premise that external devices "are not part of the alleged invention of the '769 patent," also implicit in Mangum's conclusion, is plainly wrong:  the '769 patent's system claims (asserted claims 20, 47, and 48) each include an "external device" as a claim element. Indeed, the Court already granted summary judgment of infringement in Fujitsu's favor with respect to every accused external device.[16]  *See* Dkt. No. 307 at 27:13-25.  Accordingly, it is plain legal error for Leonard to assume that "external devices … are not part of the alleged invention of the '769 patent."  Ex. 13 at ¶25.  As this was the basis for what he called his "valid methodology, " his entire methodology is based on legal error that renders his opinions unreliable and misleading.

Leonard's legal error regarding the scope of the claims is not surprising given that he does not appear to have reviewed, let alone understood, the patent or the Court's *Markman* ruling.  The patent itself is not identified in his list of "Documents Considered."  *See* Ex. 13 at Appendix B. Nowhere in his report does he identify, let alone quote, any of the asserted claims.  He also does not even acknowledge the *Markman* ruling (or identify it in his "Documents Considered").  At his deposition, Leonard was unable to identify any of the asserted claims, even with the assistance of his report.  *See* Ex. 20 at 76:12-23.  Also, until being informed by Defendants' counsel during a break, he did not realize that sales of cards alone could infringe the patent.  *See id.* at 56:4-10, 64:15-65:3.  The fact that he did not review or understand the patent or the Court's *Markman* ruling renders his opinions unreliable.

Based on his incorrect belief that external devices are not patented products, he then compounds his error by concluding that the Entire Market Value Rule ("EMVR") applies in this case.[17] The law is clear, however, that because external devices themselves are patented products (rather than a component of a patent product), EMVR does not apply.  *See, e.g. Laserdynamics, Inc.*

---

[16] Even without the grant of summary judgment, Leonard's assumption would be plainly wrong in light of the presumption of infringement that applies and the fact that the Court already rejected this argument on at least two occasions: when Defendants sought to exclude external devices from discovery and then at the Markman stage when rejecting Defendants' proposed construction of "peripheral function."

[17] Mangum, appears to have recognized the folly in Leonard's approach.  In the context of addressing a convoyed sale issue, Mangum noted, "That is, to the extent that External Devices infringe the '769 patent, and are therefore *patented* products, such sales are, by definition, *not convoyed sales.*"  Ex. 14 at 17 (italics in original, underlining added).

1  *v. Quanta Computer, Inc.*, -- F.3d --, 2012 WL 3758093, at *11 (Fed. Cir. Aug. 30, 2012) (focusing

2  on whether "small elements of multi-component products are accused of infringement").  Unlike

3  the typical EMVR case in which the component accused of infringing is only a small part of a

4  larger product (e.g., the date-picker function in Microsoft Outlook), here it is the use of the accused

5  product itself that has been found to infringe.  Fujitsu is not seeking damages on something larger

6  than the "smallest saleable patent-practicing unit."  *Id.* (quoting *Cornell Univ. v. Hewlett-Packard*

7  *Co.*, 609 F.Supp.2d 279, 283 (N.D.N.Y. 2009) ("logical and readily available alternative was the

8  smallest salable infringing unit with close relation to the claimed invention").  Leonard and

9  Mangum should be precluded from offering opinions that damages for the accused external devices

10  should not be included in the royalty base.

   **E.    Leonard Ignored a Subpoena and Failed to Produce Supporting Calculations that are Necessary to Understand His "Back Up" Methodology.**

11

12         Given the clear defects in his primary opinion, Leonard also offered a back-up opinion. This

13  opinion adopts the same exact apportionment methodology used by Meyer on behalf of Fujitsu, but

14  then makes two downward adjustments.  Unfortunately, the calculations necessary to support these

15  adjustments are set forth in documents Leonard withheld from production in response to a duly

16  served subpoena.   Notwithstanding the requirement of Fed. R. Civ. Proc. 26(a)(2)(B)[18] and a

17  subpoena calling for production of "all documents and/or things reviewed by Dr. Leonard and

18  relied upon by him in forming his opinions," Ex. 24.  Leonard withheld from production documents

19  showing not only the bases for his opinions, but the actual numbers he used to discount the royalty

20  base.  Leonard's misconduct should not be excused.  Here are the specifics.

