John P. Bovich (SBN: 150688)
Email: jbovich@reedsmith.com
William R. Overend (SBN: 180209)
Email: woverend@reedsmith.com
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone: (415) 543–8700
Facsimile: (415) 391–8269

Attorneys for Defendant
NETGEAR, INC.

David Enzminger (SBN: 137065)
Email: denzminger@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071–1543
Telephone: (213) 615–1700
Facsimile: (213) 615–1750

Attorneys for Defendants

BELKIN INTERNATIONAL INC. AND
BELKIN, INC.

[COUNSEL FOR OTHER DEFENDANTS
LISTED ON SIGNATURE PAGE]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| FUJITSU LIMITED,<br><br>     Plaintiff,<br><br>  vs.<br><br>BELKIN INTERNATIONAL, INC., BELKIN, INC., D-LINK CORPORATION, D-LINK SYSTEMS, INC., NETGEAR, INC., ZYXEL COMMUNICATIONS CORPORATION, and ZYXEL COMMUNICATIONS, INC.,<br><br>     Defendants. | Case No. 10-cv-03972-LHK<br><br>**DEFENDANTS' OPPOSITION TO FUJITSU'S _DAUBERT_ MOTIONS AND MOTIONS _IN LIMINE_**<br><br>Hearing Date: November 1, 2012<br>Time: 1:30 p.m.<br>Courtroom: 4, 5th Floor<br><br>Judge: Honorable Lucy H. Koh |

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**TABLE OF CONTENTS**

**Page**

DEFENDANTS' OPPOSITIONS TO FUJITSU'S MOTIONS IN LIMINE .......................1

    A.    MIL #1: Fujitsu's Mischaracterization of References before PTO and PTO's Examination..................................................................................................1

    B.    MIL #2: Evidence and Argument Regarding Canceled Claims and Related Office Actions.................................................................................................3

    C.    MIL #3: Fujitsu's Motion in Limine re "Irrelevant Japanese Patent Applications"..............................................................................................................5

    D.    MIL #4: Pre-suit Correspondence.............................................................................8

    E.    Opposition To MIL V Seeking To Bar Defendants' Invalidity Expert From Testifying Contrary To Summary Judgment Decision And Beyond Opinions In His Report .......................................................................................10

        1.    The Court should not preclude Dr. Mihran from testifying that the plain meaning of "card" includes cartridges ...........................................10

        2.    The Court should not preclude Dr. Mihran from testifying that the plain meaning of "inserted into a slot" includes installation onto the connector of a motherboard .......................................................12

        3.    The Court should not bar Defendants from arguing their alternate "data transfer circuit" theory.........................................................14

        4.    The Court should not bar Defendants from asserting their properly disclosed prior art references ........................................................14

    F.    MIL # VI  Opinions re Specific Intent To Induce Infringement...............................16

OPPOSITION TO DAUBERT MOTION REGARDING DAMAGES EXPERTS ......................16

    A.    Defendants' Experts Applied the Proper Methodology to Defendants' Prior Licenses.............................................................................................................16

        1.    The Relevant Case Law Allows Experts to Convert Lump-Sum Licenses Into Effective Royalty Rates .................................................16

        2.    Defendants' Experts Applied Sound Methodology in Converting Lump Sum Payments to Effective Royalty Rates..........................................17

    B.    Dr. Mangum's Analysis of the Agere License Was Proper.......................................19

    C.    Dr. Mangum's Analysis of the Via Licensing Patent Pool Agreement Was Proper .....................................................................................................................20

    D.    Defendants' Experts Correctly Concluded that Fujitsu's Expert Failed to Apply the Entire Market Value Rule ........................................................................20

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

E.     The Court Should Not Preclude Dr. Leonard's Opinions on Wireless Penetration and Non-Defendant Market Share ............................................................22

F.     Dr. Leonard's Analysis of the External Device Royalty Rate is Sufficient................22

G.    Dr. Leonard Does Not Assert a Technical Opinion on the CSIRO License ...............23

H.    Defendants' Experts Can Cite To Fujitsu's Prior License Offers to Defendants ................................................................................................................23

I.     Defendants' Experts Correctly Applied the FRAND Principle ................................23

J.     Defendants' Experts' Intervening Rights Reports are Proper....................................24

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

# TABLE OF AUTHORITIES

**Page**

### Cases

*Acoustical Design, Inc. v. Control Electronics Co.,*
   932 F.2d 939 (Fed. Cir. 1991) ................................................................ 6

*Bausch & Lomb, Inc. v. Alcon Labs., Inc.,*
   79 F. Supp. 2d 252 (W.D.N.Y. 2000) ................................................. 3, 22

*Caluori v. One World Tech., Inc.,*
   20120 U.S. Dist. LEXIS 25508, (C.D. Cal. Feb. 27, 2012) ................. 20

*Conlon v. U.S.,*
   474 F.3d 616 (9th Cir. 2007) .......................................................... 14, 16

*Cordis Corp. v. Boston Scientific Corp.,*
   No. 03-27-SLR, 2010 WL 331792 (D. Del. Jan. 28, 2010) ................... 6

*Ecolab, Inc. v. FMC Corp.,*
   569 F.3d 1335 (Fed. Cir. 2009) ............................................................ 10

*ePlus, Inc. v. Lawson Software, Inc.,*
   764 F.Supp.2d 807 (E.D.Va. 2011) ..................................................... 20

*Flores v. Arizona,*
   516 F.3d 1140 (9th Cir. 2008) ............................................................. 19

*Hoechst Selanese Corp. v. BP Chems. Ltd.,,*
   78 F.3d 1575 (Fed. Cir. 1996) .......................................................... 3, 4

*Hooper v. Lockheed Martin Corp.,*
   688 F.3d 1037 ..................................................................................... 19

*Lucent Technologies, Inc. v. Gateway, Inc.,*
   580 F.3d 1301 ............................................................................... passim

*Manville Sales Corp. v. Paramount Sys., Inc.,*
   917 F.2d 544 (Fed. Cir. 1990) .............................................................. 5

*Max Daetwyler Corp. v. Input Graphics, Inc.,*
   583 F. Supp. 446 (E.D. Pa. 1984) ......................................................... 9

*Micro Chem. Inc. v. Lextron, Inc.,*
   317 F.3d 1387 ..................................................................................... 18

*Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.,*
   2011 U.S. Dist. LEXIS 141548, ......................................................... 11

*Minemyer v. B–ROC Representatives, Inc.,*
   No. 07 C 1763, 2012 WL 346621 (N.D. Ill. Feb. 2, 2012) .................... 6

*Nat'l Union Fire Ins. v. W. Lake,*
   Acad., 548 F.3d 8 (1st Cir. 2008) .................................................. passim

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) ............................................................ 3

*Pivonka v. Central Garden & Pet Co.,*
   2008 WL 486049 ................................................................................... 4

*Plumley v. Mockett,*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

836 F.Supp.2d 1053 (C.D. Cal. 2010) .................................................................. 5

*Rhoades v. Avon Prods., Inc.*,
504 F.3d 1151 (9th Cir. 2007) ................................................................... 11, 12

*Pulse Med. Instr. Inc. v. Drug Impairment Detection Servs., Inc.*,
2009 U.S. Dist. LEXIS 55571, (D. Md. 2009) ........................................... 14

*SynQor, Inc. v. Artesyn Techs. Inc., No.*,
2-07-CV-497, 2011 WL 3625036 (E.D. Tex. Aug. 17, 2011) ..................... 4

*Tesco Corp. v. Weatherford Int'l, Inc.*,
722 F. Supp. 2d 755 (S.D. Tex. 2010) .......................................................... 1

*Whitserve, LLC v. Computer Packages, Inc.*,
20120 U.S. App. LEXIS 17510, (Fed. Cir. Aug. 7, 2012) ......................... 19

*Wordtech Sys. Inc. v. Integrated Networks Solutions, Inc.*,
609 F.3d 1308 (Fed. Cir. 2010) ................................................................... 20

### Rules

Fed. R. Civ. Proc. 36(b) ............................................................................... 12, 14

Fed. R. Evid. 402 ............................................................................................... 6

Fed. R. Evid. 403 ......................................................................................... 12, 14

Fed. R. Evid. 408(b) ........................................................................................... 9

Fed. R. Evid. 408 ........................................................................................... 9, 10

Fed. R. Evid. 702 ............................................................................................. 25

### Other Authorities

7 Wash. J.L. Tech. & Arts 379 ........................................................................... 8

DEFENDANTS' OPPOSITION TO FUJITSU'S *DAUBERT* MOTIONS AND MOTIONS *IN LIMINE*

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**DEFENDANTS' OPPOSITIONS TO FUJITSU'S MOTIONS *IN LIMINE***

**A.     MIL #1: Fujitsu's Mischaracterization of References before PTO and PTO's Examination**

Fujitsu's first *and* second motions *in limine* request the Court to keep Defendants from showing why the '769 Patent survived reexamination despite so many invalidating prior art references.  Fujitsu urges:  "[t]he PTO has confirmed the asserted claims in this case on *three* separate occasions, including three *ex parte* reexamination requests."  [Dkt. #270 at p. 1:2–3 (emph. in original).]  As long as Fujitsu touts the purported "strength" of the surviving claims, Defendants must show how Fujitsu's misrepresentations caused the PTO to err.[1]

Fujitsu argues its conduct is irrelevant to any matter other than inequitable conduct (not asserted), but this is nonsense.  *Eolas Techs. Inc. v. Microsoft Corp.*, 270 F. Supp. 2d 997, 1002 (N.D. Ill. 2003) ("There will likely be evidence concerning [prior art in the prosecution history] that is relevant to the issues of prior art and invalidity  . . .").  Even if Fujitsu's conduct does not rise to inequitable conduct, it remains relevant to other legal issues which are still prominent: invalidity, willfulness, and inducement.  *Tesco Corp. v. Weatherford Int'l, Inc.*, 722 F. Supp. 2d 755, 765 (S.D. Tex. 2010) ("[Defendant] has offered at least three possible uses for this evidence: validity, willfulness of infringement, and inequitable conduct. This only further highlights the fact that different portions of the re-examination record may be . . . admissible for some of the named purposes but not others . . .").