21         The first adjustment uses a "wireless penetration rate" to further apportion the base to

22  exclude external devices that Leonard believes were used via a wired connection (notwithstanding

23  the fact that all of the external devices have wireless capability and consumers presumably would

24  not have paid more for such capability if they did not intend to use it).  His entire analysis of this

25  issue is set forth in Paragraph 102 of his report and Exhibit 4 to the report.   But Leonard's Report

26

   ---

27  [18] Experts must provide a report that includes "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them." Fed.

28  R. Civ. Proc. 26(a)(2)(B).

1  failed to identify  the amount of the "wireless penetration rate" discount that he applied to reduce

2  the royalty base for any given year.  At his deposition, he was unable to state the "wireless

3  penetration rate" for most years, but instead offered to tried to calculate them at the deposition.  *See*

4  Ex. 20 at 172:6-173:11.  Leonard explained that the calculations were set forth in spreadsheets that

5  he prepared and relied upon.  *See id.* at 173:12-17.  Leonard, however, withheld those spreadsheets

6  from production and they were not identified in Appendix B to his report, which is supposed to

7  identify all materials he considered in forming his opinions.

8         Leonard's second adjustment further reduces the base by the market share of non-

9  defendants.  His entire analysis of this issue is set forth in Paragraph 104 and Exhibit 4.  Again, the

10  present issue is not the merits of this argument, but rather the fact that Leonard failed to identify the

11  market share he used for any year or explain how he derived it.  As with the "wireless penetration

12  rate," Leonard explained that the calculations were set forth in spreadsheets he did not produce.

13  *See* Ex. 20. at 181:5-25.  These spreadsheets also were not listed in Appendix B to his report.

14         Leonard's conduct is in flagrant disregard of a subpoena (*see* Ex. 24) and the obligations

15  imposed by Rule 26.  Amazingly, Leonard admitted at his deposition that he did not even look at

16  the subpoena.  *See* Ex. 20 at 173:20-22 ("Q:  Did you look at the subpoena that was issued for this

17  deposition today?  A:  I don't think so, no.").  When it became apparent that his decision to

18  withhold the documents (or to even explain them in his report) made it impossible for Fujitsu to

19  understand his opinions, Leonard brazenly stated, "Well your mouth works too.  You can try

20  asking."  *Id.* at 182:1-7.  Of course, experts are held to a higher standard than this.  Leonard's

21  misconduct made it impossible for Fujitsu to understand the bases for his opinions, let alone cross-

22  examine him on them at his deposition.  The same will be true at trial.  Leonard's opinions

23  regarding the "wireless penetration rate" and non-defendant market shares should be excluded in

24  their entirety.

25       **F.**     **Leonard Failed to Perform a Georgia-Pacific Analysis For External Devices.**

26         Leonard also failed to conduct a *Georgia-Pacific* analysis with respect to a royalty rate for

27  external devices.  His entire analysis is set forth in three sentences at the end of his report.  *See* Ex.

28

13. at ¶ 105.  Leonard multiplies his proposed rate for cards (0.5%) by the ratio of the proposed rates that Fujitsu's expert, Paul Meyer, proposed for external devices (3.5%) and cards (5.0%).  *See id.*  This is his entire analysis.  When asked at his deposition whether he did a *Georgia-Pacific* analysis, Leonard stated, "Not really because I didn't agree that they should be part of the base."  Ex. 20 at 214:8-20.  Referring to his three sentence analysis, he claimed that "built into all that there was a *Georgia-Pacific* framework sitting in the background, but I didn't explicitly go through each of the factors."  *Id.*   The Federal Circuit has rejected this approach:

> We do not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases.  If they choose to use them, however, reciting each factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration…. Expert witnesses should concentrate on *fully* analyzing the *applicable* factors, not cursorily reciting all fifteen.  And, while mathematical precision is not required, some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed.

*Whitserve*, 2012 WL 3573845, at *14.  As Leonard's analysis with respect to external devices falls far short of this, his opinions should be excluded.

### G.      Leonard Improperly Seeks to Offer Opinions on Technical Issues.

Despite conceding that he is not an expert on technical issues, *see* Ex. 20 at 33:20-22; *id.* at 41:2-6, Leonard nonetheless sought to offer opinions on technical issues.  For example, he  relies on his own understanding of technical issues relating to the comparability of certain license agreements. ███████████████████████████████████████████████

████████████   Leonard is not a technical expert and did not talk with either of Defendants' technical experts. ██████████████████████████████████████

████████████████████████████████████████████████████████ Leonard should be excluded from testifying about any technical issues, including technical issues relating to the comparability of license agreements produced by the parties in this case.