Fujitsu will assert that the PTO has already examined the same (Murakami and Mizutani) or similar (documents regarding the Arlan device) prior art, and therefore this prior art cannot be invalidating.  But it is Fujitsu which repeatedly insists that "[t]he **examiner expressly accepted Fujitsu's arguments [in] allow[ing] the asserted claims.**" [Dkt. No. 270–00, at p. 11:23–24 (emph. added).]  And many of Fujitsu's arguments were incorrect—regardless of whether they were intentionally misleading or merely error.  For instance, Fujitsu told the examiner "Arlan does not teach or suggest that the transceiver is located on an end of the Arlan 450 device. . . [and] [f]or at least these reasons, Claim  . . .47. . . [is] allowable."  [Dkt. No.

---

[1] And regardless of Fujitsu's attempts to increase Defendants' burden, the jury needs to know that: (1) patents issued by the PTO are not conclusively valid and unchallengeable; (2) reexaminations are an *ex parte* proceeding where Defendants had no opportunity to address Fujitsu's unchallenged representations to the USPTO; and (3) Non-literature systems/devices and § 112 defenses that Defendants have cannot be submitted or considered in a reexamination.

271-03 at p. 68.] But Claim 47 (still in the case) has no "opposing end" or other geographic limitation. [Dkt. # 271–01 at 21, col. 13:19–44.] In another example, Fujitsu now admits the "Arlan-Brochure discloses a data transfer circuit within the meaning of claims 38, 39, 41, 43, 45, 47 and 49 [four claims still in the case] of the '769 patent." [Dkt. # 262-02 at 20:14–15.] In contrast, Fujitsu told the examiner "Arlan fails to disclose, teach, or suggest 'a data transfer circuit . . .'" [Dkt. No. 271–03 at 70.] And the examiner explicitly said Fujtisu's argument was a reason for patentability. [Dkt. # 271–04 at 25 (emph. in orig.).]

The Court is well aware of Fujitsu's comments to the PTO regarding Mizutani (supposedly allowed over Nukata in reissue because it was a cartridge, but Fujitsu never made this argument), so Defendants will not rehash this except to say this is highly relevant to validity where Fujitsu is expected to argue a cartridge is not a "card."[2]

As a final example, Fujitsu may argue that Murakami was considered and examined by the USPTO, but Murakami was simply disclosed in one of several IDS forms with references the examiner described as "an unusually large number" and given "only the most cursory review."[3]  [Dkt. #262–10 at 5.] Because Fujitsu will likely use the PTO's examination of the prior art as evidence the patents are not invalid, it is only fair that the jury be allowed to hear the whole story.

As to willfulness and inducement, the Court has noted "Fujitsu questions the reasonableness of Defendants' reliance on their advice of counsel in light of the reexamination's confirmation." [Dkt. # 307, at 57:13–14.] If Fujitsu wishes to use confirmation of the remaining asserted claims to show Defendants' willfulness/inducement defenses are infirm, Defendants should be able to reply.

Fujitsu argues that its conduct before the PTO did not "inform[] Defendants' belief regarding validity" [Dkt. No. 317 at p. 1:22–2:1], but Fujitsu's statements and the PTO's reaction is the very "indisputable public record" on which Defendants and Defendants' opinion counsel relied upon to evaluate the patent's validity. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005). Fujitsu wishes to deride Defendants' opinion counsel by arguing "it is highly unlikely that any jury will be impressed" by

---

[2] Defendants believe such argument is improper given the history of the claim construction for "card," and have filed a motion in limine to preclude such argument.  [Dkt. No. 318, MIL #1.]

[3] Fujitsu argues that Defendants should not delve into "speculation into the examiner's understanding of the prior art" [Dkt. No. 317 at p. 2:11–12], but this is not speculation; this is the examiner's description of the amount of time she spent on the prior art only disclosed by IDS ("the most cursory review").

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   their opinions given that the PTO confirmed the presently-asserted claims in reexamination. [Dkt. No. 317

2   at 10:19–21.]  But at the same time, Fujitsu seeks to preclude Defendants from explaining that the opinions

3   were reasonable, despite the PTO confirming the claims, given Fujitsu's misrepresentations that are evident

4   in the reexamination record.  Indeed, Defendants' opinion counsel took note of Fujitsu's characterization of

5   the prior art when reconsidering their invalidity opinions in light of the PTO cancelling only some of the

6   '769 Patent claims in the first reexamination.  [*See, e.g.*, Doc. #265–01 at p. 11.]  Fujitsu intends to tout the

7   reexaminations to rebut Defendants' invalidating prior art and the credibility of Defendants' opinion

8   counsel; if they wish to do so, Defendants must be able to discuss the same evidence.

9   **B.    MIL #2: Evidence and Argument Regarding Canceled Claims and Related Office Actions**

10          Fujitsu's second motion seeks to exclude any discussion regarding interim office actions.  This

11  motion again seeks to exclude the record of Fujitsu's behavior and the PTO's response.  Fujitsu's attempt

12  to keep such evidence from the jury should be rejected.  *Bausch & Lomb, Inc. v. Alcon Labs., Inc.*, 79 F.

13  Supp. 2d 252, 253 (W.D.N.Y. 2000) ("If [Defendant] has evidence that there actually were defects in the

14  particular application process at issue in this case . . . it may seek to offer such evidence.").

15          The Federal Circuit case Fujitsu cites to support its position is inapposite.  In *Hoechst Selanese

16  Corp. v. BP Chems. Ltd.*, 78 F.3d 1575 (Fed. Cir. 1996), the defendant requested reexamination of the

17  patent only six months before trial, and the court was discussing the effect of a willfulness defense due to

18  the *grant* of a reexamination as showing the likeliness that *all* claims would be cancelled.[4]  *See id.* at 1583–

19  84.  Here, there is no speculation as to what happened during prosecution; the record confirms many of

20  Defendants' arguments and the cancellation of claims.  Indeed, from September 29, 2007 to April 17,

21  2009—the damages period—the record was:  (1) After Fujitsu approached Defendants, Defendants

22  obtained invalidity opinions of counsel; (2) Defendants' invalidity positions were strong enough to prompt

23  Fujitsu to unilaterally forbear from enforcing the patent and to request a reexamination in light of the art,

24  admitting there was a substantial question of patentability, and ceasing all enforcement activity [Dkt. # 266-

25

26  _____

27  [4] This is the same flaw with respect to the case law Fujitsu points to for inducement.  *SynQor, Inc. v. Artesyn Techs. Inc.*,
    No. 2-07-CV-497, 2011 WL 3625036, at *12 (E.D. Tex. Aug. 17, 2011)  ("The Court first notes that at the time the
28  evidence was excluded, the Patent Office had not made any final or conclusive determinations or substantively
    considered [Defendant's] responses to the preliminary reexamination actions.")

00]; and (3) the PTO agreed that all claims were invalid [Dkt. # 266–1 at p. 59].  While this evidence shows there is no clear and convincing objectively-defined risk rising to the level of recklessness, even if the Court finds otherwise, it also is evidence that Defendants did not know, and could not have known of such a risk, given that opinion counsel, plaintiff, and the PTO were all aligned in indicating that all claims had questionable validity.  *See Pivonka v. Central Garden & Pet Co.,* 2008 WL 486049, at *2–*3 (D. Colo. 2008) (granting summary judgment of no willfulness in light of opinion counsel and PTO rejection).

Fujitsu also wishes to suppress evidence the PTO canceled "certain claims which are not currently asserted." [Dck.# 317 at 3:10–11.]  But Fujitsu fails to mention that twelve of these "certain claims" (18, 38–39, 40, 43, 44–46, 49–51 and 55) *were previously asserted* against Defendants.  [*See, e.g.*, Dkt. # 264–06 at 33–34, 39–40, 43–44, 49–52, 58–59; Mar. 31, 2011, Pl. Discl. Asserted Cl.]  Four of the claims were asserted against Defendants as recently as June 2012.  [Dkt. # 247 at p. 4:16–18.]  Indeed, the independent claims from which three presently-asserted claims depend (2, 4, and 20) are among the invalidated "certain claims." [*Id.* at p. 4:20–21.]  Clearly, Defendants should be able to point out that the independent claims were cancelled, as it shows the inventive scope of the remaining claims is minimal, if anything.

Moreover, the cancellation of claims is directly relevant to Fujitsu's willfulness allegations, even if they are not (or are no longer) asserted.  *See Plumley v. Mockett*, 836 F.Supp.2d 1053, 1075 (C.D. Cal. 2010) (insufficient evidence of objective recklessness and granting summary judgment of no willful infringement, where patent subject was to multiple reexamination requests, one of which resulted in cancellation of certain claims).  This evidence also goes to the subjective prong of willfulness, because Fujitsu must prove by clear and convincing evidence that Defendants' took an objectively high risk that opinion counsels' invalidity opinion were wrong and that this risk "was either known or so obvious that it should have been known." *Seagate*, 497 F.3d at 1371 (emph. added).  The fact that the PTO agreed with Defendant's opinion counsel for some claims is evidence that Defendant's reliance upon opinion counsel for other claims the PTO did not find invalid was not  reckless.

Likewise, the fact that the PTO both issued interim rejections and cancelled non-asserted claims is directly relevant to one of Defendants' defenses to inducement:  namely, that they lacked specific intent to cause infringement.  *See Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990); *accord Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1321–22 (Fed. Cir. 2009).  Defendants

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   all subjectively believe the '769 patent is and was invalid, and the fact the PTO granted the reexamination

2   requests not only corroborated that belief, but also meant that the asserted claims would be found

3   unpatentable by the PTO (and, in fact, some of them were found unpatentable and subsequently cancelled).