### H.      Leonard and Mangum Improperly Rely on Rule 408 Settlement Communications.

As discussed in Section III, *supra*, Leonard and Mangum both improperly rely on Rule 408 settlement offers.  Their opinions based on pre-suit negotiations should be excluded.

### I.   Leonard's and Mangum's Opinions On FRAND Issues Should Be Excluded.

Relying on FRAND principles, Leonard and Mangum both offer the opinion that Fujitsu may be limited to a royalty rate of zero given that Fujitsu has not pursued a license with █████ ███████ based on their sales of cards.[19]   As an initial matter, no expert in this case has offered the opinion that Fujitsu has FRAND obligations with respect to the Defendants, nor have they argued that the opinions of Fujitsu's damages expert fail to comply with FRAND.[20]

Even if one were to assume for purposes of this motion that such an obligation exists, Leonard's and Mangum's opinions should be excluded because there is no support for their belief that, under FRAND, a licensor who fails to license every possible infringer must therefore license the patent for free.  As Defendants have identified no legal support for this new theory, it will serve no purpose other than to mislead and confuse the jury.  This is particularly true in this case given that Defendants have offered no experts on FRAND issues.

### J.   Leonard's and Mangum's Intervening Rights Opinions Should Be Excluded.

Mangum and Leonard offer opinions regarding D-Link's and Netgear's (but not Belkin's) affirmative defenses of equitable intervening rights.  They give opinions on whether D-Link and Netgear engaged in substantial preparation with respect to the accused products prior to the July 2000 reissue date of the '769 patent, which is one factor to be weighed in evaluating this defense. *See Visto Corp. v. Sproqit Techs., Inc.*, 413 F. Supp. 2d 1073, 1090 (N.D. Cal. 2006).  Their opinions suffer from numerous significant defects that render them unreliable.

First, Mangum did not quantify the amount of "substantial preparation" or tie it to any pre-

---

[19] *See* Ex. 13 at ¶ 53



; Ex. 14 at 37

[20] There is no dispute that, when Fujitsu disclosed U.S. Patent No. 5,357,091 (which became the '769 patent following the reissue proceeding) to JEIDA, Fujitsu specifically stated that any obligations to license the patent on FRAND terms would not apply in the event that litigation with a potential licensee became necessary.  In fact, Fujitsu simply relied on language in a disclosure form provided by JEIDA.

1  July 2000 work on the specific accused products in this case.  Instead, he describes generally —in

2  nearly identical terms for D-Link and former defendant ZyXEL—the purported process by "which

3  products in D-Link's/ZyXEL's *industry* are planned, developed, manufactured and made available

4  in the marketplace," without specific information or amounts spent by D-Link or any distinction

5  between work done by D-Link versus third party suppliers.  *See* Ex. 37 at 6-9; Ex. 38 at 6-9.

6       Second, neither Leonard nor Mangum analyzed "substantial preparation" with respect to the

7  specifically-accused products.  *See* Ex. 37; Ex. 38, Ex. 39.  Instead, they rely on purported

8  investments made in prior generations of networking products, including categories of products that

9  no longer are accused in this case as substantial preparation for later generations of products.  A

10 valid analysis of "substantial preparation" must be limited to the specific accused products.  *See,*

11 *e.g., Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, No. CV 02-01087-VAP, 2008 WL 6873811,

12 at *6 (C.D. Cal. Jan. 3, 2008) (no evidence of specific investment in infringing products); *Thayer v.*

13 *Nydigger*, No. CIV 95-2004-AS, 1999 WL 372552, *13 (D. Or. Apr. 15, 1999).  As neither

14 Leonard nor Mangum did so, their opinions are unreliable. ███████████████████

15 ████████████████████████████████████████████████

16 ████████████████████████████████████████████████

17 ██████. [21]

18      Third, Leonard included in his calculation expenditures that are irrelevant to the "substantial

19 preparation" analysis.  For example, the largest portion of the expenditures he included consisted of

20 worldwide sales and marketing expenses for an arbitrary period beginning in January 1998.