4   In addition to inducement and willfulness, the cancellation of independent claims from which

5   certain asserted claims depend is also relevant to Defendants' invalidity position. Although validity must

6   be analyzed on a claim-by-claim basis, this does not preclude a fact finder from comparing an asserted

7   dependent claim to a cancelled and invalidated independent claim to discern the limitations of the asserted

8   claim which make this claim patentable when its parent is not. By attempting to preclude testimony

9   regarding the invalidity of highly related claims, Fujitsu is inappropriately trying prevent the jury from

10  conducting this important exercise when considering invalidity.

11  Fujitsu cites *Acoustical Design, Inc. v. Control Electronics Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991)

12  for the proposition that when "claims at issue have been confirmed on reexamination, other office actions

13  taken during the reexamination proceedings are not probative of invalidity or willfulness." But *Acoustical*

14  is a pre-*Seagate* case that applied a different standard for willfulness, and is easily distinguishable for both

15  legal issues. First, the accused infringer in *Acoustical* was found to have "committed perjury or misled the

16  court" so that the jury was justified in being skeptical of its "good faith belief in the invalidity." *Id.*

17  Second, unlike the current case, the accused infringer "sought the opinion of general, not patent counsel

18  with regard to validity" which led the court to question this "procedure le[a]ding to a good faith belief." *Id.*

19  The only other case with any substance Fujitsu cites is an unreported district court case from

20  Illinois, *Minemyer v. B–ROC Representatives, Inc.*, No. 07 C 1763, 2012 WL 346621 (N.D. Ill. Feb. 2,

21  2012).[5] There, the defendants asked the Court to judicially notice 23 reexamination actions containing

22  incredible minutiae for claims that had eventually issued. Those facts are drastically different from here,

23  where claims asserted against Defendants, and from which currently-asserted claims depend, were rejected

24  (and ultimately cancelled) as invalid over the very art Defendants' opinion counsel relied upon.

25  **C.    MIL #3: Fujitsu's Motion in Limine re  "Irrelevant Japanese Patent Applications"**

26

27  ---

[5] Fujitsu cited the entirety of the *Cordis* discussion, 10 words, regarding the admissibility of reexamination proceedings, so there is no way to determine the relevancy of that case to the case *sub judice*. *Cordis Corp. v. Boston Scientific Corp.*, No. 03-27-SLR, 2010 WL 331792, at *3 (D. Del. Jan. 28, 2010).

28

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    Lurking in this motion is a separate and distinct motion to exclude a contemporaneous written

2    admission by Fujitsu's principal corporate witness, Hitoshi Fuji, that the patentability of the invention was

3    "on the border." [Dkt. # 317, at 5:6-18.]  Defendants will address this issue first, then discuss Fujitsu's

4    motion to preclude evidence of its unsuccessful Japanese application.

5    The inventors' disclosure of their alleged invention to Fujitsu's internal patent department included

6    an assessment of patentability by Mr. Fuji, then a "person in charge" of that department.  In that

7    assessment, Mr. Fuji stated that "inventiveness is on the border."  [Herring Decl., Exh. 1 at 351:9; and Exh.

8    2 (certified English translation of Defs' Exh. 100, at FUJ0020161).]  Fujitsu argues this admission against

9    interest should be excluded as irrelevant, under FRE 402, because it was intended narrowly to address the

10   borderline patentability of the invention in Japan and has no bearing on patentability in the United States.

11   [Dkt. 317, at 5:10-12.]  But the Evaluation form contradicts Fujitsu's position, because it states that Fujitsu

12   intended "to file patent application in foreign countries."'  [Herring Decl., Exh. 2.]  In fact, Mr. Fuji is listed

13   as a signatory to Fujitsu's "Evaluation of patent application in foreign countries sheet," which noted that

14   one reason to seek a U.S. patent was progress at unifying the standards in Japan and U.S. for IC memory

15   cards.  [*Id.* at FUJ0020162).]  Moreover, Fujitsu's assertion that Mr. Fuji's doubts about patentability were

16   directed solely to Japanese patent law is contradicted by the form.  In the form's "patentability assessment,"

17   which ranks inventions on a 1-5 scale (with 1 being "hard to get the rights" and 5 "high creativity"), the

18   invention was ranked squarely in the middle at "3. Just patentability," thereby confirming Mr. Fuji's

19   assessment that "inventiveness is on the border."[6]  [*Id.* at FUJ0020161.]  Finally, Fujitsu had just sent Mr.

20   Fuji to the U.S. for a year to train with a patent law firm in our patent laws.  [*Id.*, Exh. 1 at 195:11-197:6).]

21   Mr. Fuji's admission is highly relevant to the fact finder's determination of what claimed features

22   of the purported invention, if any, were conceived by Fujitsu, as opposed to found the prior art.  For

23   example, Fujitsu's expert, Dr. Williams, claims that Fujitsu invented the input/output interface functionality

24   of IC memory cards [*see*, *e.g.*, Dkt. # 272-1, ¶25], but Fujitsu's contemporary patent "Evaluation" reflects

25   that this was then being developed by other manufactures of "I/O cards."  [Herring Decl., Exh. 2 at

26   FUJ0020161 ("Related patent applications competing manufacturers, etc.: Manufacturers developing I/O

27
_____

28   [6] Other rows in this box reflect similar skepticism of the purported invention's value.  For Item "(6) Pioneering property of the topic," Mr. Fuji gave the assessment "4. The topic has ordinary novel need."  [*Id.*, Exh. 2 at FUJ0020161.]

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

cards"); *see also* Exh. 1 at 347:20-349:21 ("Fujitsu is not saying that it was the first to invent this, quote, conceive, close quote, this" [using an IC memory card as an input/output interface]).] Fujitsu's admission is also highly relevant to determine Defendants' objective recklessness in judging the '769 patent invalid and thus to willfulness. *In re Seagate Technology, LLC*, 497 F.3d 1360, 1370-71 (Fed. Cir. 2007). If Fujitsu itself considered inventiveness "on the border," the trier of fact should be permitted to consider this in evaluating whether Defendants' reliance on evidence of invalidity was "objectively reckless."[7]

Turning to the Japanese patent applications, Fujitsu tells the Court that "one of these applications issued as a Japanese patent" [Dkt. # 317, at 4:4-5], and supplies the Japanese language patent [Dkt. # 322-5], published on April 2, 2009, 18 years after the original application. Reviewing the English translation of the single allowed claim shows why Fujitsu neglected to provide a translation. [*See* Herring Decl., Exh. 3.] The Japanese patent claims a system with at least four different "devices" (some connected wirelessly and some by cables) that bears no resemblance to any proposed or issued claim of the '769 Patent.

Despite its 18-year prosecution, Fujitsu suggests the JPO's rejection hinged on only one reference, "*Kitamura*," which Fujitsu argues is not anticipating art in the U.S. [Dkt. #317, at 4:15-17, and n. 4.] Fujitsu is wrong on both counts. The Japanese prosecution involved at least 27 rejections of the many claims submitted by Fujitsu, dozens of prior art references (some at issue here), and numerous appeals affirming the rejections. [Dkt. # 260-3 & 260-4.] It is unreasonable for Fujitsu to challenge the whole JPO examination based on a single, cherry-picked reference. In any event, *Kitamura* stands as prior art, because it described specific embodiments not disclosed in Fujitsu's original Japanese patent application, but added by Fujitsu to its U.S. Patent application.[8] *Kitamura* also shows the state of the art at the time of the invention and can be relied upon to show what a person of ordinary skill would have considered obvious.

Fujitsu's citation of a law review article for the proposition that the Japanese test for patentability is "more stringent" than the U.S. test [Dkt. # 317, at 5:14-16], is misplaced. This article notes that Chief Justice Rader had argued that the Teaching-Suggestion-or-Motivation test, rejected by the U.S. Supreme

---

[7] *See, e.g.*, Herring Decl., Exh. 4 (Belkin's 30(b)(6) witness), at 111:10-15 ("I repeatedly told them that their patent was invalid and I also asked them why the Japanese patent office did not allow their patent or any of their divisional"); and Exh. 5 (Belkin's opinion counsel, Larry Kurland), at 76:2-77:5.

[8] [*Cf.*, *e.g.*, Dkt. # 260-2 (English translation of Fujitsu's Japanese application), and the '769 Patent showing, *inter alia*, addition of Figures 3A, 3B, 4A-D, 6A, 6B, 8, 9A-C, 10A-c, and 11A-C to U.S. application.]

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1    Court, in *KSR*, as rigidly applied by the Federal Circuit, was still "consistent with the Supreme Court's

2    precedent as the test is applied flexibly." *See* 7 Wash. J.L. Tech. & Arts 379, at 391.  This article does not

3    mean a jury cannot fairly consider a 17-year string of JPO rejections in assessing the issues in this case.

4            As noted above, Fujitsu's willfulness claim brings into play determination of Defendants'

5    "objective recklessness."  Indeed, other courts have denied a patentee's motion *in limine* to exclude

6    evidence of the unsuccessful foreign application, finding such evidence relevant and admissible.  *See, e.g.*,

7    *Max Daetwyler Corp. v. Input Graphics, Inc.*, 583 F. Supp. 446, 457 (E.D. Pa. 1984).

8    **D.    MIL #4: Pre-suit Correspondence**

9            Fujitsu's request for the Court to prevent Defendants from introducing evidence of pre-suit

10   correspondence should be denied for two reasons: (1) Fujitsu has opened the door by referring to and using

11   settlement communications throughout the case, including in its Complaint; and (2) Defendants' use of the

12   evidence to rebut willfulness and inducement allegations is a permissible use pursuant to Rule 408.

13           First, a party cannot introduce evidence of pre-suit negotiations for one purpose while precluding

14   use by the other party.  *See, e.g.*, *Nat'l Union Fire Ins. v. W. Lake Acad.*, 548 F.3d 8, 21-22 (1st Cir. 2008).