21 Without any basis for doing so, he allocated these expenditures to a selected group of products

22 (both accused and non-accused) based on their percentage of total sales.  This inclusion of

23 generalized marketing expenditures that are not tied to the accused products, and which are incurred

24

25 [21] Leonard did not even know Netgear's total research and development expenses for accused products.  *See* Ex. 20 at 299:20-23 ███████████████████

26 ██████████████████████████ *Id.* at 299:20-300:10. ██

27 ████████████████████████████████████████████████

28 ████████████████████████ *See id.* 307:3-5. ████

24

1   at similar levels in all years (*e.g.*, general brand-related marketing) was legal error.  *See Halliburton*

2   *Co. v. Western Co.*, No. Civ-85-430R, 1989 WL 1677414, *14-15 (W.D. Okla. Jan. 27, 1989)

3   (insufficient to "arbitrarily allocate a portion of its various general corporate expenditures, such as

4   advertising and education, to the infringing activity").[22]

5          Fourth, Leonard and Mangum both ignored whether Netgear and D-Link recouped any of

6   their "investment" since July 2000, including by the beginning of the damages period in September

7   2004.  *See Visto*, 413 F. Supp. 2d at 1090 (recoupment of investment is a factor to be considered).

8          Fifth, it would be inequitable to allow Leonard and Mangum to offer opinions on

9   intervening rights given that Defendants' Rule 30(b)(6) designees on this topic were unable to

10  provide basic information about their defense.[23]  It also would be inequitable given that D-Link and

11  Netgear obtained relief from the Court to limit discovery of sales and financial information to after

12  July 2000, hampering Fujitsu's ability to obtain full discovery concerning the purported "substantial

13  preparation" prior to this date.  *See* Ex. 36 at 70-71.  Yet, Leonard and Mangum now purport to be

14  relying on "investments" made during the very same time period about which Defendants fought to

15  avoid discovery.  Without the discovery that they refused to provide, it is impossible to fully

16  evaluate whether D-Link and Netgear have recouped any investments that they supposedly made in

17  those products.

18         Finally, Appendix 1 to Mangum's responsive report should be excluded.  This appendix,

19  which relates solely to the intervening rights defense (an issue on which Defendants bear the

20  burden) should have been included in Mangum's opening report.  *See* Ex. 19 at 306:12-310:1.

21  Mangum's effort to sneak this information into a responsive report (through an oddly placed

22  paragraph at the top of page 9 of his report) should be rejected.

---

[22] Leonard's conclusion that "a significant proportion" of NETGEAR's relatively small R&D expenses was "likely related" to certain categories of networking products (including categories no longer accused) is undermined by NETGEAR's own 30(b)(6) witness, who testified that ███████████████████████████████████████ ██████████████████████████████████████████████████████  Ex. 25 at 41:10-19.  ████ Ex. 25 at 124:24-126:8 ████████████████████████████████████████████████████████████ █████████████████████████████████; Ex. 26  at 87:25-89:6 ████████████████ █████████████████████████████.

1

2    DATED:  October 18, 2012                   COVINGTON & BURLING LLP

3                                    By: /s/  *Robert D. Fram*           

4                                    Robert D. Fram (rfram@cov.com)
                                   Thomas E. Garten (tgarten@cov.com)

5                                    COVINGTON & BURLING LLP
                                   One Front Street

6                                    San Francisco, CA 94111-5356
                                   Telephone:     415.591.6000

7                                    Facsimile:     415.591.6091

8                                    Philip A. Irwin (pirwin@cov.com)
                                   COVINGTON & BURLING LLP

9                                    The New York Times Building
                                   620 Eighth Avenue

10                                  New York, NY 10018-1405
                                 Telephone:     212.841.1000

11                                  Facsimile:     212.841.1010

12                                    Gary M. Rubman (grubman@cov.com)
                                   R. Jason Fowler (jfowler@cov.com)

13                                    William E. Zapf (wzapf@cov.com)
                                   Brianne Bharkhda (bbharkhda@cov.com)

14                                    COVINGTON & BURLING LLP
                                   1201 Pennsylvania Avenue, NW

15                                    Washington, DC 20004-2401
                                   Telephone:     202.662.6000

16                                    Facsimile:     202.662.6291

17                                    Attorneys for Plaintiff

18                                    FUJITSU LIMITED

19

20

21

22

23

24

25

26

27

28