15   Fujitsu has opened the door to consideration of pre-suit correspondence by relying on that correspondence

16   throughout the case.  Although Fujitsu's motion indicates that it relies on "a subset of the communications

17   for the limited purpose of showing notice of the '769 patent," this is simply not the case.  Fujitsu included

18   over 40 paragraphs relying on the substance of the pre-suit correspondence in its Complaint.  [*See* Dkt.

19   # 102, at ¶¶ 32–41, 51 (Belkin); 81–91, 100 (D-Link); 130–45, 154 (NETGEAR).]  As this Court

20   previously ruled, Fujitsu's detailed inclusion of the pre-suit correspondence in its Complaint has waived

21   any objections under Rule 408.  [*See* Herring Decl., Exh. 6, *Markman* Hr'g Tr. 49:21–22, Oct. 14, 2011.]

22           Moreover, in opposing Defendants' Summary Judgment of No Willfulness, Fujitsu again spent

23   several pages detailing the pre-suit correspondence, and even implied that the fact that Defendants offer to

24   settle shows the validity of Fujitsu's claims.[9]  [Dkt. # 273 at 4–6].  Fujitsu's recital, despite each Defendant

25   admitting having notice of the patent during discovery, belies Fujitsu's retroactive claim that it relies upon

26

27   _____
     [9] Defendants' motion *in limine* #5 requests the Court preclude Fujitsu from implying (as it did in its Opposition) that
     Defendants' offers to settle establish validity of its ultimate claim of infringement.  This is the specific type of conduct

28   that Rule 408 prohibits, and should be prohibited even in light of the waiver.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   this evidence for notice.  Defendants would be substantially prejudiced if Fujitsu can rely on the pre-suit

2   correspondence to get past summary judgment, but Defendants cannot use the same correspondence at trial.

3   Second, even in the absence of Fujitsu's waiver, Defendants should be allowed to introduce the

4   pre-suit correspondence to rebut allegations of willfulness and inducement.  Fujitsu alleges that the pre-suit

5   correspondence is being offered to disprove the validity of a disputed claim.  However, Defendants do not

6   offer the pre-suit negotiations to show the merits of Fujitsu's ultimate claim (patent infringement), but

7   rather as evidence of Defendants' contemporaneous, subjective belief that the '769 patent is invalid as well

8   as Fujitsu's state of mind at that time.  This type of state of mind evidence falls squarely within the Rule's

9   exceptions: "The court may admit this evidence for another purpose, such as proving a witness's bias or

10  prejudice…." Fed. R. Evid. 408(b).

11  Fujitsu decided to include willfulness allegations in this case, and thus Defendants' state of mind is

12  relevant.  *See Seagate*, 497 F.3d at 1371.  The fact that Defendants consistently maintained that the '769

13  patent was invalid and not infringed during pre-suit negotiations demonstrates they did not possess the

14  requisite intent to induce direct infringement.  *See, e.g., Ecolab, Inc. v. FMC Corp.,* 569 F.3d 1335, 1350-

15  51 (Fed. Cir. 2009); *Mikkelsen Graphic Eng'g, Inc. v. Zund Am., Inc.,* 2011 U.S. Dist. LEXIS 141548, at

16  *18–*25 (E.D. Wis. Dec. 8, 2011).  Therefore, Defendants would be prejudiced in defending against

17  Fujitsu's willfulness and inducement allegations if contemporaneous evidence of its good faith belief of

18  invalidity is excluded merely because that evidence was communicated to Fujitsu.  This exclusion would

19  also unfairly prejudice Defendants' ability to present its opinions of counsel, because they considered

20  positions Fujitsu had taken in the pre-suit correspondence in forming opinions.  [*See, e.g.*, Dkt. # 265-00.]

21  Fujitsu cites *Hypotherm, Inc. v. Am. Torch Tip Co.*, No. 05-cv-373-JD, 2009 WL 435324 (D.N.H.

22  Feb. 19, 2009) for the proposition that Rule 408 bars inclusion of pre-suit correspondence to negate

23  willfulness, describing the case as "excluding settlement communications offered to negate willfulness."

24  But Fujitsu has falsely characterized the case: *Hypotherm* in fact **denied** the plaintiff's motion *in limine*.  *Id.*

25  at *6.  Moreover, *Hypotherm* is inapposite because the evidence subject to the Rule 408 challenge was not

26  offered to show the defendant's state of mind.  Instead, the case dealt with whether design changes made

27  after mediation negated willfulness.  The court noted that "even in the absence of Rule 408," it was unclear

28  whether this evidence would be relevant to past willful infringement.  *Id.*  This stands in stark contrast to

1   this case, because the pre-suit correspondence here consistently documents Defendants' then-existing good

2   faith belief that the patent was invalid, which negates an element of willfulness and inducement.

3        Fujitsu also cites *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1161 (9th Cir. 2007).  In the only

4   Rule 408 issue there, the court found a demand letter labeled with Rule 408-based disclaimers **admissible**

5   to establish declaratory judgment jurisdiction.  The court further noted that "the Rule, by its own terms, is

6   one of limited applicability." *Id.* at 1161–62.  In the portion of the case parenthetically described by

7   Fujitsu, the court distinguishes a case cited by the plaintiff where a threat made in a negotiation actually

8   created liability for an alleged anti-trust violation. *Id.* at 1161.  Again, that is not the case here: Defendants'

9   communications are contemporaneous evidence of Defendants' states of mind, which Fujitsu has made

10  relevant through willfulness and inducement allegations.

11       Because Fujitsu has opened the door by the use of pre-suit correspondence, its objections under

12  Rule 408 have been waived.  Moreover, Defendants' use to negate the elements of willfulness and

13  inducement are permitted because the evidence is contemporaneous evidence of Defendants' states of

14  mind.  Accordingly, Fujitsu's motion *in limine* should be denied.

15  **E.**    **Opposition To MIL V Seeking To Bar Defendants' Invalidity Expert From Testifying**
           **Contrary To Summary Judgment Decision And Beyond Opinions In His Report**

16

17       **1.**    **The Court should not preclude Dr. Mihran from testifying that the plain**
                  **meaning      of "card" includes cartridges**

18       Defendants agree that the parties' experts should be precluded from testifying in a manner that is

19  inconsistent with the Court's claim construction, and have indeed filed their own motion *in limine* on such

20  grounds.  But Fujitsu's motion seeks preclusion based on purported constructions that were not expressly

21  stated by the Court.  The fact that both parties have moved *in limine* based on the very same aspects of the

22  Court's construction shows that greater clarity is needed in that construction.  Moreover, if the construction

23  is as Fujitsu asserts, then it is <u>different</u> from the construction which Defendants applied when responding to

24  requests for admissions, and they should be given leave to amend those responses and relief from MSJ as

25  appropriate.  Fujitsu's motion should be denied for at least the following reasons.

26       First, contrary to Fujitsu's arguments, the Court's MSJ Order does not provide a construction of

27  "card" as excluding cartridges.  Rather, the Court merely confirmed Defendants' plain meaning

28  construction and rejected Fujitsu's construction of "card" as limited to "IC-type card."  [Dkt. # 307, at 35.]

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Although the Court's MSJ Order refers to "Fujitsu's disavowal of 'cartridges,'"[10] the Court does not state that Fujitsu disavowed <u>all</u> cartridges from the scope of "card."  Rather, the Court merely refers to the purported "disavowal" in the context of Mizutani, before discussing the standard for disavowal and without applying that standard to Fujitsu's alleged disavowal of "cartridges."  [*See id.* at 35-36.]  Moreover, if Dr. Williams is permitted to testify at trial that Mizutani (or any other prior art) is not a "card" but is instead a "cartridge," then Defendants should be permitted to argue the converse  – including by discussing the PTO's recent characterization of Mizutani <u>as a card</u>.

Second, if, as Fujitsu suggests, the Court did construe "card" to exclude "cartridges," then the Court's MSJ Order is not clear as to the scope of any such exclusion.  As a threshold matter, any such construction would conflict that the Court's construction of "card" as <u>including</u> a printed circuit board ("PCB"), because Mizutani (or any other cartridge) is simply a PCB with an outer housing.  Moreover, any such construction would be indefinite, because there is no guidance regarding what is meant by "cartridge."  For example, did the Court adopt Dr. Williams' purported distinctions between a "cartridge" and "card"?  Such a construction would be inconsistent with other aspects of the Court's ruling, because Dr. Williams uses thickness as a factor to distinguish "cartridges" from "cards," and the Court ruled that Fujitsu <u>abandoned</u> thickness as a limitation.  [*See* Doc. #307, at 31.]  If not the factors used by Dr. Williams, did the Court adopt some other measure to determine whether a PCB with a housing is somehow a "cartridge" rather than a "card"?  The answers to these questions are unclear from the MSJ Order.  If the Court intended to adopt a construction of "card" that excludes "cartridges," then greater clarity is needed in the construction so that both parties know how to apply it at trial.

Finally, as set forth in more detail in Defendants' own motion in limine, if a "cartridge" is not a "card," then Defendants should be given leave to amend their responses to requests for admissions.  A party may amend an admission if (1) it would promote the presentation of the merits of the action and (2) allowing the amendment would not prejudice the party that obtained the admission.  *See* Fed. R. Civ. Proc. 36(b);  *Conlon v. U.S.*, 474 F.3d 616, 625 (9th Cir. 2007).   Other courts have granted leave to amend

10   As set forth in detail in other filings, Defendants respectfully disagree that any disavowal occurred, as the purported disavowal as to Mizutani is based on Fujitsu's claim that it earlier distinguished the Nukata reference on the grounds it was not a card because it was a "cartridge" – even though Fujitsu's earlier comments about Nukata never even mentioned a "cartridge," much less "clearly disavowed" one.  [*See, e.g.*, Dkt. # 306.]

1    admissions where they were based on an incorrect claim construction.  *See, e.g.*, *Pulse Med. Instr. Inc. v.*

2    *Drug Impairment Detection Servs., Inc.*, 2009 U.S. Dist. LEXIS 55571, at * 42-47 (D. Md. 2009).

3        Here, Defendants made admissions in discovery based on an understanding of "plain meaning" of

4    "card" as <u>including</u> cartridges, because Fujitsu during *Markman* had urged a construction that excluded

5    cartridges and then <u>abandoned</u> that construction and instead stipulated to Defendants' plain meaning

6    construction.  If a "card" excludes a "cartridge," then Defendants should be able to argue non-infringement

7    based on the accused card products being "cartridges" instead of "cards."  For purposes of alleged validity,

8    Dr. Williams argues there are several distinctions between "cards" and "cartridges," including that a

9    cartridge typically has a PCB surrounded by a clam-shell housing.  [Dkt #320, ¶ 171.]  By that standard,

10   many of Defendants' accused products would also be "cartridges," because they also are a PCB surrounded

11   by a clam-shell housing.  [*See* Herring Decl., Exh. 7, at 440:19-24 (Fujitsu's expert admits that, under

12   Fujitsu's construction, accused products might not infringe if they had a clam-shell housing).]  It would be

13   fundamentally unfair, improper and prejudicial if Fujitsu were allowed to apply a construction for invalidity

14   that Defendants were not allowed to apply for non-infringement.  *See* Fed. R. Evid. 403.  Thus, if the Court

15   allows Fujitsu to use a different claim construction at trial for invalidity than Defendants applied during

16   discovery, Defendants should be permitted to amend their responses to all requests where they admitted

17   their accused products were "cards," [*see, e.g.*, Dkt #320-1—320-3.] and the Court should grant relief from

18   summary judgment of infringement accordingly.   Doing so would promote the presentation of the merits

19   and would cause no real prejudice to Fujitsu, since there is no cognizable "prejudice" in not being allowed

20   to use two different claim constructions.  To the contrary, it is a fundamental principle of patent law that a

21   patentee cannot construe a patent one way to ensnare accused products, but another way to avoid invalidity.

22        In sum, the Court should clarify its ruling to make clear whether and to what extent a "cartridge" is

23   not a "card," including how "cartridge" is defined.  If the Court construes a "card" to exclude a "cartridge,"

24   Defendants should not be precluded from arguing that a particular prior art reference is not a "cartridge"

25   and should be allowed to amend their discovery responses.

26       **2.    The Court should not preclude Dr. Mihran from testifying that the plain**
         **meaning of "inserted into a slot" includes installation onto the connector of a**
27       **motherboard**

28   Similarly, Fujitsu's motion regarding the "slot" term raises issues that should be clarified by the

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Court, but that nonetheless do not warrant preclusion of testimony by Defendants.

First, the Court did not specifically construe "slot" to exclude any card that is "installed by inserting the card into a connector on the motherboard." Rather, the Court rejected Fujitsu's proposed construction of "slot" as limited to "an opening in the exterior of the electronic device," and instead agreed with Defendants that "slot" simply means "an opening" and that it can be on the "interior" of an electronic device. [Dkt #307, at 38.] Although the Court references Fujitsu's alleged disavowal of a card that must be "installed by inserting the card into a connector on the motherboard," it does so when discussing ARLAN. [*Id.* at 37-38.] The Court does not state that all "installations by inserting the card into a connector on the motherboard" are excluded. Rather, it appears the Court found it was a factual issue for the jury whether a skilled artisan would consider a connector slot on the motherboard to be a slot. If Dr. Williams can testify at trial that ARLAN, Rorden or other prior art is not "inserted into a slot," then Defendants should be permitted to argue that an artisan would understand otherwise.

Second, if the Court has, in fact, construed the "slot" term as Fujitsu suggests, then the Court's MSJ Order is not clear as to the scope of any such exclusion. Indeed, the construction would be indefinite as to at least two terms: "installation" and "connector." All cards are "installed" in some sense when they are inserted into a slot. Would an excluded "installation" be limited to installation that was "cumbersome" (a vague concept raised by Dr. Williams) or that were installed using a series of specific steps (as argued in Dr. Williams' Invalidity Report, ¶¶ 363-370)? If "installed" cards are excluded, there is no guidance in the MSJ Order or the patent specification as to what that means and the term is thus indefinite. Likewise, the parties presently dispute whether a "connector" is a "slot," and thus excluding "connector" from the scope of slot would confuse, rather than clarify. As with the "card" term, greater clarity is needed in the construction so that both parties know how to apply it at trial.

Finally, if "inserted into a slot" excludes "installed by inserting the card into a connector on the motherboard," then Defendants should be given leave to amend their RFA responses. *See* Fed. R. Civ. Proc. 36(b); *Conlon*, 474 F.3d at 625. Defendants made admissions in discovery based on an understanding of "plain meaning" of "slot" as including any card inserted into an interior or exterior slot, regardless of whether "installation" was required. If cards that are "installed" are excluded, then Defendants should be allowed to make non-infringement arguments regarding their accused products that

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   are likewise "installed."  Indeed, Fujitsu's own manuals note its netbooks must be powered off (an

2   installation step according to Dr. Williams [Dkt #320, at p. 97:26]) prior to inserting express cards like the

3   accused products.  It would be unfair and prejudicial if Fujitsu were allowed to apply a construction for

4   invalidity that Defendants could not apply for non-infringement.  *See* Fed. R. Evid. 403.  Thus, as with the

5   "card" term, Defendants should be allowed to amend responses [*see, e.g.*, Dkt #320-1—320-3] based on

6   incorrect claim constructions, as doing so would promote the presentation of the merits and cause no real

7   prejudice to Fujitsu.  *See Pulse* 2009 U.S. Dist. LEXIS 55571, at * 42-47.

8         **3.**      **The Court should not bar Defendants from arguing their alternate "data transfer circuit" theory**

9         With regard to the "data transfer circuit" argument, Fujitsu seeks to re-litigate an issue it already

10   argued and lost.  Specifically, Fujitsu moved to strike Defendants' argument raised in their summary

11   judgment reply brief as to why the Murakami reference satisfies the "data transfer circuit" limitation even if

12   the "in response to" language were construed to require a cause-and-effect relationship.  [Dkt #297.]  he

13   Court already <u>refused</u> to strike this argument [Dkt #317, at 44], and Fujitsu's attempt to raise the same issue

14   via its motion in limine is improper and should be denied.

15         First, as Defendants previously explained, the "in response to" language was not identified as an

16   issue at *Markman* or by either party's opening expert report.  [*See* Dkt #299.]  Rather, Dr. Williams first

17   explicity raised the issue in his <u>rebuttal</u> report on invalidity.  By then, Defendants' expert Dr. Mihran

18   obviously could not provide his own analysis based on this new position.  Recognizing the predjuce to

19   Defendants, the Court already <u>denied</u> Fujitsu's motion to strike this very argument.  [Dkt #317, at 44.]  And

20   if Fujitsu alleges prejudice, the Court addressed that issue by allowing Fujitsu to supplement the record.

21   [*Id.*]  If the jury can hear Fujitsu's eleventh hour theory of validity, it should also hear Defendants' reply.

22         Second, Fujitsu is wrong that Defendants' alternate invalidity theory regarding Murakami conflicts

23   with the Court's construction of "data transfer circuit" ("DTC") as a "circuit transferring data."  The fact

24   that the "DTC" is depicted as a line in a functional diagram does not mean the circuit is a "mere conductive

25   line," as Fujitsu asserts.  Moreover, even if it were, a conductive line can constitute a "data transfer circuit."

26   Nothing in the Court's construction <u>excludes</u> a conductive line from constituting a "circuit for transferring

27   data" as a matter of law.  Defendants should be able to present their arguments to a jury on this issue.

28         **4.**      **The Court should not bar Defendants from asserting their properly disclosed prior art references**

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Finally, Fujitsu's improper attempt to preclude Defendants from arguing invalidity based on numerous prior art references that were properly disclosed should be denied.  First, the Patent Local Rules require Defendants to disclose "[t]he identity of each item of prior art that allegedly anticipates each asserted claim or renders it obvious." Pat. L. R. 3-4(a).  Fujitsu's motion claims that Defendants' final prior art list of 13 references actually consists of 57 references, and that "17 or these 57 items were not disclosed."  But Fujitsu neglects to mention that each of these 17 items is one of multiple articles describing a reference that was indisputably disclosed in the Amended Invalidity Contentions, and one of the items itself was disclosed.  [Herring Decl., ¶ 11.].  Defendants complied with the Patent Rules because they disclosed "the identity of each item of prior art" on which they intend to rely at trial.

Second, Fujitsu's argument that Defendants were required to chart every single obvious combination is absurd.  The Patent Local Rules require Defendants to serve "[a] chart identifying where specifically in each alleged item of prior art each limitation of each asserted claim is found," but not to chart every single obviousness combination possible. Pat. L. R. 3-4(c).  Defendants' Contentions disclosed at least 45 prior art references and included 31 invalidity charts totaling over 1,800 pages.  [*See* Dkt #322-17.]  With regard to the charts, Defendants expressly stated that the combinations were exemplary and that "each of the items of prior art listed above renders the asserted claims of the '769 patent obvious expressly or inherently, either alone or in combination with each other . . . ." [*Id.*, at 15-18.]  If Defendants had charted every permutation of the 45 references, as Fujitsu suggests, there would have been hundreds of thousands of pages of charts.  Defendants complied with the Patent Rules and Fujitsu's motion should be denied.

Finally, and similarly, Defendants' expert was not required to identify every single obviousness combination in his report.  Mr. Mihran extensively discussed the prior art references upon which Defendants intend to rely at trial, but it would be absurd to require him to discuss every single permutation and prior art combination in his report.  Rather, he discussed all of the bases of anticipation and specifically discussed many obviousness combinations, but otherwise agreed with the disclosures in Defendants' Contentions.[11]  [Herring Decl., Exh. 8 at ¶ 1570.]  Fujitsu's motion has no merit, and the requested

---

[11]  Fujitsu improperly cites to the *Key Energy* opinion to support its position, but that is just a cursory Order that grants a motion in limine limiting an expert to obvious combinations in his report, with no discussion whatsoever as to the reasons for granting the motion or any basis for analogizing to the facts of this case.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   preclusion would seriously prejudice Defendants' defenses at trial.  Fujitsu's motion should be denied.

2   **F.**   **MIL # VI  Opinions re Specific Intent To Induce Infringement**

3            Fujitsu argues that Dr. Brody's opinions improperly address the issue of a corporate defendant's

4   state of mind.  But, of course, Dr. Brody's *rebuttal* opinions are directed against Fujitsu's expert Dr.

5   Williams' own opinions of Defendants' state of mind.  In his expert report, Dr. Williams opines that

6   Defendants "specifically intended to encourage direct infringement by a third party…." [Dkt. # 272-1

7   (Williams Infringement Report), ¶ 240].  To the extent that Dr. Williams is permitted to present his opinion

8   and the allegedly supporting evidence of inducement, Defendants' expert Dr. Brody should be permitted to

9   present evidence and opinions rebutting the same.

10           In urging this Court to preclude Dr. Brody from opining on intent, Fujitsu relies on inapplicable,

11  out-of-Circuit authority.  Determination of whether evidence should be admitted at trial is controlled by the

12  law of the regional circuit.  *Micro Chem. Inc. v. Lextron, Inc*. 317 F.3d 1387, 1390–91 (Fed. Cir. 2003).

13  All the cases cited by Fujitsu are outside the Ninth Circuit.  The law here allows expert testimony in

14  complex cases, even as to subjects usually deemed inappropriate elsewhere for expert testimony.  *Hooper*

15  *v. Lockheed Martin Corp.*, 688 F.3d 1037, 1052–53 (9th Cir. 2012), citing *Flores v. Arizona*, 516 F.3d

16  1140 (9th Cir. 2008).  Dr. Brody is qualified to discuss and provide opinions on the complex subjects of the

17  alleged acts of inducement, and why the documents cited by Dr. Williams do not induce infringement.  His

18  testimony and opinions will help the jury understand these complicated subjects.

19       **OPPOSITION TO *DAUBERT* MOTION REGARDING DAMAGES EXPERTS**

20  **A.**   **Defendants' Experts Applied the Proper Methodology to Defendants' Prior Licenses**

21       **1.**   **The Relevant Case Law Allows Experts to Convert Lump-Sum Licenses Into**
              **Effective Royalty Rates**
22

23           Fujitsu has cited several cases for the proposition that converting lump-sum licenses into effective

24  royalty rates is improper.  These cases are not only factually distinguishable, but expressly acknowledge

25  that lump-sum licenses can be relevant to a running royalty.  For example, in *Lucent Techs., Inc. v.*

26  *Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), the Federal Circuit assessed a conversion of a running

27  royalty to a lump-sum payment (the converse of this situation) and noted that one type of agreement <u>can be</u>

28  <u>used</u> to determine the parameters of the other type.  *See id.* at 1330 ("This is not to say that a running-

royalty license agreement cannot be relevant to a lump-sum damages award, and vice versa.").

Fujitsu's cited *Whitserve* case is also instructive. There, both parties' experts had cited to prior lump-sum payments to support their proffered royalty rates. *Whitserve, LLC v. Computer Packages, Inc.*, 20120 U.S. App. LEXIS 17510, *41-*45 (Fed. Cir. Aug. 7, 2012). The court noted that prior lump-sum payments can support a running royalty if there is testimony explaining how the lump-sum payments apply to the case. *Id.* at *43. The court rejected the testimony of the plaintiff's expert, because he "did not offer any testimony to explain how [the lump-sum] payments could be converted to a royalty rate." *Id.* at *44. The court contrasted this with the defendants' expert, who "explained how he converted one of the lump-sum payments into [the effective royalty rate] by dividing the license fee by the revenue generated by accused infringing sales," and whose testimony was thus proper. *Id.* at *44-*45, n. 13.[12]

Indeed, the case law contains at least one example of using lump-sum payments to calculate running royalties. *See, e.g.*, *Caluori v. One World Tech., Inc.*, 20120 U.S. Dist. LEXIS 25508, *10-*14 (C.D. Cal. Feb. 27, 2012) (citing *Lucent*) (a lump-sum license can be relevant to a running royalty).

### 2. Defendants' Experts Applied Sound Methodology in Converting Lump Sum Payments to Effective Royalty Rates

Both Dr. Leonard and Dr. Mangum applied proper methodologies when they derived effective royalty rates from the CSIRO, Linex, and Acticon licenses. It appears Fujitsu's main complaint is that Defendants' experts erred in calculating the effective royalty rates by using sales of products accused in this case, rather than the CSIRO, Linex, or Acticon cases. However, this methodology was appropriate, and in fact yielded conservative effective rates, because **the products at issue in this case are covered by the CSIRO, Linex, and Acticon licenses.** Thus, as explained in greater detail below, Drs. Leonard and Mangum's methodologies were sound and should not be excluded as to each license.

---

[12] The *ePlus* and *Wordtech* cases Fujitsu cites are readily distinguishable. In *ePlus*, the expert's opinion was not stricken based solely on the expert's conversion of a lump-sum payment into an effective royalty, but also on a number of other issues not present here. For instance, that Court objected to the expert's apparent lack of consideration of other relevant licenses, the expert's use of accused sales figures from previous litigations, and the expert's directional adjustment to the running royalty rate from the evaluation of the *Georgia Pacific* factors, none of which Fujitsu accuses Defendants' experts of doing here. *See ePlus, Inc. v. Lawson Software, Inc.*, 764 F.Supp.2d 807, 815-16 (E.D.Va. 2011). And, the *Wordtech* case did not involve a lump-sum/running royalty conversion, but rather the court there excluded prior lump-sum agreements from the analysis of another lump-sum agreement. *Wordtech Sys. Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319-20 (Fed. Cir. 2010)). Thus, the problem with the expert opinion in that case has nothing to do with the problem Fujitsu complains of here.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

**CSIRO**: In paragraph 69 of his report, and in his deposition, Dr. Leonard explains step-by-step his methodology in converting the lump-sum payments in the CSIRO agreements into effective royalty rates: (1) discounting post-agreement sales by the weighted average cost of capital, to correct for the difference in risk-allocation between lump-sum licenses and running royalties; (2) reviewing the agreement, which he understood to cover all WiFi-capable products[13]; and (3) to avoid overstating the number of products covered and understating the effective royalty rate, dividing the lump-sum by just the products at issue in this case (i.e., cards and external devices), all of which are WiFi-capable and therefore covered by the license. [Doc. #322-13, ¶ 69; Herring Decl., Exh. 6 at 270:23-271:15; 275:13-276:3.] Dr. Leonard also took a conservative approach by only applying Defendants' U.S. sales (even though the CSIRO agreement was worldwide), and only using sales to 2012 (even though the CSIRO license would continue in the future). [*Id*.] Dr. Leonard's report then discusses several additional reasons that his calculated effective rate likely *overstates* the actual effective rate of the CSIRO license. [*Id*. ¶ 70.] Dr. Leonard used a proper methodology, and did so conservatively.

Similarly, Dr. Mangum, starting at page 32 of his report and in his deposition, explains his methodology in calculating an effective per-unit royalty rate in the CSIRO/D-Link Systems agreement. [Doc. #322-14.] First, he analyzed CSIRO's interpretation of the products covered by the CSIRO agreement. Then, he reviewed the agreement and consulted with Defendants' technical expert. He then used U.S. sales numbers, even though the CSIRO agreement was worldwide. Further, as mentioned in his deposition, Dr. Mangum dealt with factors of risk sharing and considered discounting with various rates to present value that could potentially arise in evaluating a lump sum agreement. [Herring Decl., Exh. 9 at 189:24:190:24 & 263:15-23]

**Linex**: Dr. Leonard took the same approach for the Linex calculation as for the CSIRO license. [Doc. #322-13, ¶ 71.] Dr. Leonard also testified in deposition that he reviewed the Linex agreement and understood the technology at issue in that case. [Herring Decl., Exh. 6 at 278:16-279:15.] As Dr. Leonard also explained, one cannot calculate an effective royalty rate from a cross license containing a lump-sum payment. [*Id*. at 283:22-284:4.] Neither the CSIRO, Linex, nor Acticon licenses is a cross license.

---

[13] Dr. Leonard was an expert witness in one of the litigations involving the same CSIRO patent that was the subject of this license, and therefore had a working knowledge of the technology covered by that license.

Further, even Mr. Meyer acknowledges that Defendants' products at issue in this case would have been covered under the Linex license: "The licensed products are broadly defined in the agreement as all products of the respective licensee." [Doc. #316 at ¶ 72.]

**Acticon**: Dr. Leonard also calculates the effective royalty rate from a 2001 license between D-Link and Acticon, which specifically identifies PCMCIA cards and states that the patented technology involves "data communications." [Doc. #322-13, ¶ 72; Herring Decl., Exh. 6 at 258:13-259:1.] Dr. Leonard reviewed the agreement, and used D-Link's sales of PCMCIA cards to determine the effective royalty rate. [Doc #322-13, ¶ 72; Herring Decl., Exh. 6 at 254:13-255:22.] Again, inclusion of only these products demonstrates Dr. Leonard's conservative approach, as the Acticon license also mentions USB adapters. [Doc #322-13, ¶ 72; Herring Decl., Exh. 6 at 260:17-23.] At deposition, Dr. Leonard explained his calculation in detail, including that he performed a discount analysis for future sales. [Herring Decl., Exh. 6 at 263:7-19.] Dr. Leonard also relied on Defendants' technical expert Dr. Brody's opinion that certain patents covered by the Acticon license are similar to the '769 Patent, and opined that the Acticon effective rate is therefore particularly relevant here. [Doc. #322-13, ¶¶ 73-74; Herring Decl., Exh. 6 at 254:13-255:22.] Dr. Leonard also properly accounted for any uncertainty regarding validity and infringement at the time of the negotiation of the Acticon license. [Doc. #322-13, ¶ 75.]

Similarly, Dr. Mangum explains that he reviewed the agreement, consulted with Defendants' technical expert to verify that the technology under the Acticon agreement related to the '769 Patent, and used a conservative approach. [Doc. # 322-14 at 30.] In his deposition, Dr. Mangum discussed how he performed a calculation to show the effect of adding USB products on the per-unit royalty. In addition, Dr. Mangum discussed how he was also conservative by only applying his calculation as to one of the four patents covered by the agreement. [Herring Decl., Exh. 9 at 35:2-36:19.]

In sum, Defendants' experts used reliable methods, not "sheer speculation," when they calculated the effective royalty rates from the CSIRO, Linex, and Acticon agreements.[14]

**B.    Dr. Mangum's Analysis of the Agere License Was Proper**

___

[14] In its motion, Fujitsu repeatedly mentions Defendants' 30(b)(6) testimony on these licenses. The awareness of Defendants' fact witnesses of the minute details regarding these licenses is irrelevant to the issue of whether Defendants' experts applied the proper methodology, and Fujitsu cites no cases excluding expert testimony due to the deposition testimony of fact witnesses. Fujitsu's reliance on this testimony is therefore improper.

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

Dr. Mangum's analysis of the Agere license was in response to Mr. Meyer's analysis of the Agere license, which he claimed to be "instructive," and in addition the Agere patents relate to wireless networking. [Doc #316 at ¶¶ 183, 191, 214.] Dr. Mangum sets forth his detailed reasoning starting at page at page 35 of his report. [Doc. #322-14.] In particular, Dr. Mangum took Mr. Meyer's assertions and citation to Fujitsu corporate witness' testimony that only very small number of patents were viewed as relevant to Fujitsu, and evaluated the implication on damages. Dr. Mangum reported the running royalty that would result from this overly conservative assumption. The Agere license is highly relevant and Dr. Mangum was conservative in his methodology. Fujitsu's request to strike this portion of Dr. Mangum's expert report should therefore be denied.

## C.    Dr. Mangum's Analysis of the Via Licensing Patent Pool Agreement Was Proper

The Via Licensing Pool Agreement is relevant because (1) it relates to wireless networking, which Fujitsu contends relates to the '769 Patent, (2) the agreement specifies that it covers "essential" IEEE 802.11 standard patents, and (3) Fujitsu was a Via Licensing Patent Pool member and contributed one patent to the patent pool. [Doc. #322-14 at p. 41.] As such, this agreement reflects the rate under which Fujitsu is willing to license its purportedly "essential" wireless networking patent, the '769.

Also, the analysis of the Via Licensing Pool agreement is prompted by Fujitu's own emphasis of "wireless connectivity" between a card interface device and an external device, as well as card interface devices needing to work with WiFi (802.11) standards. [Doc. #316 at ¶ 175.] The patents of the Via Licensing Pool, being essential to 802.11 standards, therefore are relevant to the royalty for the '769 Patent.

In his report, Dr. Mangum sets forth his calculation of effective per-unit royalty rate under the Via Licensing Pool Agreement. [Doc. #322-14 at 41.] In particular, he studied the agreement, and took a conservative approach to factor the two-tiered per-unit rate by taking the higher per-unit rate and considering only U.S. patents. Thus, Dr. Mangum thoroughly analyzed this highly relevant agreement and was conservative in his methodology. Fujitsu's request to strike this portion of Dr. Mangum's expert reports should be denied.

## D.    Defendants' Experts Correctly Concluded that Fujitsu's Expert Failed to Apply the Entire Market Value Rule

Predictably, Fujitsu argues that Defendants' experts erred in concluding that the entire market value

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

("EMV Rule") must be satisfied before external devices can be included in the royalty base.[15]  Fujitsu claims that the EMV Rule does not apply because the term "external devices" appears in the claim language.  Fujitsu's argument is contrary to fact, law, and common sense.

First, Fujitsu's argument is factually wrong.  The mere fact that "external device" appears in the claim language does <u>not</u> mean external devices were "invented" by Fujitsu.  To the contrary, the inventors of the '769 patent <u>admit</u> they did not invent external devices.  [Doc. #319-2, 319-3.]  The fact that external devices are included in the claim language means that Fujitsu may seek damages on the entire "system" (and include external devices in the royalty base) where Defendants sell <u>the entire system</u> by selling both routers and cards together (i.e., kits).  But Mr. Meyer includes external devices in the royalty base where Defendants are selling <u>only</u> the external device – even though there is no claim that the external device alone infringes and there are clearly substantial non-infringing uses for such devices.  When sold by themselves, the external devices are unpatented components that may or may not be incorporated into the claimed system, and thus Fujitsu must satisfy the EMV Rule to obtain a royalty on such sales.

Second, Fujitsu's argument is contrary to law.  Fujitsu fails to cite a single case holding that listing a product in a claim means the patentee need not satisfy the EMV Rule as to that product.  Instead, Fujitsu merely claims this is not a "typical" EMV Rule case (citing *LaserDynamics*), and thus the EMV Rule does not apply.  But Fujitsu is wrong because this case is highly analogous to *LaserDynamics*: both involve a multicomponent system (here, a card and an external device) where, at most, the patentee has only invented one component (here, cards).  Defendants' external devices here do not "infringe" the '769 patent any more than computers "infringed" the date-picker patent in *Lucent* or smartphones "infringed" the patent in the *DataQuill* case cited in Defendants' *Daubert* motion.  There, as in myriad other cases, the patentees had to apply and satisfy the EMV Rule before recovering damages on the entire multicomponent product.

Third, Fujitsu's argument flies in the face of common sense, and would lead to absurd results.  If Fujitsu is correct, then the inventor of a chip used in a GPS device could claim a system comprising the GPS and a satellite, and then seek damages based on the sales of satellites.  There are sound legal and practical reasons why Fujitsu was obligated to apply and satisfy the EMV Rule, but it did not.  Defendants'

---

[15] Defendants address this issue in great detail in their *Daubert* motion.

1   expert opinions stating the same are correct and should not be excluded.[16]

2   **E.    The Court Should Not Preclude Dr. Leonard's Opinions on Wireless Penetration and Non-Defendant Market Share**

3
        Fujitsu next complains (for the first time) that because Dr. Leonard did not produce supporting

4   documents showing his calculations regarding wireless penetration and non-Defendant market share, he

5   should be precluded from testifying on those topics.  But Fujitsu's arguments, at worst, are directed to an

6   oversight in responding to a subpoena, not a failure of methodology justifying exclusion under *Daubert*.

7
        Importantly, Dr. Leonard's expert report plainly explains the basis for his opinion that Mr. Meyer's

8   apportionment model should account for wired connections (it only includes wireless) and non-Defendant

9   market share (it includes cards made by all companies), and sets forth the sources of information used.

10  [Doc. #322-13, ¶¶ 102-105, exh. 4.]  Further, when Fujitsu's counsel asked Dr. Leonard to explain his

11  calculations at deposition, he did so.  [Herring Decl., Exh. 6 at 173:2-11; 182:10-186:20.]  As Dr. Leonard

12  made clear, he merely left these documents out of his "Documents Considered" because experts usually do

13  not list such documents.  [*Id.* at 181:22-25.]  The fact that he neglected to produce the document showing

14  his precise calculations is not "misconduct" justifying exclusion, much less a failure of methodology.

15  Moreover, it was an oversight remedied at his deposition.

16
17  **F.    Dr. Leonard's Analysis of the External Device Royalty Rate is Sufficient**

        Fujitsu next claims that Dr. Leonard's opinion regarding the external device royalty rate should be

18  excluded because Dr. Leonard failed to conduct a full *Georgia Pacific* analysis.  Fujitsu is wrong.  First, Dr.

19  Leonard was only obligated to rebut Mr. Meyer's report.  Because Mr. Meyer applied all *Georgia-Pacific*

20  factors to determine a royalty rate for cards, Dr. Leonard analyzed all factors in rebutting Mr. Meyer's

21  opinions and determining his own proper rate for cards.  But Mr. Meyer himself did not apply all *Georgia-*

22  *Pacific* factors to the determination of a royalty rate for external devices, and thus Dr. Leonard had no

23  obligation to do so.  Rather, he opined first that Mr. Meyer improperly included external devices in the

24  royalty base, and when saw the need to rebut one of Mr. Meyer's opinions regarding the royalty rate for

25  external devices, he did so.  [*See, e.g.*, Doc. #322-13, ¶ 91.]  Dr. Leonard then concluded that if external

26

27  ───────────────
    [16] In any event, both Dr. Leonard and Dr. Mangum presented alternative royalty rates for external devices. [Doc. #322-
28  14, Exhs. 7.1, 8, 10.2, 11.1, 13.2, 15.1, 16.1, 17.1; Doc. #322-13, Exh. 4.]

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   devices were part of the base, the ratio to the card royalty rate that Mr. Meyer used for his opinion was

2   sufficient.  [*Id.*, ¶ 105.]  As such, to the extent that Mr. Meyer applied the *Georgia Pacific* factors in

3   establishing a royalty rate for external devices, Dr. Leonard incorporated the same analysis when he applied

4   the same relative rate.   Dr. Leonard applied the correct methodology, and the fact that Fujitsu disagrees

5   with his conclusions does not mean his methods were unreliable under *Daubert*.

6   **G.**   **Dr. Leonard Does Not Assert a Technical Opinion on the CSIRO License**

7           Dr. Leonard has never offered a technical opinion regarding the CSIRO license.  Rather, he simply

8   reviewed the license, applied his knowledge of the scope of the license from his prior work on that case,

9   and offered his opinion.  Fujitsu's argument that Dr. Leonard did not consult a technical expert regarding

10  the scope of the CSIRO license is a red herring.  As Fujitsu's cited deposition testimony makes clear, Dr.

11  Leonard simply declined to speak to an expert on this topic "in the context of **this case**."  [Doc. #317, at

12  22:22] (emph. added).  That is because Dr. Leonard was already familiar with the technology in that case

13  based on his work on CSIRO litigation itself.  [Herring Decl., Exh. 6 at 269:12-16 ("I'm very familiar with

14  the technology covered by the CSIRO agreements.").]  Dr. Leonard was under no obligation to re-confirm

15  his prior knowledge on this subject, and Fujitsu cites no case law that would support the exclusion of this

16  knowledge simply because it was derived from a prior case.  Thus, Dr. Leonard's understanding of the

17  scope of the CSIRO license is not a "technical opinion," and should not be excluded.

18  **H.**   **Defendants' Experts Can Cite To Fujitsu's Prior License Offers to Defendants**

19          As discussed more fully in Defendants' response to Fujitsu's MIL no. IV above, Defendants'

20  experts were justified in citing Fujitsu's prior license offers to Defendants.  The experts do not rely on those

21  offers for any ultimate issues in this case, but rather to rebut Mr. Meyer's opinion by noting that Fujitsu has

22  offered to license the '769 patents to Defendants at a much lower rate than Mr. Meyer's proffered 5

23  percent, and at the exclusion of standalone external devices.  [Doc. #322-13 at ¶¶. 49, 60.]  Also, Fujitsu's

24  prior attempts to license indicate that Fujitsu has no policy or interest in maintaining monopoly on rights to

25  use the technology under the '769 Patent.  [Doc. #322-14 at 39:20-21.]  As such, Drs. Leonard and Meyer's

26  testimony on Fujitsu's prior license offers to Defendants should not be excluded.

27  **I.**   **Defendants' Experts Correctly Applied the FRAND Principle**

28          Fujitsu misstates Drs. Leonard and Mangum's opinions on the FRAND issue.  The experts did not,

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1   as Fujitsu claims, conclude that "a licensor who fails to license every possible infringer must therefore

2   license the patent for free."  Indeed, the experts did not conclude that a FRAND obligation existed, and

3   they did not conclude that the royalty rate in this case should be zero.  Rather, Defendants' experts simply

4   opine that, assuming a FRAND obligation exists in this case, Fujitsu's implicit grant of a royalty-free

5   license to a large number of other companies means that the FRAND rate (i.e., a non-discriminatory

6   license) would be zero, or that Fujitsu has not licensed on FRAND terms.  [Doc. #322-13 at ¶¶ 18, 53;

7   #322-14 at 37:6-10.]  This section in Fujitsu's motion is nothing more than an improper attempt to argue

8   the merits of the FRAND issue, and its motion here should therefore be denied.

9   **J.   Defendants' Experts' Intervening Rights Reports are Proper**

10         Each of Fujitsu's arguments regarding the intervening rights reports of Drs. Leonard and Mangum

11   is misguided and should be rejected.  Regarding Fujitsu's first argument, Dr. Mangum notes that prior to

12   issuance of the broadening reissue of the '769 patent, "D-Link had an in-house research and development

13   department, and that on or before July 2000, D-Link had personnel and facilities used for product design,

14   including chip design."  Further, D-Link began selling routers in the U.S. since January 2000 – seven

15   months prior to the reissuance of the '769 Patent.  [Doc. # 322-38 at 8.]  Dr. Mangum also detailed D-

16   Link's design, development, testing and commercialization processes, including for specific accused

17   products, during the pre-July 2000 period.  Moreover, Dr. Mangum separately discusses D-Link's

18   substantial investments in various categories of accused D-Link products.  [Doc. #322-38 at 9-11.]

19         Fujitsu's second argument misses the entire point of Drs. Leonard and Mangum's methodologies.

20   Both experts analyzed the pre-July 2000 investments on two types of products – wired cards and routers –

21   that Fujitsu accuses of infringement in this case.  And based on the experts' discussions with people within

22   NETGEAR and D-Link, these investments provided the foundation for all such products ever sold by

23   NETGEAR and D-Link.  [Doc. #322-39, ¶¶ 13-18; 322-38 at 8-12.]  Specifically, NETGEAR and D-Link

24   both made substantial investments to research and development, marketing, and sales of routers and wired

25   cards prior to July 2000, investments which carried over to the accused products.  [*Id.*]  Dr. Leonard's

26   opinion on this matter was informed by a conversation that he had with NETGEAR VP of Engineering

27   Derek Lam, as well as a review of Mr. Lam's deposition testimony.  [Doc. #322-39 at n. 2.]  Similarly, Dr.

28   Mangum's opinion on this matter was informed by Mr. Robert Lin, who started working with D-Link

REED SMITH LLP

A limited liability partnership formed in the State of Delaware

1  Corp. in 1990 and has personal knowledge of the R&D for card interface devices since the late 1990s, and

2  Mr. A.J. Wang, who has been the Chief Technology Officer at D-Link Systems since 2002.  [Doc. #322-38

3  at Exh. 2.]  Thus, Defendants' experts' analysis of this issue was sound and used a reliable methodology.

4         Fujitsu's next complaint is that Dr. Leonard did not properly tie NETGEAR's pre-reissue

5  marketing expenditures to the accused products.  That is simply not true: as paragraph 17 of his report

6  makes clear, Dr. Leonard aggregated NETGEAR's research and development, sales, and marketing

7  expenses from 1998 (the earliest available data) to the July 2000, and divided that number by the sales of

8  the accused product categories.[17]  Dr. Leonard's calculations are detailed in Exhibit 3 to his report.  [Doc.

9  #322-39.]  Based on this analysis, Dr. Leonard concluded that NETGEAR spent over $32 Million in R&D,

10 sales, and marketing for the accused product categories in this case prior to the reissue of the '769 Patent.

11 [*Id.*]  Thus, Dr. Leonard was justified in using those costs to determine whether NETGEAR made

12 substantial preparations before the reissue date.

13        The fourth issue Fujitsu raises, regarding analysis of whether Defendants recouped their

14 investment, is a discretionary factor that some courts analyze in weighing the equities.  However, such

15 information need not come from expert testimony, and the fact that the experts did not analyze this issue

16 does not make provide a basis for exclusion.   Finally, Fujitsu claims that it would be "inequitable" to allow

17 Drs. Leonard and Mangum to opine on intervening rights given certain deposition testimony and discovery

18 history.  First, "equity" is not the standard under *Daubert* or FRE 702.  Second, NETGEAR did in fact

19 provide sales, marketing, and R&D data to Fujitsu starting in 1998 – indeed, bates-stamped documents

20 showing this data form the basis for Dr. Leonard's entire opinion on this subject.  Similarly, D-Link

21 produced documents from as early as 1995 and offered Mr. Robert Lin who worked on D-Link's card

22 interface devices in the late 1990s for deposition.  Fujitsu had ample opportunity to explore this issue

23 during the discovery period.[18]

24

25 ───────────────

26 [17] Dr. Leonard's calculations here included hubs and switches, because at the time of Dr. Leonard's report, hubs and
   switches were accused products in this case.

27 [18] Fujitsu's request to exclude Appendix 1 of Dr. Mangum's "responsive" report should similarly be rejected.  As
   mentioned above, Dr. Mangum prepared Appendix 1 to summarize sales of the accused products by product categories.
   [Doc. #322:14].  Appendix 1 reflects the damage basis when absolute intervening rights or equitable rights are applied.

28

Date:  October 22, 2012

By: */s/ John P. Bovich*_____

John P. Bovich (CA Bar No. 150688)
E-mail:  jbovich@reedsmith.com
William R. Overend (CA Bar No. 180209)
E-mail:  woverend@reedsmith.com
Reed Smith LLP
101 Second Street, Suite 1800
San Francisco, CA 94105-3659
Telephone:  (415) 543-8700
Facsimile:  (415) 391-8269

Attorneys for Defendant NETGEAR, INC.

By: */s/ Duncan Palmatier*_____

Duncan Palmatier (CA Bar No. 116692)
E-mail:  dpalm@dpalmlaw.com
S.J. Christine Yang (CA Bar No. 102048)
E-mail:  cyang@sjclawpc.com
Victoria Der-Lung Hao (Pro Hac Vice)
E-mail:  vhao@sjclawpc.com
The Law Office of S.J. Christine Yang
17220 Newhope Street, Suites 101 & 102
Fountain Valley, CA 92708
Telephone:     (714) 641-4022
Facsimile:     (714) 641-2082

Attorneys For Defendants D-LINK
CORPORATION AND, D-LINK SYSTEMS,
INC.

By: */s/ David Enzminger*_____

David Enzminger (SBN: 137065)
Email: denzminger@winston.com
WINSTON & STRAWN LLP
333 S. Grand Avenue
Los Angeles, CA 90071-1543
Telephone:(213) 615-1700
Facsimile: (213) 615-1750

Jeffrey J. Phillips (Admitted Pro Hac Vice)
Email: jphillips@winston.com
Robert A. Calico III (Admitted Pro Hac Vice)
Email: rcalico@winston.com
Michael J. Forbes (Admitted Pro Hac Vice)
Email: mforbes@winston.com
WINSTON & STRAWN LLP
1111 Louisiana, 25th Floor

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

Houston, TX 77002
Telephone: (713) 651-2600
Facsimile: (713) 651-2700

Attorneys for Defendants BELKIN
INTERNATIONAL INC. AND BELKIN, INC.

REED SMITH LLP

A limited liability partnership formed in the State of Delaware